## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

OLYMPIA LEVINSON STIEGELE, )
            Plaintiff, ) **05    10677 MLW**
                          )
vs. )   Case No. _____
                          )
BERNARD C. BAILEY, PAUL T. )
PRINCIPATO, PETER NESSEN, )
THOMAS J. REILLY, DENIS K. )
BERUBE, B.G. BECK, CHARLES )
E. LEVINE, and WILLIAM K. AULET, )
                          )
          Defendants, )
                          )
and )
                          )
VIISAGE TECHNOLOGY, INC., )
                          )
         Nominal Defendant. )

RECEIPT #_____
AMOUNT $ 250
SUMMONS ISSUED 40
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. _____
DATE _____

MAGISTRATE JUDGE _____

### VERIFIED SHAREHOLDER DERIVATIVE
### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff files this Verified Shareholder Derivative Complaint and alleges on information and belief, except as to those allegations that pertain to Plaintiff, which are alleged on personal knowledge, as follows:

### NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by a shareholder of Viisage Technology, Inc. ("Viisage" or "Company") on behalf of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred from October 24, 2004 through

1

March 2, 2005 (the "Relevant Period") and that have caused substantial losses to Viisage and other damages, such as to its reputation, goodwill and ability to secure monies in the capital markets.

2.    This Court has jurisdiction pursuant to 15 U.S.C. §1331 in that federal securities law violations are alleged herein and thus a federal question exits, and Rule 23.1 of the Federal Rules of Civil Procedure authorizing derivative actions by shareholders to remedy Defendants' violations of state common law.

### JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

4.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a) in that many of the acts and the conduct constituting the violations of law complained of herein occurred in this District, and because Nominal Defendant Viisage maintains its principal executive offices in this District.

### SUMMARY OF THE ACTION

5.    Viisage creates technologies and services geared at creating difficulty to reproduce documents used in the making of driver's license for various states, and technology for authenticating documents and preventing identity theft.

6.    For many years, Viisage has not been able to run its business profitably. After a loss of $17.7 million in 2003, the Company found itself in dire financial straits in the first half of 2004. Its credit line with Commerce Bank had proved inadequate to its needs, and controlling shareholder Lau Acquisition Corp. ("Lau") had been forced

during 2003 to bail out Viisage by making loans totaling approximately $5 million pursuant to a $7 million credit facility entered into between Lau and Viisage in May 2003. Lau is controlled by the family of Defendant Denis Berube ("Berube"), the Chairman of the Company's Board of Directors.

7.     Viisage knew that its liquidity problems would be eased, and Lau relieved of its uncomfortable role as lender of last resort to a struggling enterprise, if Viisage could obtain a large and flexible credit line from a reputable bank. To do this, Viisage would have to present itself as a Company that was not constantly teetering on the edge of business failure, but rather as one which had turned the corner to profitability. The Defendants thus allowed implementation of a scheme to create an artificial profit in the third quarter of 2004, which ended on September 26, 2004. Such a profit would allow Viisage to accomplish its crucial goal of replacing its old inadequate credit line with a newer, more generous credit line.

8.     On October 26, 2004, the beginning of the relevant period, Viisage reported a net profit for the third quarter of 2004, its first corporate profit in three years. Turning the corner to apparent profitability had allowed Viisage to obtain and announce a new $25 million credit line, as to which Defendant Aulet, the C.F.O., boasted: "This new arrangement will not only give us valuable flexibility but will also reduce our rates of borrowing, significantly simplify our covenants, and increase yields on our money in the bank...." Viisage also announced that it was increasing its projections for EBITDA to $11.5 to $12.5 million for the 2004 year. (EBITDA is a key financial measure signifying earnings before deducting interest, taxes, depreciation and amortization).

3

9.     Unbeknown to shareholders and the capital markets, this third quarter profit had been artificially engineered by improperly recognizing corporate benefits, and deferring recognition of corporate expenses from the third quarter into the fourth quarter. The artificially rosy third quarter report was followed almost immediately by unusual and suspicious selling by insiders, including Lau.

10.    On February 7, 2005 Viisage stunned the capital markets and investors by reporting that in its fourth quarter it had returned to serious unprofitability. It reported unusual and disproportionate fourth quarter charges, many of which had plainly been improperly deferred from the third quarter or earlier periods. One such charge, in the amount of $2 million, related to a settlement payment in a case in which Viisage had been accused of misconduct in the procurement of a contract with the State of Georgia. Georgia was enjoined from making this payment in Viisage's third quarter of 2004, and the payment was adjudged unlawful due to fraud by Viisage in the fourth quarter. Given this circumstance, this prospective payment should have been the subject of a reserve against earnings by the beginning of the relevant period, and been deemed impaired no later than December 27, 2004, the date of the final court ruling. Nonetheless, Viisage remained silent regarding the financial impact of this matter until Feb. 7, 2005. Due to this and other events, Viisage said EBITDA for 2004 would be $8-9 million, not the $11.5 to $12.5 million previously forecast, and that its loss for the year would be $7-8 million.

