# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| OLYMPIA LEVINSON STIEGELE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 05-10677 (MLW) |
| | ) |
| BERNARD C. BAILEY, PAUL T. PRINCIPATO, | ) |
| PETER NESSEN, THOMAS J. REILLY, | ) |
| DENIS K. BERUBE, B.G. BECK, CHARLES | ) |
| E. LEVINE, and WILLIAM K. AULET, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| VIISAGE TECHNOLOGY, INC., | ) |
| | ) |
| Nominal Defendant. | ) |

**PLAINTIFF'S RESPONSE AND OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

II.   FACTUAL ALLEGATIONS ....................................................................................... 2

   A.   Parties 2

   B.   Viisage Announces Internal Control Deficiencies    2

   C.   The Fraudulent Scheme       3

   D.   The Georgia State License Litigation 5

   E.   A Majority of the Defendants Knew, or in the Absence of Extreme Recklessness Should
        Have Known, of the Company's Improprieties       7

   F.   The Defendant Directors Abdicated their Oversight Responsibilities        8

   G.   Defendants' Illegal Insider Stock Sales       8

III.  PLAINTIFF HAS ALLEGED FACTS SUFFICIENT TO DEMONSTRATE DEMAND
      FUTILITY.................................................................................................................... 9

   A.   Plaintiff has Alleged that a Majority of the Board is Disinterested   10

      1.   Each of the Defendant Directors Actively Engaged in Securities Fraud...................... 11

      2.   The Director Defendants Breached Their Duties of Good Faith by Abdicating their
           Oversight Responsibilities ................................................................................. 13

      3.   Breach of the Duty of Loyalty Through Insider Trading............................................ 16

   B.   Defendants Principato, Berube and Beck are not Independent       17

IV .  THE ARTICLES OF INCORPORATION DOES NOT PROTECT DEFENDANTS .... 18

V.    PLAINTIFF HAS ALLEGED INJURY TO VIISAGE................................................... 20

VI.   CONCLUSION............................................................................................................ 20

I:\Viisage\Derivative\ResponseMotionDismiss.doc

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Kinder Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003)..................................................16

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)..................................................................................9

*Beam v. Stewart*, 845 A.2d 1040 (Del. 2004). .......................................................................10, 17

*Brophy v. Cities Services Co*., 70 A.2d 5 (Del. Ch. 1949)......................................................11, 20

*Dollens v. Zionts*, 2002 WL 1632261 (N.D. Ill. July 22, 2002). ............................................10, 20

*Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001)...................................................................11

*Felker v. Anderson*, 2005 WL 602974 (W.D. Mo. Feb. 11, 2005)................................................14

*Fina v. Calarco Corp*., 2005 WL 3112894 (Conn. Super. 2005).................................................12

*Grimes v. Donald*, 673 A.2d 1207 (Del. 1996).............................................................................10

*Grobow v. Perot*, 539 A.2d 180 (Del. 1988) ................................................................................10

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003)..................................................................11, 13

*In re Abbott Laboratories Deriv. Litig.,* 325 F.3d 795 (7th Cir. 2003)...................................14, 19

*In re Caremark International, Inc. Deriv. Litig*., 698 A.2d 959 (Del. Ch. 1996)........................13

*In re Cendant Corp. Derivative Action Litigation*, 189 F.R.D. 117 (D.N.J. 1999) ...............13, 14

*In re Electronic Data Systems Corp. Sec. and "ERISA" Litig.,* 298 F.Supp.2d 554 (E.D.Tex. 2004).........................................................................................................................................14

*In re FirstEnergy Shareholder Deriv. Litig*., 320 F.Supp.2d 621 (N.D. Ohio 2004) ..................15

*In re Genta In. Sec. Litig*., 2005 WL 2416970 (D. N. J. Sept. 30, 2005) ....................................16

*In re Independent Energy Holdings PLC Sec. Litig*., 154 F. Supp. 2d 741 (S.D.N.Y. 2001) ......12

*In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917 (Del Ch. 2003)...................................................17

*In re Oxford Health Plans, Inc. Sec. Litig*., 192 F.R.D. 111 (S.D.N.Y. 2000)............................14

*In re Ply Gem Industries, Inc. Shareholders Litig.*, 2001 WL 755133 (Del. Ch. June 26, 2001) 19

I:\Viisage\Derivative\ResponseMotionDismiss.doc

*In re Polymedica Corp.*, 2002 WL 1809095 (Mass.Super. July 16, 2002) .................................. 16

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2nd Cir. 2001) .................................... 16

*In re Taser Int'l. Shareholder Deriv. Lit.*, 2006 WL 687033 (D. Ariz. March 17, 2006) ...... 12, 16

*In re Viacom Pharmaceuticals, Inc.*, 2005 WL 2989674 (E.D. Pa. July 1, 2005)........................14

*In re Vicuron Pharmaceuticals, Inc.*, 2005 WL 2989674 (E.D. Pa. July 1, 2005)....................... 16

*In re Walt Disney Company Derivative Litigation*, 825 A.2d 275 (Del. Ch. 2003) .................... 11

*Levine v. Smith*, 591 A.2d 194 (Del. 1991)................................................................... 9

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001)........................................................ 18

*McMullen v. Bearn*, 765 A.2d 910 (Del. 2000). ........................................................ 19

*McSparran v. Career Education Corp.*, 2006 WL 250698 (N.D. Ill. Jan. 27, 2006)............. 15, 16

*Mills Acquisition Co. v. MacMillan, Inc.* 559 A.2d 1261 (Del. 1989) ........................................ 13

*Oberly v. Kirby*, 592 A.2d 445 (Del, 1991). ............................................................... 20

*Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002)........................................................ 10