11.    On March 2, 2005, Viisage announced more bad news. Its loss for the fourth quarter of 2004 was an astounding $5.2 million. In addition, Viisage stunned the markets with the following announcement:

4

In connection with the preparation of the Company's consolidated financial statements for the year ended December 31, 2004, **the Company determined that it had an internal control deficiency that constitutes a "material weakness"** as defined by the Public Company Accounting Oversight Board's Accounting Standard No. 2. **The Company has concluded that it had insufficient personnel resources and technical accounting expertise within the accounting function to resolve non-routine or complex accounting matters. As a result, management will be unable to conclude that the Company's internal controls over financial reporting are effective as of December 31, 2004.** Therefore, BDO Seidman LLP, the Company's external accounting firm, will issue an adverse opinion with respect to the effectiveness of the Company's internal controls over financial reporting. In addition, as part of the Sarbanes-Oxley Section 404 compliance review, the Company is in the process of reviewing all of its other key internal control processes as well. **While the evaluation is ongoing, management believes that it will likely conclude that the Company had significant deficiencies, which could constitute a material weakness, in the control processes around information technology systems as well.** (emphasis added).

### THE PARTIES

12.    Plaintiff Olympia Levinson Stiegele (hereinafter "Stiegele" or "Plaintiff") is and was at all times relevant hereto, an owner and holder of Viisage common stock. Stiegele is a citizen of Miami, Florida.

13.    Nominal Defendant Viisage delivers technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, providing access control and protecting personal privacy. The Company's business involves two related segments: secure credentials and biometrics. The secure credentials solutions segment involves the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies. The focus of the biometric technology solutions segment is

5

primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts.

14.    Defendant Bernard C. Bailey is the Company's President, Chief Executive Officer and serves as a Director.  As C.E.O., Mr. Bailey is responsible for ensuring that the financial statements and reporting processes, including the system of internal controls, are in compliance with GAAP and relevant rules, regulations and statutes.

15.    Defendant William K. Aulet is a Senior Vice-President and Chief Financial Officer.  As C.F.O., Mr. Aulet responsible for ensuring that the financial statements and reporting processes, including the system of internal controls, are in compliance with GAAP and relevant rules, regulations and statutes.

16.    Defendant Paul T. Principato has served as a Director of Viisage since May, 2001.  Additionally, Mr. Principato serves as the Chief Financial Officer of non-party Lau Acquisition Group, the largest shareholder of Viisage and until the fourth quarter of 2004, Viisage's source of last resort for liquidity.

17.    Defendant Peter Nessen has served as a Director of Viisage since its incorporation in May, 1996.  Defendant Nessen was the Chairman of Viisage's Audit Committee during the relevant time period.  As a member of the Audit Committee, Mr. Nessen has the responsibility of overseeing the Company's accounting, financial reporting, data processing, regulatory and internal control environments. This responsibility includes, but is not limited to:  (1) serving as an independent and objective body to monitor the Company's financial reporting process and internal control system; (2) evaluate the Company's financial reporting and compliance with laws and

6

regulations; and (3) oversee management's establishment and enforcement of financial policies.

18.    Defendant Thomas Reilly has served as a Director of Viisage since its incorporation in 1996. Defendant Reilly also served on Viisage's Audit Committee during the Relevant Period. As a member of the Audit Committee, Mr. Reilly has the responsibility of overseeing the Company's accounting, financial reporting, data processing, regulatory and internal control environments. This responsibility includes, but is not limited to: (1) serving as an independent and objective body to monitor the Company's financial reporting process and internal control system; (2) evaluate the Company's financial reporting and compliance with laws and regulations; and (3) oversee management's establishment and enforcement of financial policies.

19.    Defendant Denis K. Berube has served as Chairman of the Board of Directors of Viisage since the Company's incorporation in 1996. In addition, Viisage entered into a consulting agreement with Mr. Berube under which he receives additional annual compensation of $125,000. Further, Mr. Berube is the Executive Vice-President and Chief Operating Officer of Lau Acquisition Group. Berube's spouse also receives $125,000 annually as a consultant to Viisage. Further, combining both his and his spouse's holdings in Lau, makes them the *de facto* controllers of Lau and Viisage.

20.    Defendant G. B. Beck has served as a Director of Viisage since February, 2004. Mr. Beck also has a consulting agreement with Viisage under which he receives additional annual compensation of $300,000. Further, Mr. Beck is the beneficial owner of more than 5% of Viisage's outstanding shares of common stock. Beck also holds a promissory note with a face value of $15.3 million.

7

21.     Defendant Charles E. Levine has served as a Director of Viisage since 1998. Defendant Levin also served on Viisage's Audit Committee during the Relevant Period.   As a member of the Audit Committee, Mr. Levine has the responsibility of overseeing the Company's accounting, financial reporting, data processing, regulatory and internal control environments. This responsibility includes, but is not limited to:  (1) serving as an independent and objective body to monitor the Company's financial reporting process and internal control system; (2) evaluate the Company's financial reporting and compliance with laws and regulations; and (3) oversee management's establishment and enforcement of financial policies.

22.     Defendants Bailey, Principato, Nessen, Reilly, Berube, Beck, Levine and Aulet are referred to collectively as "Individual Defendants."

23.     Defendants Bailey, Principato, Nessen, Reilly, Berube, Beck and Levine are referred to collectively as "Director Defendants."