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ...................................................... 9, 10

*Rattner v. Bidzos*, 2003 WL 22284323  (Del. Sept. 30, 2003) .................................... 10

*Saito v. McCall*, 2004 WL 3029876 (Del. Ch. Dec. 20, 2004)............................................. 13, 14

*Schnall v. Annuity and Life Re (Holdings), LTD.*, 2004 WL 231439 (D. Conn. Feb. 4, 2004).... 12

*Seminaris v. Landa*, 662 A.2d 1350 (Del. Ch. 1995)................................................... 10

*Telxon Corp. v. Myerson*, 802 A.2d 257 (Del. 2002) ........................................... 17, 18

*Zimmerman v. Braddock*, 2005 WL 2266566 (Del. Ch. Sept. 8, 2005) ....................................... 16

## Other Authorities

Hillary A. Sale, *Delaware Good Faith*, 89 Cornell L. Rev. 456, 467 (January 2004) ........... 13, 18

Rethinking Corporate Federalism in the Era of Corporate Reform, 29 J.Corp.L. 625 (Spring 2004) ..........................9

Plaintiff Olympia Levinson Stiegele ("Plaintiff") submits this response and opposition to the Motion to Dismiss Plaintiff's Verified Shareholder Derivative Complaint filed by Defendants Bernard C. Bailey ("Bailey"), Paul T. Principato ("Principato"), Peter Nessen ("Nessen"), Thomas J. Reilly ("Reilly"), Denis K. Berube ("Berube"), B.G. Beck ("Beck"), Charles E. Levine ("Levine"), and William K. Aulet ("Aulet") (collectively "Defendants")

## I.    INTRODUCTION

This is a shareholder derivative lawsuit brought against certain current and former officers and directors of Viisage Technology, Inc. ("Viisage" or the "Company").  Defendants argue that (1) Plaintiff has failed to plead with particularity that demand on the Board of Directors to bring this suit would have been futile, and (2) the Defendants are insulated from liability by provisions of Viisage's Articles of Incorporation.  Defendants' Motion should be denied.  Plaintiff has alleged the failure to disclose material information to the public, and the complete lack of control and oversight by the officers and directors of the Company as evidenced by the serious internal control deficiencies admitted by the Company.  Plaintiff has further alleged that a majority of the Directors were aware of the scheme, or, in the absence of severe recklessness, should have learned of and prevented it.  Indeed, it is apparent that the actions alleged herein could not have occurred without the Defendant Directors' knowledge, in the absence of their complete failure to fulfill their oversight responsibilities to the Company.

As a result of the Defendants' malfeasance and/or misfeasance, as alleged by Plaintiff, the Company has and will continue to suffer damages.  Such damages include costs incurred by the Company in defending and settling or satisfying a judgment in securities class action lawsuits and the impairment of the Company's ability to close new contracts.  Finally, the Company has been damaged by certain of the Defendants' sales of their personally held Company shares at

I:\Viisage\Derivative\ResponseMotionDismiss.doc

prices artificially inflated by the fraud.  A majority of the Company's Board of Directors faces a substantial likelihood of liability and are incapable of impartially and objectively considering a demand by shareholders and any such demand would have been futile.

## II.    FACTUAL ALLEGATIONS

### A.    Parties

Plaintiff is, and was at all relevant times, an owner of Viisage common stock.  Verified Shareholder Derivative Complaint ("Complaint") at ¶12.  Viisage is incorporated in the state of Delaware.  *Id*. at ¶13.  Viisage creates technologies and services geared at creating difficult to reproduce documents used in making of driver's license for various states, and technology for authenticating documents and preventing identity theft.  *Id*. at ¶5.  At the time this derivative action was filed, Viisage's Board of Directors consisted of nine (9) members - - Bailey (the Company's CEO), Principato, Nessen (Chairman of the Audit Committee), Reilly (a member of the Audit Committee), Berube (Chairman of the Board), Beck, Levine (a member of the Audit Committee) and non-Party/non-Defendants Harriet Mouchly-Weiss and Christoph von der Malsburg.  *Id*. at ¶26.   Seven (7) of the Directors, Bailey, Principato, Nessen, Reilly, Berube, Beck and Levine, have been named as Defendants herein.  In addition, named as a Defendant is Aulet, the Company's Chief Financial Officer.  *Id*. at ¶15.

### B.    Viisage Announces Internal Control Deficiencies

On February 7, 2005 Viisage stunned the market by reporting that it had returned to serious unprofitability. *Id*. at ¶10.  It reported unusual and disproportionate fourth quarter charges, many of which had plainly been improperly deferred from the third quarter or earlier periods. *Id*.  One such charge, in the amount of $2 million, related to a settlement payment in a case in which Viisage had been accused of misconduct in the procurement of a contract with the

State of Georgia. *Id*. The State of Georgia was enjoined from making this payment to Viisage, and the payment was later adjudged unlawful due to Viisage's fraud. *Id*. Viisage remained silent regarding the financial impact of this matter until Feb. 7, 2005. *Id*. On March 2, 2005, Viisage announced more bad news, in that the loss for the fourth quarter of 2004 was an astounding $5.2 million. *Id*. at ¶11. In addition, Viisage announced that the Company had determined that it had an **internal control deficiency that constituted a "material weakness"** as defined by the Public Company Accounting Oversight Board's Accounting Standard No. 2. *Id*. As a result, the Company was unable to conclude that the internal controls over financial reporting were effective as of December 31, 2004. *Id*. Additionally, the Company announced that management believed that it was likely that the Company had significant deficiencies in the control processes around information technology. *Id*.