24.     Non-party Lau Acquisition Corp. ("Lau"), d/b/a Lau Technologies, beneficially owns approximately 13.8% of the Company's stock. The Company has significant relationships with Lau, including two (2) directors being part of Lau's senior management team. Also, the Company had previously acquired Lau Security Systems from Lau, which resulted in the large ownership interest that Lau has in Viisage, the consulting agreement for Berube, and other financial ties.   Prior to the offering described below, Lau provided the Company with a credit facility in an aggregate principal amount of $7.3 million, which was secured by some of the Company's assets.

25.     As officers and directors and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the

8

Exchange Act, and which were publicly traded and governed by the provisions of the federal securities laws, the Individual Defendants had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, and product development, and to correct any previously-issued statements which had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

26.    The current Board of Directors of Viisage, and the Board of Directors at the time this lawsuit was filed, consists of nine (9) members: Bailey, Principato, Nessen, Reilly, Berube, Beck, Levine and non-Party/non-Defendants Harriet Mouchly-Weiss and Christoph von der Malsburg. Seven (7) of the Directors, Bailey, Principato, Nessen, Reilly, Berube, Beck and Levine, have been named as Defendants herein. As further alleged herein, the Board is incapable of making an impartial determination as to whether to institute legal proceedings to redress the wrongful conduct alleged herein because there is a substantial likelihood that its members would be found liable for non-exculpatory breaches of their fiduciary duties to the Company and shareholders by intentional misconduct and/or completely failing to perform their oversight duties to the Company, failing to oversee the Company's compliance with legally mandated disclosure standards and the systemic failure to assure that a reasonable information and reporting system existed. The Directors are also incapable of making an impartial decision concerning whether to institute legal proceedings against Individual Defendants because of their extensive personal and business entanglements because

of the Berube family's domination and control of the Board, the Director Defendants

reasonable likelihood of being liable to the Company and the other financial connections

between certain Director Defendants and the Company outlined more fully below.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27.    By reason of their positions as officers, directors and/or fiduciaries of

Viisage and because of their ability to control the business and corporate affairs of

Viisage, the Individual Defendants owed Viisage and its shareholders fiduciary

obligations of trust, loyalty, good faith and due care, and were and are required to use

their utmost ability to control and manage Viisage in a fair, just, honest and equitable

manner.  The Individual Defendants were and are required to act in furtherance of the

best interests of Viisage and its shareholders so as to benefit all shareholders equally

and not in furtherance of their personal interest or benefit.

28.    Each director and officer of the Company owes to Viisage and its

shareholders the fiduciary duty to exercise good faith and diligence in the administration

of the affairs of the Company and in the use and preservation of its property and assets,

and the highest obligations of fair dealing.  In addition, as officers and/or directors of a

publicly held company, the Individual Defendants had a duty to promptly disseminate

accurate and truthful information with regard to the Company's revenue, margins,

operations, performance, management, projections and forecasts so that the market

price of the Company's stock would be based on truthful and accurate information.

29.    The Individual Defendants, because of their positions of control and

authority as directors and/or officers of Viisage, were able to and did, directly and/or

indirectly, exercise control over the wrongful acts complained of herein, as well as the

contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Viisage, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Viisage.

30.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Viisage, and was at all times acting within the course and scope of such agency.

31.    To discharge their duties, the officers and directors of Viisage were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Viisage were required to, among other things:

- a. Refrain from acting upon material inside corporate information to benefit themselves;

- b. Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- c. Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- d. Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- e. Remain informed as to how Viisage conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection

11

> therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

> f.    Ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

32.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Viisage, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33.    The Individual Defendants breached their duties of loyalty and good faith by allowing the other Defendants to cause or by themselves causing the Company to misrepresent its condition and business prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of the Individual Defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, Viisage has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

12

      a.      Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

      b.      Costs incurred in investigating and defending Viisage and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

34.    Moreover, these actions have irreparably damaged Viisage's corporate image and goodwill. For at least the foreseeable future, Viisage will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Viisage's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

36.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow Defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Viisage and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Viisage, regarding the Individual Defendants' management of Viisage's operations, the Company's financial

health and stability, and future business prospects. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

37.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least October, 2004, and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that Viisage was misrepresenting its performance from operations and business prospects.

38.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Viisage common stock so they could: (i) dispose of over $1 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

## SUBSTANTIVE ALLEGATIONS

39.     Prior to the commencement of the Relevant Period, Viisage had expanded its operations and had incurred high interest rate loans to finance its operations and acquisitions, including loans from Lau, which became the Company's lender of last resort

40.     On February 14, 2004, the Company acquired Trans Digital Technologies from B.G. Beck. In connection with the acquisition, Viisage issued a promissory note to

Beck in the amount of $15.3 million and entered into the consulting agreement referenced above.

41.    In addition to the funds owed to Beck and Lau, the Company also had loans outstanding to Commerce Bank. The outstanding debt included:

| Lender | Due Date | Interest Rate | Amount |
|---|---|---|---|
| B.G. Beck | 12/1/2005 | 8.50 % | $15,300,000 |
| Commerce | 3/11/2006 | 6.25 % | $1,612,000 |
| Commerce | 6/20/2006 | 8.00 % | $2,053,000 |
| Commerce | 2/27/2007 | 7.30 % | $2,924,000 |
| Commerce | 6/24/2007 | 5.25 % | $901,000 |
| Commerce | 12/31/2007 | 5.25 % | $1,394,000 |
| Commerce | 4/24/2008 | 5.25 % | $1,191,000 |
| Lau | 8/30/2005 | 8.50 % | $1,014,000 |
| Lau | 5/30/2008 | 8.50 % | $2,249,000 |
| Lau | 6/30/2009 | 8.50 % | $1,673,000 |
| | | | $30,311,000 |