### C.      The Fraudulent Scheme

For many years Viisage had not been able to run its business profitably. *Id*. at ¶6. After a loss of $17.7 million in 2003, the Company found itself in dire financial straits in the first half of 2004. *Id*. Viisage had expanded its operations and had incurred high interest rate loans to finance its operations and acquisitions. *Id*. at ¶39. Its credit line with Commerce Bank had proved inadequate, and controlling shareholder Lau Acquisition Corp. ("Lau")[1] had been forced to bail out Viisage by making loans totaling approximately $5 million. *Id*. at ¶6. In addition, on February 14, 2004, the Company acquired Trans Digital Technologies from Defendant Beck. *Id*. at ¶40. In connection with the acquisition, Viisage issued a promissory note to Beck in the amount of $15.3 million. *Id*. In addition to the funds owed to Beck and Lau, the Company also had loans outstanding to Commerce Bank. *Id*. The outstanding debt totaled over $30 million. *Id*.

---

[1] Non-party Lau Acquisition Corp. ("Lau"), d/b/a Lau Technologies, beneficially owns approximately 13.8% of the Company's stock. *Id*. at ¶ 24.

The Defendants knew that its liquidity problems would be eased, and Lau relieved of its role as lender of last resort to a struggling enterprise, if Viisage could obtain a large and flexible credit line from a reputable bank. *Id*. at ¶7. To do this, Viisage would have to present itself as a profitable Company, instead of one which was teetering on the edge of failure. *Id*. The Defendants allowed implementation of a scheme to create an artificial profit in the third quarter of 2004. *Id*. A profit would allow Viisage to accomplish its crucial goal of replacing its inadequate credit line with a more generous credit line. *Id*. In a follow-on public offering on August 5, 2004, the Company sold 7.2 million shares for proceeds of $37.4 million. *Id*. at ¶42. Approximately $30.3 million was used to repay debt, including debt owed to Lau and Beck. *Id*. This offering, while easing the Company's immediate liquidity issues, did not solve all of its problems. *Id*. The Company still lacked adequate working capital or credit facilities, the credit agreement with Commerce Bank was too restrictive, and it did not provide for all of its credit requirements. *Id*.

Thereafter, the Defendants launched a scheme to flood the market with highly positive information concerning Viisage. *Id*. at ¶43. In a conference with analysts on October 25, 2004, the Defendants portrayed Viisage as on track, and profitable, with costs under control. *Id*. There was no disclosure of material negatives, including the true facts and costs concerning the Georgia license litigation, discussed below, material accounting deficiencies which plagued the Company, of which the Individual Defendants must have been aware, and the failure to disclose the nature and extent of compliance costs associated with the Sarbanes-Oxley Act of 2002, which had imposed new corporate governance responsibilities upon public companies. *Id*.

On October 25, 2004, the Company announced financial results for the Third Quarter of 2004. *Id*. **The Company reported news certain to impress shareholders and lenders: Viisage had returned to profitability, reporting its first profitable quarter in years.** *Id*. This

I:\Viisage\Derivative\ResponseMotionDismiss.doc

allowed Viisage to obtain and announce a new $25 million credit line, as to which Defendant Aulet, the C.F.O., boasted: "This new arrangement will not only give us valuable flexibility but will also reduce our rates of borrowing, significantly simplify our covenants, and increase yields on our money in the bank...." *Id*. Viisage also announced that it was increasing its projections for EBITDA to $11.5 to $12.5 million for the 2004 year. *Id*. In an Analysts' Conference that day, Defendants Bailey and Aulet touted the Company's new credit line and raised the Company's guidance for Fiscal 2004. *Id*. at ¶44. However, unbeknownst to the markets, this third quarter profit had been artificially engineered by improperly recognizing corporate benefits, and deferring recognition of corporate expenses from the third quarter into the fourth quarter. *Id*. at ¶9.

### D.    The Georgia State License Litigation

On December 27, 2004, the Company issued a press release concerning the dispute over the award of a $19.5 million contract with the Georgia Department of Motor Vehicles (the "DMVS") to provide secure drivers' licenses for the state. Viisage repeatedly issued press releases to the public about the contract and discussed it with securities analysts. However, Viisage had engaged in highly improper conduct in bidding for that contract. This misconduct was the specific focus of a lawsuit contesting the award of the Georgia DMVS contract to Viisage brought by Digimarc ID Systems ("Digimarc"), a competitor in bidding on the DMVS contract.

Viisage falsely represented that the litigation commenced by Digimarc only involved alleged wrongdoing by the DMVS, and that it was not even a party to the litigation. Viisage thereby concealed its own wrongful conduct which included: (a) submitting sample cards as "production quality" cards that were, in fact, produced by a competitor and which were not cards Viisage had the ability to produce; and (b) falsely stating to the DMVS that Viisage had secured a back-up card production facility to take over license production. *Id*. at ¶51. On July 21, 2004,

Viisage announced that it had entered into a settlement with the DMVS by which the DMVS would: (i) pay Viisage $2.5 million for work it ostensibly completed for the DMVS since the bid award; (ii) terminate the contract awarded to Viisage; and (iii) issue a new request for proposal. Viisage touted this settlement as being a result of its initiative to help resolve the dispute on a contract "appropriately awarded to Viisage."