42.    In a follow-on public offering on August 5, 2004, the Company sold 7.2 million shares at $5.50 a share and raised approximately $37.4 million. Approximately $30.3 million of these proceeds were used to repay debt, including debt owed to Lau and Beck. This offering, while easing the Company's immediate liquidity issues, did not solve all of its problems. For one thing, as a result of the offering share price, the offering markedly depressed the market price of Viisage shares. In addition, the Company still lacked adequate working capital or credit facilities; the credit agreement with Commerce Bank was too restrictive for Viisage's needs, and it did not provide for all of its credit requirements. As a result, Lau and Berube had become the lenders of last resort for Viisage. These defendants did not want to continue in their role as lenders of last resort, and thus the defendants hatched a scheme to portray the Company as very successful, and profitable, so as to secure a credit line from another lender, and relieve Lau and

Berube of any concerns that they would be forced to fund what was, in truth, a struggling company.

43. Thereafter, the defendants launched a scheme to flood the market with highly positive information concerning Viisage, in order to pump up the Company's depressed stock price. Thus, in a conference with analysts on October 25, 2004, the defendants portrayed Viisage as on track, and profitable. They represented that the Company's costs were under control, and that the Company's future performance would be even better than in the third Quarter of 2004. There was no disclosure of material negatives, including the true facts and costs concerning the Georgia license litigation, discussed below, material accounting deficiencies which plagued the Company, of which the Individual Defendants must have been aware, and the failure to disclose the nature and extent of compliance costs associated with the Sarbanes-Oxley Act of 2002, which had imposed new corporate governance responsibilities upon public companies. Individual Defendants omitted to disclose a real likelihood that very material contracts expected to be finalized in the fourth quarter of 2004 would not be finalized; that the Company's legal fees would skyrocket by $500,000 in the fourth quarter; or that the Company's increased overseas business would likely result in a loss of a like amount due to weakness in the dollar. On October 25, 2004, the Company announced financial results for the Third Quarter of 2004. Revenues for the third quarter of 2004 totaled $19.91 million, marking the fifth consecutive quarter in which revenues set a Company record, up 97% from $10.11 million in the comparable period last year, as reported in accordance with the change in accounting principle described below. **The Company also reported news certain to impress shareholders and lenders: Viisage had returned to profitability, reporting its first profitable quarter in years.** The net income for the

16

third quarter of 2004 was $198,000, or $0.00 on a basic and diluted share basis, compared to a net loss of $389,000, or $0.02 per basic and diluted share, for the third quarter of 2003.

44.    In an Analysts' Conference that day, Individual Defendant Bailey stated in relevant part:

> We are certainly exceedingly pleased with our results for this quarter. For the fifth straight quarter we are reporting record quarterly revenues. At $19.9m our revenues are up 97 percent on a year-over-year basis. I am also pleased to report that we produced a profitable quarter with earnings of almost $200,000. At the same time, we have generated a record level of EBITDA. At $3.4m this quarter our EBITDA was up more than 110 percent from the previous year's quarter.
>
> These financial results are certainly a testament to our continued focus on delivering profitable revenue growth for our shareholders, while effectively managing our cost structure. I also think these results speak very well to the momentum we are building, both for the rest of this year, as well as leading us into 2005.
>
> The results we have already produced and the opportunities ahead of us provide us with the confidence today to increase our 2004 annual revenue and EBITDA guidance.

Defendant Bailey touted the Company's new credit line:

> This past quarter we also put a great deal of effort into improving the long-term financial health of our Company. Our follow-on offering allowed us to increase our cash position from $12.6m to more than $37m, while at the same time reducing our outstanding debt from $29.8m to $19.2m. *This improved financial health has allowed us to secure a $25m line of credit with the leading financial institution, Citizens Bank, which will give us even greater financial flexibility to build our Company going forward.*

Defendant Aulet was reported to have said:

> As Bernard mentioned, for the third quarter of 2004 we experienced robust revenue growth. Revenues for the recently completed quarter were $19.91m, a fifth consecutive record quarter.
>
> In addition, these systems will provide the foundation for ongoing higher margin revenue streams in the future, specifically in the area of consumables. The gross margin percentages on these production systems

was within the mid-teens range and, therefore, are adding to the absolute gross margin they did go down the overall gross margin percentage for the Company in the quarter.

Of the 97 percent year-to-year growth rate, organic growth represented approximately one-third demonstrating that not only are our acquisitions already contributing significantly to our top line growth but we are experiencing healthy organic growth in our core business, as well.

Equally as important to our top line growth is our net income. We are proud to announce the first GAAP profit in three years with $198,000 of net income, or essentially breakeven on a basic and diluted share basis, demonstrating our commitment to attaining this important long-term goal. We've been steadily improving our performance in the bottom line, and in the first quarter we had a loss of slightly over $1m. Last quarter this has been reduced to a loss of $17,000. This quarter we crossed the breakeven line to be net income positive. For a year-to-year comparison purposes in the last year's third quarter the Company recorded a loss of $390,000 or 2 cents per share on a basic and diluted basis. We are pleased with our progress here.