In reality, the contract had not been appropriately awarded to Viisage and, at the time of the settlement, Viisage had been refusing to comply with orders of the Georgia Court presiding over the litigation.  Because of the lack of compliance, on August 19, 2004, the Georgia court entered a TRO enjoining the settlement, and on September 2, 2004 entered a preliminary injunction against the settlement.  No public disclosure of the August TRO was made until late October, and no public disclosure of the September injunction was made until mid-November. During the period it concealed these rulings, Viisage secured State drivers license contracts with other States, and when it finally disclosed the Georgia court's injunction in mid-November 2004, still publicly maintained that the Georgia litigation was focused solely on alleged wrongdoing by the DMVS.  On December 22, 2004, the Georgia court issued a ruling which found, "that there were significant instances of misconduct and misrepresentations by Defendant Viisage." *Id*. It was also found that Viisage engaged in inappropriate and unauthorized communications with certain Georgia State employees after a premature reading of the price proposals regarding the license contract bid.  *Id*. As a result, the Georgia court disallowed the $2 million in payments Viisage claimed it was owed, and directed a re-bid of the DMVS contract. Viisage did not issue a press release regarding this ruling until December 27, 2004 and that press release omitted any information concerning the Georgia Court's finding of misconduct.

Although the Georgia court enjoined the $2.5 million settlement on August 19, 2004,

defendants made no disclosure of that fact until the October 26, 2004 conference call. Significantly, this was after Viisage had announced that it had completed its stock for stock acquisition of Imaging Automation, Inc. and after it had been awarded four new secure identity contracts. Even then, the injunction was not revealed until November 10, 2004, after the Company had publicly announced its first quarterly profit in some time.[2]  It may be reasonably inferred that the Court finding that Viisage had engaged in improper conduct in connection with the Georgia bidding process impaired the Company's ability to close new contracts, and indeed Viisage was having difficulty closing contracts in the fourth quarter of 2004.  *Id*. at ¶53.

### E.    A Majority of the Defendants Knew, or in the Absence of Extreme Recklessness Should Have Known, of the Company's Improprieties

As alleged in the Complaint, at least a majority of the Company's Board of Directors at the time this lawsuit was filed had, or in the absence of extreme recklessness should have had, knowledge of the Company's wrongful activities.  For instance, each of the Defendant Directors signed SEC reports containing false information concerning the Company's financial results.[3]  Defendants Bailey and Aulet signed each of the Company's quarterly and annual financial statements and certified, pursuant to the Sarbanes-Oxley Act of 2002, that he had familiarized himself with the Company's controls, books and records and could thereby attest to the accuracy of those statements because of facts that "existed," and were knowable to them, at the time they were issued.[4]  As members of the Audit Committee, Defendant Directors Nessen, Reilly and

---

[2] Any allegations made in the previous four paragraphs that were not made in the Complaint could be so alleged, upon amendment.

[3]  Defendants Bailey and Aulet signed Viisage's Form 10-Qs for its quarters ended March 28, 2004, June 27, 2004 and September 26, 2004.  In addition, Defendants Bailey, Aulet, Berube, Beck, Levine, Reilly, Principato, and Nessen signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.  These additional allegations can be made upon amendment.

[4] These additional allegations can be made upon amendment.

Levine had heightened responsibilities concerning the Company's financial reporting process which, if fulfilled, made them privy to information that would have exposed the accounting chicanery. *Id*. at ¶¶17, 18, 21, 59(c).

**F.    The Defendant Directors Abdicated their Oversight Responsibilities**

It is apparent that the type of fraud that is alleged in the Complaint could not have occurred without the Defendant Directors' knowledge unless effective internal accounting and financial controls were completely lacking.    The duties to design and implement effective financial and accounting controls are those of management and the Board of Directors, but in particular, its Audit Committee. During the relevant period, Defendants Nessen, Reilly and Levine were members of the Company's Audit Committee. *Id*. at ¶¶17, 18, 21.  However, on March 2, 2005, Viisage announced that

> it had an internal control deficiency that constitutes a "material weakness" as defined by the Public Company Accounting Oversight Board's Accounting Standard No. 2. The Company has concluded that it had insufficient personnel resources and technical accounting expertise within the accounting function to resolve non-routine or complex accounting matters. As a result, management will be unable to conclude that the Company's internal controls over financial reporting are effective as of December 31, 2004.

**G.    Defendants' Illegal Insider Stock Sales**

During the Relevant Period, Defendant Berube benefited from Lau's sale of 380,602 shares of Viisage stock for total proceeds exceeding $2.9 million.  Because Berube and his spouse are the controlling shareholders of Lau, it is reasonable to infer that Berube personally benefited from this sale. *Id*. at ¶59(a).  In addition, Lau realized proceeds of $779,779.00 from the sale of 141,778 shares of Viisage common stock that were included in Viisage's Secondary Offering of 7.5 million shares of common stock.    Additionally, Defendant Beck realized proceeds of $779,779 from the sale of 141,778 shares of Viisage common stock that were

included in Viisage's Secondary Offering of 7.5 million shares of common stock; Defendant

Levine sold 9,000 shares of Viisage common stock and realized proceeds of $63,000; and

Defendant Reilly sold 10,000 shares of Viisage common stock and realized proceeds of

$87,000.[5]  The selling by insiders, including Lau was unusual and suspicious in that it occurred

almost immediately after the release of the artificially rosy third quarter report. *Id*. at ¶53.

### III.    PLAINTIFF HAS ALLEGED FACTS SUFFICIENT TO DEMONSTRATE DEMAND FUTILITY

Defendants argue that Plaintiff has failed to allege with particularity that a shareholder

demand upon Viisage's Board to bring this action would be futile.   In the present case, the

determination of whether Plaintiff has sufficiently alleged demand futility is determined under

the test set forth in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993).  Under *Rales v. Blasband*:

> [A] court must determine whether or not the particularized factual allegations of a
> derivative stockholder complaint create a reasonable doubt that, as of the time the
> complaint is filed, the board of directors could have properly exercised its
> independent and disinterested business judgment in responding to a demand.

*Id*. at 934.