Defendant Aulet further stated:

The gross profit margins we indicated on the last conference call that they would decrease due to the Department of Defense, our production systems, anticipated in this quarter. As projected, this became a reality this quarter as our gross margins decreased to 28 percent from 31 percent in this year's second quarter, and down from a record 33 percent in last year's third quarter. This is a reflection of product mix. We anticipate a substantial number of tax reductions to shift in the fourth quarter, as well, albeit at a slightly lower total volume.

Even so, we see that investments we have made in improving our product offerings and efficiencies in delivery should make this just completed quarter a temporary depression in gross margin percentage. We are confident that these efforts to increase gross margin going forward will pay dividends in the near term. In fact, as we look forward to our pipeline for the next quarter and the productivity improvements we have made even with the significant component of common access card production systems in the quarter's revenue we believe we are poised for significant overall gross margin improvement that will not only return us to the margins we saw earlier this year but allow us to potentially exceed them.

Defendant Aulet stressed the importance of the new credit facility:

> As Bernard mentioned, we're pleased to announce as well today that we have received a commitment letter from a major bank for a $25m line of credit to replace our existing bank facilities. This new arrangement will not only give us valuable flexibility but will also reduce our rates of borrowing, significantly simplify our covenants, and increase yields on our money in the bank, all while making our G&A operations more productive by providing services locally and worldwide to meet our rapidly evolving needs.
>
> In the fourth quarter we will be able, if we so choose, to reduce our outstanding debt quite significantly, and after paying off early prepayment fees save approximately $600,000 a year in interest expense. We will be monitoring this closely, and our actions will be affected directly by our M&A program. But in any case, we have new financial flexibility that will be very valuable to support our growth, as well as being highly cost effective.

Significantly, defendant Aulet raised the Company's guidance for Fiscal 2004:

> Now, I'd like to discuss our annual guidance for 2004. In early May, based upon the strength of our pipeline business we raised annual guidance to 60m to 63m, and our EBITDA guidance for 2004 to 11m to 12m. **At this time, we are comfortable raising this guidance *yet again* to revenue of $66m to $68m for 2004, up approximately 10 percent, and EBITDA of 11.5m to 12.5m for the year.**

45.    On December 27, 2004, the Company issued a press release concerning

the dispute over the award of the Georgia state drivers license contract, which stated:

> "Viisage learned today that the Georgia court has issued a summary judgment ruling permitting the state to move forward in its rebid of the state's drivers' license contract and permitting Viisage to compete to retain its contract with the state. We are pleased that the state will finally be permitted to begin the rebid process and that the judge has agreed with us and the state on virtually all aspects of the summary judgment motions," said Bernard Bailey, president and CEO, Viisage. "Contrary to statements made by our competitor in an earlier press release, the court did not disallow the 2002 award of the contract to Viisage. The court merely acknowledged that the state and Viisage had entered into a settlement agreement under which the state terminated the drivers' license contract with Viisage for convenience and was to pay Viisage a $2.5 million settlement payment, all as previously announced by Viisage. However, the court has ruled that the state cannot pay $2 million of that settlement payment. Without this payment, Viisage believes that either the settlement

agreement with the state is not effective and that Viisage's contract with the state remains in place or that Viisage's initial claim for an $8.2 million settlement payment is revived. While we are very pleased with the overall result, we are disappointed and strongly disagree with this and certain other elements of the court's ruling, including statements of disputed fact which we believe are not appropriate in a summary judgment ruling, and intend to appeal."

46.    On February 7, 2005, the Company began to admit the truth:  that its stellar performance was overstated and that there were significant negatives which the Individual Defendants had failed to reveal.  In a press release the Company revised its previous guidance on fiscal 2004 financial performance, stating in relevant part:

> Earnings before interest, taxes, depreciation and amortization (EBITDA) and net income are expected to fall below guidance. The expected shortfall is primarily due to several non-recurring factors, including a non-cash impairment charge of $2 million in connection with a settlement involving the Company's previous drivers' license contract with the Georgia Department of Motor Vehicle Safety, which had been litigated. This charge was a result of a judge's ruling in the fourth quarter, which the Company is currently appealing.
>
> In issuing its results for the third quarter of 2004 on October 25, 2004, the Company had increased its guidance for 2004, anticipating revenues for the full year in the range of $66-68 million, with EBITDA between $11.5-12.5 million, while maintaining net income guidance as a loss of $1.5 million for the year.
>
> Based upon the preliminary review of its financial results for the year, Viisage now expects revenues of approximately $66-67million, and EBITDA of approximately $8-9 million.  Net income, which includes the $2 million impairment charge related to the terminated Georgia contract, is anticipated to be a loss of approximately $7-8 million.  The primary drivers of the shortfall in operating performance are related to non-recurring charges, timing associated with contracts and a temporary increase in certain operating expenses.   Viisage believes that these results do not reflect  a  change  in  the  underlying  fundamentals  of  the  business. Specifically, fourth quarter results were impacted by the following:
>
> -- **Georgia** -- the non-cash write-down of certain assets related to the terminated Georgia contract reduced pre-tax income by $2 million in the fourth quarter but did not affect EBITDA.

-- **Tax Liability** -- in the fourth quarter, the Company filed an election under Internal Revenue Tax Code Section 338(h)10 to treat its acquisition of TDT as an asset transaction for tax purposes. This election may generate approximately $8.5 million of future tax benefits. In connection with this election, an initial deferred tax asset of approximately $900,000 was created. Based on Viisage's history of tax losses, the Company had to provide approximately $900,000 for a valuation reserve against the deferred tax asset in the fourth quarter. This provision did not affect EBITDA.