Pleading futility of demand is not nearly as difficult as Defendants pretend.[6]  Although a

plaintiff is held to a particularized standard, plaintiff need not plead evidence.  *Levine v. Smith*,

591 A.2d 194, 207 (Del. 1991).   Instead, the factual allegations of the complaint must be

accepted as true and need only raise a "reasonable doubt" as to the directors' disinterestedness or

independence.  *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).  The "reasonable doubt"

standard is not a restrictive evidentiary test.  Plaintiffs are not required to plead particularized

facts sufficient to sustain a "judicial finding" that the test excusing demand is satisfied.  *Grobow*

---

[5] These additional allegations can be made upon amendment.

[6]   In fact, "recent Delaware decisions suggest a trend toward stricter judicial scrutiny of director decision-making."
Renee M. Jones, *Rethinking Corporate Federalism in the Era of Corporate Reform*, 29 J.Corp.L. 625, 645 (Spring
2004).

*v. Perot,* 539 A.2d 180, 195 (Del. 1988). "Nor must plaintiff demonstrate a reasonable probability on the merits." *Dollens v. Zionts*, 2002 WL 1632261 at *5 (N.D. Ill. July 22, 2002). "Reasonable doubt can be said to mean that there is a reason to doubt. This concept is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996) ("the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule."); *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

Plaintiff's allegations go beyond notice pleading, and raise a reasonable doubt that a majority of Viisage's Board was disinterested and independent.

### A.    Plaintiff has Alleged that a Majority of the Board is Disinterested

Directorial interest may be said to exist when a director receives a personal financial benefit from a transaction which is not actually shared by the stockholders or "a corporate decision will have a materially detrimental impact on a director but not on the corporation and the stockholders." *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002); *Rales*, 634 A.2d at 936; *Rattner v. Bidzos*, 2003 WL 22284323 at *8-9 (Del. Sept. 30, 2003). A substantial likelihood of personal liability creates a disabling interest which prevents a director from impartially considering a demand. *Rattner,* 2003 WL 22284323 at *9; *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995). In the present case, Plaintiff has alleged with particularity facts demonstrating that a majority of the members of Viisage's Board of Directors received a personal financial benefit not shared by Viisage shareholders and/or face a substantial likelihood of personal liability for breaches of their fiduciary duties owed to Viisage and its shareholders.

Directors of Delaware corporations have a triad of primary fiduciary duties: due care, loyalty, and good faith. *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001); *In re Walt Disney Company Derivative Litigation*, 825 A.2d 275, 286 (Del. Ch. 2003). Each of the Defendant Directors breached one or more of these duties. For instance, Plaintiff has alleged with particularity that Defendants Berube, Beck, Levine and Reilly breached their duties of loyalty and good faith to the Company through illegal insider trading and derived an improper personal benefit from such illegal sales. *Brophy v. Cities Services Co*., 70 A.2d 5, 7 (Del. Ch. 1949). Plaintiff has also alleged that each of the Director Defendants breached his duty of good faith by actively causing the Company to engage in securities fraud to the detriment of the Company and/or by abdicating his oversight duties to the Company and thereby permitting same.[7] The Defendant Directors face a substantial likelihood of liability for their conduct and/or are otherwise not disinterested and are incapable of objectively considering demand.

### 1.    Each of the Defendant Directors Actively Engaged in Securities Fraud

Each of the Defendant Directors actually engaged in securities fraud to the detriment of the Company.[8] They did so by, among other things, disseminating to the public false and misleading statements concerning the Company's financial condition and results. *See*, *e.g*., Complaint at ¶¶ 9, 43, 44, 51,53. Each of the Defendant Directors signed reports filed with the SEC in which such materially false and misleading statements were made. *See,* Section II(E), *supra*. Moreover, Defendants Bailey and Aulet made numerous materially false and misleading statements in press releases and conference calls with analysts. *Id*. at ¶¶43, 44. This makes them liable. Defendants that sign SEC reports and other documents are liable for the material

---

[7]   Moreover, a director cannot act loyally towards the corporation unless he or she acts in good faith. *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

[8]   Some of the damages that resulted to the Company as a result are set forth in Part II, *supra*.

I:\Viisage\Derivative\ResponseMotionDismiss.doc

misstatements and omissions contained therein.  *See In re Independent Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 767 (S.D.N.Y. 2001) ("by affixing his name to the Prospectus, [defendant] adopted the statements made therein and can be held liable for the alleged misrepresentations").  It also excuses demand.  *Fina v. Calarco Corp.*, 2005 WL 3112894, *7 (Conn. Super. 2005) (addressing demand futility allegations against directors under Delaware law).  In *Fina*, the Court stated:

> Surely the conscious decision to sign off on forms required to be filed with a federal investigative body was intended as a "vouching" for the accuracy and integrity of the information.... The court concludes there is reasonable doubt these directors (all - - as opposed to a mere majority) are disinterested and independent and there is, thus, reasonable doubt "that the protections of the business judgment rule are available" to them.

2005 WL 3112894 at *7.

In *In re Taser International Int'l. Shareholder Deriv. Lit.*, 2006 WL 687033 (D. Ariz. March 17, 2006) (applying Delaware law), the court found that demand was excused where plaintiffs alleged that three of the outside directors served on the audit committee and plaintiffs argued "by inference that the Audit Committee members 'closely monitored and were aware of declining sales trends' and 'could not possibly approve Company earnings press release and earnings guidance without knowing how the quarter at issues was progressing.'"  *Id*. at *40.

Moreover, Defendants Bailey, Berube, Beck, Levine, Reilly, Principato and Nessen, a majority of the directors at the time this lawsuit was filed, are named as Defendants to the securities class action claims, Complaint at ¶59(j), for which they face a substantial likelihood of liability.[9]  In *In re Cendant Corp. Derivative Action Litigation*, 189 F.R.D. 117, 129 (D.N.J.