-- **Timing** -- deliveries on several substantial, high margin contracts, including a State of Florida Department of Highway Safety document authentication contract and a major European border management project, slipped from the fourth quarter of 2004 into the first half of 2005. This resulted in revenue and an overall lower margin revenue mix for the quarter. Viisage estimates that these contracts would contribute more than $1 million of gross profit directly affecting EBITDA and net income in the fourth quarter.

-- **Sarbanes-Oxley Section 404 Compliance** -- despite work undertaken in prior quarters, Viisage experienced higher than anticipated costs related to its Sarbanes-Oxley compliance efforts. In the fourth quarter alone, compliance-related costs totaled $550,000. These expenses are expected to decrease dramatically going forward.

-- **Currency** -- Viisage experienced a significant negative impact from the weak dollar, resulting in an approximately $500,000 decrease in EBITDA and net income in the fourth quarter. In light of the continued growth in its overseas revenue, the Company is considering various ways of mitigating future currency risks.

-- **Legal and Other Charges** -- there were a number of charges in the fourth quarter related to specific legal matters that are now completed or winding down, as well as severance payments, that together totaled approximately $500,000.

The Georgia drivers' license contract litigation has concluded with the state planning to conduct a new procurement for its drivers' license program. However, the status of Viisage's previously-awarded $2.5 million settlement from the state in connection with the termination of the contract has not been resolved. While the state has agreed to pay the amount to Viisage, the presiding judge reduced that payment by $2 million in her December summary judgment ruling. Viisage believes that it is appropriate to take a non-cash write-down of $2 million in the fourth quarter of 2004 for an impairment charge to assets currently on its balance sheet, although the

Company continues to maintain the validity of its position in terms of the settlement and is appealing the judge's ruling.

47.    On March 2, 2004, the Company reported financial results for the Fourth

Quarter and Fiscal 2004. The press release confirmed the Company's failure to meet

previous guidance. The release stated in relevant part:

Viisage a leading provider of advanced technology identity solutions, today reported final results for its fourth quarter and year ended December 31, 2004. For the fourth quarter, revenues were $19.0 million, an 84 percent increase over $10.3 million in the same period last year. *The net loss for the fourth quarter of 2004* was $5.2 *million,* or $0.11 per fully diluted share, which includes the impact of the previously disclosed $2 million impairment charge of contract assets related to the terminated State of Georgia drivers' license contract, and a $900,000 non-cash deferred tax expense. In the 2003 fourth quarter, the Company reported a net loss of $1.4 million or $0.06 per fully diluted share. The 2004 fourth quarter results include the contribution from the acquisition of Imaging Automation, Inc. (iA), which was completed on October 5, 2004.

For the full year 2004, revenues were $67.5 million, an 81 percent increase over revenues of $37.4 million in 2003. *The Company's net loss for 2004 was $7.0 million,* or $0.18 per basic and diluted share, compared to a net loss of $17.7 million, or $0.82 per fully diluted share, in the prior year, which includes the impact of the one-time charge of $12.1 million or $0.56 per share that the Company recorded in connection with a change in accounting principle. On December 30, 2003, Viisage adopted new accounting rule EITF 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," which pertains to revenue recognition for certain long-term contracts, such as Viisage's state drivers' licenses contracts, retroactive to January 1, 2003.

48.    On February 7, 2005, Viisage announced preliminary results for the fourth

quarter of 2004, indicating that while the Company achieved its revenue guidance, its

net income and EBITDA fell short of expectations reflecting a number of primarily non-

recurring factors.    The Company issued the following guidelines for Fiscal 2005:

Financial Outlook for 2005:

On an annual basis, Viisage expects to increase total revenues by approximately 8-19 percent over 2004, resulting in revenues in a range of

22

$73-80 million.  For the first quarter of 2005, the Company is anticipating revenues between $15-17 million, reflecting transitions on several large contracts.  The Company is not sharing specific EBITDA targets, although it anticipates remaining cash flow positive and continuing to increase its cash generation in 2005, compared to 2004. The Company also expects to reach profitability during 2005, excluding the impact of stock option expensing which will commence as of July 1, 2005.

The Company revealed material accounting deficiencies:  Sarbanes-Oxley Compliance:

In connection with the preparation of the Company's consolidated financial statements for the year ended December 31, 2004, **the Company determined that it had an internal control deficiency that constitutes a 'material weakness'** as defined by the Public Company Accounting Oversight Board's Accounting Standard No. 2.  **The Company has concluded that it had insufficient personnel resources and technical accounting expertise within the accounting function to resolve non-routine or complex accounting matters. As a result, management will be unable to conclude that the Company's internal controls over financial reporting are effective as of December 31, 2004.** Therefore, BDO Seidman LLP, the Company's external accounting firm, will issue an adverse opinion with respect to the effectiveness of the Company's internal controls over financial reporting. In addition, as part of the Sarbanes-Oxley Section 404 compliance review, the Company is in the process of reviewing all of its other key internal control processes as well.  **While the evaluation is ongoing, management believes that it will likely conclude that the Company had significant deficiencies, which could constitute a material weakness, in the control processes around information technology systems as well.** The Company is in the process of remediating the material weakness and significant deficiencies, and has devoted substantial resources to assess and take concrete steps to strengthen these internal controls. Management believes that the indicated control deficiencies do not affect the Company's financial strength or business prospects.