---

[9]    Berube, Bailey, Nessen, Reilly and Levine, at a minimum, signed SEC reports in which false financial information concerning the Company was reported.  Even outside directors can be held liable as control persons when they sign important SEC filings containing misrepresentations and omissions of others.  *Schnall v. Annuity and Life Re (Holdings), LTD.*, 2004 WL 231439 at *9 (D. Conn. Feb. 4, 2004).

1999), the court found each of the named director defendants were interested because each was a defendant in other pending class action suits arising out of the accounting irregularities at issue and faced significant personal liability for the wrongdoing alleged in the complaint.

>     **2.    The Director Defendants Breached Their Duties of Good Faith by Abdicating their Oversight Responsibilities**

Under Delaware law "a sustained or systematic failure of the board to exercise oversight ... will establish the lack of good faith that is a necessary condition to liability." *In re Caremark International, Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996) (failure to oversee management has been upheld as a basis for implicating directors, particularly "outside" directors, in wrongdoing); *Saito v. McCall*, 2004 WL 3029876 at *6-7 (Del. Ch. Dec. 20, 2004) (finding demand excused where plaintiff alleged that directors, including audit committee members abdicated their oversight responsibility).[10]

> *Caremark* instructs fiduciaries to prevent and address problems through compliance and monitoring programs. A sustained and utter failure to ensure the existence of a functioning program may well be grounds for a good-faith cause of action. Indeed, a failure to attempt to comply with one's fiduciary duties is likely to result in a breach of good faith.

Hillary A. Sale, *Delaware Good Faith*, 89 Cornell L. Rev. 456, 484 (Jan. 2004). Where a director consciously ignores his or her duties to the corporation thereby causing economic injury to its stockholders, the director's actions are "not in good faith" or "involve intentional misconduct." *Disney*, 825 A.2d at 289.

In the present case, Plaintiffs have alleged that the Company omitted material information about litigation regarding a key contract, and that the Company lacked internal controls. Clearly, Defendants would have been apprised of events which placed a key contract

---

[10]  *Mills Acquisition Co. v. MacMillan, Inc.* 559 A.2d 1261, 1282 n.32 (Del. 1989) (board's virtual abandonment of oversight functions is breach of fundamental duties of loyalty and care).

I:\Viisage\Derivative\ResponseMotionDismiss.doc

into doubt, and they also would have known of a failure to implement effective internal financial and accounting controls. See, *In re Electronic Data Systems Corp., Sec. and "ERISA" Litig.*, 298 F. Supp. 2d 554, 557 (E.D. Tex. 2004) ("contract's sheer magnitude and importance to EDS support an inference that … CEO and CFO would know its status."); *In re Viacom Pharmaceuticals, Inc.*, 2005 WL 2989674 at * 5-6 (E.D. Pa. July 1, 2005) ("allegations that key officers and directors must have known misleading statements because the statements involved the Company's lead product candidate will satisfy the pleading requirements of scienter.")

The conduct of Defendants Nessen, Reilly and Levine, members of the Audit Committee, and Bailey, a management Director, was particularly egregious in that they were charged with ensuring that an effective system of internal financial accounting controls existed. These individuals clearly failed in their duties as Audit Committee members, and as directors.

> In numerous cases where liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration which went undiscovered by the directors. *See Miller v. Schreyer*, 200 A.D.2d 492, 606 NYS 2D 642 (1st Dept. 1994 and 257 A.D.2d 358, 683 NYS2D 51, 55 (1st Dept. 1999) (applying Delaware law).

*In re Oxford Health Plans, Inc. Sec. Litig.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000) (Delaware law); *see, e.g., Saito v. McCall*, 2004 WL 3029876; *Felker v. Anderson*, 2005 WL 602974 (W.D. Mo. Feb. 11, 2005) (demand excused where plaintiff alleged facts supporting claim that directors breached their duties to monitor affairs of corporation); *In re Abbott Labs. Deriv. Litig.*, 325 F.3d 795 (7th Cir. 2003) (applying Delaware standards); *Cendant*, 189 F.R.D. at 123, 129 (applying Delaware law);

*In Oxford Health Plans*, 192 F.R.D. 111 (decided under Delaware law) shareholders brought suit against directors and officers of the company claiming a variety of breaches of fiduciary duties. The allegations included claims that the defendants (a) failed to have in place

sufficient financial controls and procedures to monitor the planned conversion of a new computer system; (b) failed to implement and enforce procedures to prevent the wholesale appropriation of the company's information by directors who were asserted to have engaged in insider trading of stock based on confidential company information; (c) knowingly or recklessly disseminated, or permitted to be disseminated misleading information; and (d) allowed the company to engage in many improper billing practices and to violate numerous insurance regulations thereby subjecting the company to fines, penalties and investigations.  *Id*. at 114. Observing that under *Caremark* a director or officer can be liable based on nonfeasance when the director or officer engaged in "a sustained or systematic failure to exercise oversight and assure accurate record keeping," the court held that the above allegations, if proven, would establish the failure of the defendants "in supervising or monitoring the affairs of the company." *Id*. at ¶17. Because, the court found, such proof would be sufficient to establish liability under the *Caremark* standard, demand was excused.  *Id*.