49.    As a result of the Company's announcement on February 7, 2005 which shocked the market, the Company's stock dropped from $7.27 on February 7, 2005 to $5.91 on February 8, 2004, on greatly increased trading of 4.6 million shares.   In reaction to the press release on March 3, 2005, which also shocked the market, the Company's stock dropped from $5.47 to $4.50 on greatly increased trading of 6.2 million shares.  The declines in the Company's stock price as a result of the revelations of the

23

true facts concerning the Company's performance resulted in a 38.10 percent decline of shareholder value. As a result the market value of Viisage declined by approximately $131 million upon the full revelation of the fraud.

50. The statements set forth above in the above paragraphs were materially false and misleading, because Individual Defendants were aware or should have been aware of the substantial negatives concerning the Company.

51. Individual Defendants' representations concerning the court decision on the Georgia state license dispute were materially false and misleading, in that the Individual Defendants knew that the disputed $2 million payment would likely never be paid. In addition, the Individual Defendants failed to reveal that the court held that Viisage had engaged in misconduct in order to procure this key contract. For one thing, it was found that there was no issue of material fact that Viisage had committed acts of misrepresentation, including representing to the State of Georgia that it had a back-up card production facility, which representation was knowingly false when made. It was also found that Viisage engaged in inappropriate and unauthorized communications with certain Georgia State employees after a premature reading of the price proposals regarding the license contract bid. Further, it was clear from the Court's opinion that there could have been no reasonable expectation that the $2 million which Viisage claimed it was owed under the settlement agreement with Georgia would ever be paid.

52. Viisage knew it had committed wrongdoing in connection with the State of Georgia bid. It should have reserved for the $2 million payment at least by the start of the Relevant Period, if not long before that. Following the Court's ruling, there was no excuse for Viisage's prolonged failure to announce a $2 million impairment charge,

especially as its financial statements were rendered plainly wrong and misleading by the court's ruling. During the period between the summary judgment opinion, and the write-down announcement, millions of Viisage shares changed hands at inflated prices. Viisage obscured the import of the Court's ruling by issuing a press release placing a false positive spin on that ruling.

53.    It may be reasonably inferred that the Court finding that Viisage had engaged in improper conduct in connection with the Georgia bidding process impaired the Company's ability to close new contracts, and indeed Viisage was having difficulty closing contracts in the fourth quarter of 2004. This too was not revealed in a timely fashion. Moreover, the various charges that seem suddenly to have cropped up in the fourth quarter were, in truth and in fact, largely deferred from previous quarters in order to create a false impression that Viisage had returned to profitability. Indeed, once Viisage had achieved its goals, including securing the crucial $25 million credit line, Viisage returned to its usual course--unprofitability. The fourth quarter loss alone was an astounding $5.2 million, compared with losses of only $1.8 million in the first three quarters of the year. The artificially rosy third quarter report was followed almost immediately by unusual and suspicious selling by insiders, including Lau.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

54.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through fifty-three (53) above, the same as set forth fully herein.

55.    Plaintiff brings this action derivatively in the right and for the benefit of Viisage, to redress injuries suffered and to be suffered by Viisage as a direct result of

the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Viisage is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

56.    Plaintiff will adequately and fairly represent the interests of Viisage in enforcing and prosecuting its rights.

57.    Plaintiff was owner of the stock of Viisage during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains shareholders of the Company.

58.    The current Board of Directors of Viisage consists of the following nine (9) individuals: Defendants Bailey, Principato, Nessen, Reilly, Berube, Beck and Levine, along with non-parties, Mouchly-Weiss and von der Malsburg. Plaintiff has not made any demand on the present Board of Directors of Viisage to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

59.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the Director Defendants knew the adverse non-public information which made the representations made by the Company false and misleading. While in possession of this material adverse non-public information regarding the Company, the following current members of the Viisage Board participated in the illegal insider selling and other transactions; and

26

a.      During the Relevant Period, Berube benefited from Lau's sale of 345,000 shares of Viisage stock for total proceeds exceeding $2.8 million. Because Berube and his spouse are the controlling shareholders of Lau, it is reasonable to infer that Berube personally benefited from this sale. Because Defendant Berube received a personal financial benefit from the challenged insider trading transactions this Defendant is interested and any demand upon him is futile;

b.      During the Relevant Period, Defendant Beck received a payment of principal and interest equaling one-third of $15.3 million, with the balance to be paid in equal installments on May 1, 2005 and December 1, 2005. Because this Defendant received a personal financial benefit from the challenged transaction, this Defendant is interested and any demand upon him is futile;

c.      The Audit Committee of the Board oversees the Company's accounting, financial reporting, data processing, regulatory and internal control environments.   The primary duties and responsibilities of the Audit Committee include, but are not limited to:  (1) serving as an independent and objective body to monitor the Company's financial reporting process and internal control systems; (2) evaluating the Company's financial reporting and compliance with laws and regulations; (3) overseeing management's establishment and enforcement of financial policies. Because the Company has admitted to material weaknesses in its internal controls and accounting systems, it is self-evident that the Audit Committee failed in its obligations.  Because Defendants Nessen, Reilly and Levine served on the Audit Committee and now face the reasonable likelihood of liability because of their failure, demand on Defendants Nessen, Reilly and Levine is futile;