In *In re FirstEnergy*, 320 F.Supp.2d 621 (N.D. Ohio 2004), plaintiffs brought a derivative action alleging breaches of fiduciary duties by certain of its officers and directors.  *Id*. at 622. The court denied the demand futility-based motion to dismiss.  The court found that specific allegations in the complaint rendered the defendants' characterization of the complaint as "mere general allegations of wrongdoing" unpersuasive.  *Id*. at 624.  Among other things, the Court found plaintiffs had alleged specifically that the "directors failed to implement and maintain adequate internal financial accounting control systems for the company…."  *Id.*  Similarly, in *McSparran v. Career Education Corp*., 2006 WL 250698 (N.D. Ill. Jan. 27, 2006), the court found that plaintiff had sufficiently alleged demand futility based on allegations that the Board had failed to fulfill its oversight responsibilities.  The conduct of the Directors alleged in the

present case is similar to the conduct of the directors in the above-cited cases and the result

reached by the Court should be the same.

### 3.    Breach of the Duty of Loyalty Through Insider Trading

Plaintiff has alleged that Defendants Berube, Beck, Levine and Reilly are directly

interested in the insider trading transactions because they received a personal benefit from those

transactions, *See*, Section II(G), *supra*, and that each faces a substantial likelihood of liability for

engaging in these transactions.  Illegal insider trading by an officer or director is a breach of their

duty of loyalty.  *Brophy*, 70 A.2d at 7.  To adequately allege that a director is "interested" in an

insider trading claim, a plaintiff need only plead facts which support the inference "that each sale

by each individual defendant was entered into and completed on the basis of, and because of,

adverse material non-public information."  *Zimmerman v. Braddock*, 2005 WL 2266566 at *8

(Del. Ch. Sept. 8, 2005).  Such allegations are sufficient where the complaint alleges "directly"

or by "imputation" that the directors had knowledge of the information and made their trades on

that basis.  *Id*.  Plaintiff has cleared this pleading hurdle, or can do so upon amendment.

Defendant Berube, the Company's Chairman, is one of the highest ranking officers.

Complaint at ¶19.  The fact that a person is the "most senior executive" of the Company is

relevant in the scienter equation.  *Adams v. Kinder Morgan, Inc.*, 340 F.3d 1083, 1100 (10th Cir.

2003).  Moreover, Defendants Berube, Beck, Levine and Reilly signed SEC reports in which the

Company's financial condition was misrepresented.  *See,* fn. 3, *supra*.   Insiders selling stock

while disseminating positive information to the public is "like a ship's captain exiting in the

safety of a lifeboat while assuring the passengers that all is well."  *In re Scholastic Corp. Sec.

Litig.*, 252 F.3d 63, 67 (2nd Cir. 2001).  Plaintiff has alleged facts from which it can be inferred

that these Directors had knowledge, directly or by imputation, of the undisclosed information

concerning the accounting practices. Where Defendants profit through illegal insider trading, they are not disinterested with respect to demand futility. *See, e.g., McSparran*, 2206 WL 250698 at *2, 5; *In re Polymedica Corp*., 2002 WL 1809095 (Mass.Super. July 16, 2002).

**B.    Defendants Principato, Berube and Beck are not Independent**

If a plaintiff pleads facts that create a reasonable doubt that a majority of the Board could not have acted independently in responding to demand, the presumption of independence is rebutted. *Beam v. Stewart*, 845 A.2d at 1049. Directorial independence "focuses on whether the directors, for *any substantial reason*, cannot act with only the best interests of the corporation in mind." *In re Oracle Corp. Deriv. Litig*., 824 A.2d 917, 937-938 (Del Ch. 2003) (emphasis in original), *rev'd in part on other grounds*, 817 A.2d 149 (Del. 2002)). The "cases ultimately focus on impartiality and objectivity." *Oracle*, 824 A.2d at 938. A director may be compromised if he is beholden to or controlled by an interested person. *Id.*; *Telxon Corp. v. Myerson*, 802 A.2d 257, 264 (Del. 2002). Beholden can also mean "personal or other relationships" to the interested party. *Oracle*, 824 A.2d at 938-39. A controlled director is one who is dominated by another party through close personal or familial relationship or through force of will. *Telxon*, at 264. In evaluating the impartiality and objectivity of the board, the court should employ a common sense application of those terms. *Parfi*; 794 A.2d at 1234.

Plaintiff has alleged facts in the Complaint that demonstrate that Director Defendants Principato, Berube and Beck are not independent of other interested directors. Defendant Principato serves as the CFO of non-party Lau, the largest shareholder of Viisage and until the fourth quarter of 2004, Viisage's source of last resort for liquidity. Complaint at ¶16. Additionally, Viisage entered into a consulting agreement with Defendant Berube under which he receives annual compensation of $125,000. *Id*. at ¶ 19. Further, Berube is the Executive

Vice-President and Chief Operating Officer of Lau. Berube's spouse also receives $125,000 annually as a consultant to Viisage. *Id*. Further, combining both his and his spouse's holdings in Lau, makes them the *de facto* controllers of Lau and Viisage. *Id*. Defendant Beck also has a consulting agreement with Viisage under which he receives annual compensation of $300,000. *Id*. at ¶ 20. Further, Beck is the beneficial owner of more than 5% of Viisage's outstanding shares of common stock. He also holds a promissory note with a face value of $15.3 million. *Id*.

## IV . THE ARTICLES OF INCORPORATION DOES NOT PROTECT DEFENDANTS

Defendants contend that they are insulated from liability by Section 102(b)(7) of the Delaware Corporations Code. "The purpose of [the statute is] to permit shareholders… to exculpate directors from any personal liability for the payment of monetary damages for breaches of duties of care, but not for duty of loyalty violations, good faith violations and certain other conduct." *Emerald Partners*, 787 A.2d at 90. It does not operate to defeat a plaintiff's claims on the merits, but to defeat plaintiff's ability to recover damages. *Id*. at 92. Furthermore, it bars a complaint at the motion to dismiss stage only if it states an "unambiguous, residual" breach of the duty of care claim and nothing else. *Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001); Hillary A. Sale, *Delaware Good Faith*, 89 Cornell L. Rev. 456, 467 (January 2004) ("If a complaint alleges breaches of care intertwined, for example, with loyalty, and rebuts the business judgment rule, the entire complaint will survive the motion to dismiss.").