d.      A majority of Viisage's Board of Directors and senior management participated in the wrongs complained of herein.  Viisage's directors are not disinterested or independent due to the following:  Bailey, Principato, Nessen, Reilly, Berube, Beck and Levine served on the Board during the Relevant Period.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above-referenced Defendants breached the fiduciary duties that they owed to Viisage and its shareholders in that they failed to prevent and correct material misrepresentations made by the Company.  Further, Defendants Bailey, Principato, Berube and Beck are not independent because of their stake in the financial performance of the Company because Bailey is the Company's C.E.O., Berube and Principato are executives with Lau, and Beck is owed money via an outstanding promissory note.

## SECOND CAUSE OF ACTION

### <u>Against All Defendants for Breach of Fiduciary Duty</u>

66.     Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through sixty-five (65) above, the same as set forth fully herein.

67.     The Individual Defendants owed and owe Viisage fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Viisage the highest obligation of good faith, fair dealing, loyalty and due care.

68.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

69.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

70.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Viisage has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

71.     Plaintiff, on behalf of Viisage, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### **Against All Defendants for Abuse of Control**

72.     Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through seventy-one (71) above, the same as set forth fully herein.

73.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Viisage, for which they are legally responsible.

74.     As a direct and proximate result of the Individual Defendants' abuse of control, Viisage has sustained significant damages.

75.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

76.     Plaintiff, on behalf of Viisage, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### **Against All Defendants for Gross Mismanagement**

77.     Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through seventy-six (76) above, the same as set forth fully herein.

78.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Viisage in a manner consistent with the operations of a publicly held corporation.

79.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Viisage has sustained significant damages in excess of tens of millions of dollars.

80.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

81.    Plaintiffs on behalf of Viisage have no adequate remedy at law.

### FIFTH CAUSE OF ACTION

### **Against All Defendants for Waste of Corporate Assets**

82.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through eight-one (81) above, the same as set forth fully herein.

83.    As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the Individual Defendants have caused Viisage to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

84.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

85.    Plaintiff, on behalf of Viisage, has no adequate remedy at law.

## SIXTH CAUSE OF ACTION

### Against All Defendants for Unjust Enrichment

86.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through eighty-five (85) above, the same as set forth fully herein.

87.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Viisage.

88.    Plaintiff, as shareholder and representative of Viisage, seeks restitution from the Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Defendants, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Individual Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.    Awarding to Viisage restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: April 5, 2005

Alan L. Kovacs (BBO No. 278240)
LAW OFFICE OF ALAN L. KOVACS
2001 Beacon Street Suite 106
Boston MA 02135
Phone: (617) 964-1177/Fax: (617) 332-1223

and

William B. Federman
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK  73102
Phone: (405) 235-1560/Fax: (405) 239-2112

and

Brian M. Felgoise
BRIAN M. FELGOISE, P.C.
The Pavilion
261 Old York Road
Suite 423
Jenkintown PA 19046
Phone: (215) 886-1900

Counsel for Derivative Plaintiff

I:\Viisage\Derivative\DerivativeComplaint.doc

## VERIFICATION

I, Olympia Levinson Stiegele, declare that I have reviewed the Derivative Complaint ("Complaint") prepared on behalf of Viisage Technology, Inc. and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Viisage Technology, Inc. common stock during the time in which the wrongful conduct alleged and complained of in the Complaint was occurring.

_Olympia Levinson Stiegele_
Olympia Levinson Stiegele

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) _Olympia Levinson Stiegle v. Bernard C. Bailey_

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

   ✓   I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

        II.     195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
                740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.            for patent, trademark or copyright cases

        III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                380, 385, 450, 891.

        IV.     220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660,
                690, 810, 861-865, 870, 871, 875, 900.

        V.      150, 152, 153.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
   Darquea v. Viisage Technology, Inc. et al, 05-Cv-10438-MLW

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   
   YES          NO    ✓

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
   
   YES          NO    ✓
   
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   
   YES          NO

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   
   YES    ✓     NO    ✓

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   
   YES          NO

        A.      If yes, in which division do all of the non-governmental parties reside?
                
                Eastern Division            Central Division              Western Division
        
        B.      If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
                
                Eastern Division            Central Division              Western Division

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)
   
   YES          NO

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME   Alan L. Kovacs, Esq.

ADDRESS   Law Office of Alan L. Kovacs, 2001 Beacon St., Suite 106, Boston, MA 02135

TELEPHONE NO.   617-964-1177

(CategoryForm.wpd  - 2/15/05)

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Olympia Levinson Stiegele | Bernard C. Bailey, Paul T. Principato, Peter Nessen, Thomas J Reilly, Denis K. Berube, B.G. Beck, Charles E. Levine, William K. Aulet and Viisage Technology, Inc. (Nominal Def) |

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Alan L. Kovacs, Esq., Law Office of Alan L. Kovacy, 2001 Beacon St., , Suite 106, Boston, MA 02135 (617) 964-1177

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332 (a)(1)

Brief description of cause:
Derivative Shareholder Action for breach of duties owed to corporation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)

JUDGE Wolf

DOCKET NUMBER 05-10438,10475,10498 et al

DATE
04/05/2005

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____