In the present case, as set forth above, Plaintiff has alleged that the insider trading Defendants, Berube, Beck, Levine and Reilly, breached their duties of loyalty and good faith to the Company and derived an improper personal benefit. *Brophy*, 70 A.2d at 7. Also, these management Directors, and the remaining Defendant Directors, and particularly Defendants Nessen, Reilly and Levine, each a member of the Audit Committee, breached their duties of

good faith and loyalty through their active participation in the wrongdoing and/or abdication of their oversight responsibilities to the Company, as described in more detail above. Therefore, Section 102(b)(7) is in inapplicable as to them. *Cendant Corporation*, 189 F.R.D. at 133; *Disney*, 825 A.2d at 290 ("Where a director consciously ignores his or her duties to the corporation, thereby causing economic injury to its stockholders, the director's actions are either 'not in good faith' or 'involve intentional misconduct'" and fall outside the liability waiver….").

Moreover, the statutory exculpatory provision contained in Section 102(b)(7) is in the nature of an affirmative defense. *McCall v. Scott*, 239 F.3d 808, 818 n. 10 (6th Cir. 2001) (applying §102(b)(7)); *McMullen v. Bearn*, 765 A.2d 910, 926 (Del. 2000). However, "[w]here the Complaint sufficiently alleges a breach of fiduciary duties based on a failure of the directors to act in good faith, [as it does here] bad faith actions present a question of fact that cannot be determined at the pleading stage." *Abbott Laboratories*, 325 F.3d at 810 (applying Illinois counterpart to §102(b)(7)). "[I]f a complaint adequately alleges . . . disloyalty . . . or if the nature of the alleged breach of duty is unclear, the complaint will not be dismissed on a motion made under Rule 12(b)(6) on the basis of a exculpatory charter provision." *In re Ply Gem Industries, Inc. Shareholders Litigation*, 2001 WL 755133 at *10 (Del. Ch. June 26, 2001). In short, Plaintiff has alleged with particularity, facts that, if proven true, demonstrate the Defendants' breaches of their duties of good faith and loyalty owed by the Defendants to the Company and its shareholders. Accordingly, Plaintiff's claims cannot be defeated by the exculpatory provision.

Finally, Section 102(b)(7) by its express terms applies only to directors. *LTV Steel Co.,* 2005 WL 2573515. The Defendants who were not directors would not enjoy §102(b)(7) protection under any circumstances. Stephen A. Radin, *Director Protection_Statutes and Motions to Dismiss after Emerald Partners*, 13 No. 6 Insights 2, and n. 12 (June 1999) (Section

102(b)(7) protection applies only to directors and if directors are also officers only with respect to such director/officers actions taken while acting as a director). Similarly, to the extent Defendants' wrongful conduct was committed while acting only as officers, §102(b)(7) could not possibly provide them with protection. *Id*.

## V.    PLAINTIFF HAS ALLEGED INJURY TO VIISAGE

Defendants assert that Plaintiff has not alleged anything that caused direct harm to the Company. This argument is without merit. Plaintiff has alleged damages suffered by Viisage as a result of Defendants' breaches of fiduciary duty. Undoubtedly the Company has incurred costs, including unnecessary legal and auditors' fees, in connection with the evaluation of the Company's deficient internal control processes as announced on March 2, 2005. Complaint at ¶ 11. Moreover, Plaintiff has detailed the Court rulings and Viisage's activities in the litigation regarding the Georgia DMVS contract above. It may be reasonably inferred that the finding that Viisage engaged in improper conduct impaired the Company's ability to close new contracts, and indeed Viisage was having difficulty closing contracts in the fourth quarter of 2004. *Id*. at ¶53. Furthermore, as to the alleged insider sales "Delaware law provides [the Company with] a separate claim of breach of fiduciary duty based on insider trading."[11] *Dollens*, 2002 WL 1632261 at *8; *see Oberly v. Kirby*, 592 A.2d 445,463 (Del, 1991). Plaintiff has adequately alleged direct harm suffered by the Company as a result of the actions of the Defendants.

## VI.    CONCLUSION

For the reasons set forth herein, Defendants' Motions to Dismiss should be denied. In the event the Court grants Defendants' Motion, any such dismissal should be without prejudice and with leave to amend so that Plaintiff can cure any perceived pleading deficiencies.

---

[11]    Plaintiff is not required to prove the company was damaged by an insider's illegal trades. *Brophy*, 70 A.2d at 8.

Dated: March 31, 2006                    Respectfully Submitted,

                                                 __ s/ William B. Federman_____

William B. Federman, Bar #OBA #2853
FEDERMAN & SHERWOOD
120 North Robinson, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560/Fax: (405) 236-2112
*wfederman@aol.com*
                       - and -
2926 Maple Avenue, Suite 200
Dallas, TX 75201

Alan L. Kovacs
LAW OFFICES OF ALAN L. KOVACS
2001 Beacon Street Suite 106
Boston, MA 02135
(617) 964-1177/Fax: (617) 332-1223
*Attorneys for Plaintiff,*
*Olympia Levinston Stiegele*

I:\Viisage\Derivative\ResponseMotionDismiss.doc

## <u>CERTIFICATE OF MAILING</u>

This is to certify that on March 31, 2006, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Mitchell H. Kaplan
John R. Baraniak, Jr.
Aloknanda S. Bose
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
(617) 248-5000
mkaplan@choate.com
jb@choate.com
**Attorneys for Defendants**

    \_\_s/ William B. Federman_____
    William B. Federman