**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| OLYMPIA LEVINSON STIEGELE,<br>derivatively on behalf of Nominal<br>Defendant Viisage Technology, Inc.<br><br>       Plaintiff,<br><br>vs.<br><br>BERNARD C. BAILEY, PAUL T.<br>PRINCIPATO, PETER NESSEN,<br>THOMAS J. REILLY, DENIS K.<br>BERUBE, Buddy G. BECK, CHARLES<br>E. LEVINE, WILLIAM K. AULET,<br>MARCEL YON and HARRIET<br>MOUCHLEY-WEISS<br><br>       Defendants,<br><br>and<br><br>VIISAGE TECHNOLOGY, INC.,<br><br>       Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 05-10677 (MLW)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE**
**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff files this Verified Amended Shareholder Derivative Complaint and alleges on information and belief, except as to those allegations that pertain to Plaintiff, which are alleged on personal knowledge, as follows:

**NATURE OF THE ACTION**

This is a shareholder derivative action brought by Plaintiff, Olympia Levinson Stiegele, a shareholder of Viisage Technology, Inc. ("Viisage" or "Company"), on behalf of Nominal Defendant  Viisage against certain of its officers and directors, i.e., Bernard C. Bailey ("Bailey"), Paul T. Principato ("Principato"), Peter Nessen ("Nessen"), Thomas

1

J Reilly ("Reilly"), Denis K. Berube ("Berube"), Buddy G. Beck ("Beck"), Charles E. Levine ("Levine"), William K. Aulet ("Aulet"), Marcel Yon ("Yon"), and Harriet Mouchly-Weiss ("Mouchly-Weiss"), seeking to remedy their violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that have caused substantial losses and other damages to Viisage, such as to its reputation, goodwill and ability to secure funds in the capital markets.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

2.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a) in that many of the acts and conduct constituting the violations of law complained of herein occurred in this District, and because Nominal Defendant Viisage maintains its principal executive offices in this District.

## SUMMARY OF THE ACTION

3.    Viisage claims to be a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Viisage purportedly combines its proprietary biometric and secure credential software with complementary industry standard products to create turn-key solutions for its customers that integrate secure document technologies, image and data capture, relational databases and multiple biometrics, improving the customer's ability to

2

process and manage identity information.

4.     Viisage's operations began in 1993 and, except for fiscal years 1996 and 2000, when it experienced only modest profits, the Company incurred losses in each fiscal year. Nevertheless, Viisage represented itself to be a growth company with increasing revenues, driven significantly by obtaining publicly bid contracts with governmental entities for secure credentials such as drivers' licenses. Viisage also promoted itself as the leader in face recognition technology.  For the quarter ended March 28, 2004, the "Secure Credentials Segment" of Viisage's business accounted for 85.8 percent of revenues. Viisage's revenue growth was also driven by a string of acquisitions funded principally with newly issued Viisage stock. In early 2004 alone, Viisage completed two acquisitions for an aggregate purchase price of $84.9 million. Continued acquisitions were a significant part of Viisage's business plan going forward and in October 2004, Viisage completed a $34.1 million acquisition using principally $26.2 million worth of newly issued shares of its stock. The ability of the Company to grow its business in the publicly bid secure credential sector and to maintain a healthy stock price to fuel acquisitions was highly dependent on Viisage's reputation and product offerings. Toward that end, Viisage emphasized the purported quality of its product offerings and that it was "extremely well-positioned to compete successfully for emerging opportunities both domestically and internationally."

5.     Before and during the relevant period, the Company issued many news releases and statements touting the capability of its facial recognition technology.  The Company's facial recognition technology, however, was not nearly as effective as it led the public to believe.

3

6.     Before and during the relevant period, Viisage also repeatedly issued press releases to the public, and discussed with securities analysts who covered Viisage, a major $19.5 million contract it had obtained with the Georgia Department of Motor Vehicle Safety ("DMVS") to provide secure drivers' licenses for the State. Unknown to the investing public, however, Viisage had engaged in highly improper conduct in bidding for that contract. Viisage's misconduct was the specific focus of a lawsuit brought by Digimarc ID Systems ("Digimarc"), a competitor in bidding on the DMVS contract, contesting the award of the Georgia DMVS contract to Viisage. Among other things, despite Viisage's efforts to avoid discovery of the improper tactics underlying its winning bid, the Superior Court of Fulton County, Georgia ("the Georgia court") ultimately found "that there were significant instances of misconduct and misrepresentations by Defendant Viisage."

7.     The disclosure of Viisage's misconduct with respect to the Georgia contract would have adversely impacted, *inter alia,* Viisage's ability to successfully bid for other public secure credential contracts and Viisage's planned August 2004 offering of 7.5 million shares of common stock by which it hoped to raise over $60 million. Thus, Viisage falsely represented during the relevant period that the litigation commenced by Digimarc solely involved alleged wrongdoing by the DMVS, and that Viisage was not even a party to the litigation. Viisage thereby concealed its own wrongful conduct in connection with its bid for the DMVS contract, including that:

- Viisage had submitted sample cards as its "production quality" cards, that were in fact produced by a competitor, for which it had no authority to produce and which were not cards

4

Viisage had the ability to produce; and

1. Viisage had falsely stated to the DMVS that it had secured a back-up card production facility to take over license production in the event the central permanent card production facility is compromised, as was required by the operative Request for Proposal.

8.    On July 21, 2004, Viisage announced that it had entered into a settlement with the DMVS by which the DMVS would: (i) pay Viisage $2.5 million for work it ostensibly completed for the DMVS since the bid award; (ii) terminate the contract awarded to Viisage; and (iii) issue a new request for proposal. Viisage touted this settlement as being a result of its initiative to help resolve the dispute on a contract "appropriately awarded to Viisage." In reality, however, the contract was not appropriately awarded to Viisage and, at the time of the settlement, Viisage had been refusing to comply with orders of the Georgia court presiding over the litigation requiring Viisage to make witnesses available for deposition by Digimarc and to produce documents to Digimarc concerning Viisage's lack of a product to actually provide to Georgia if it were ultimately successful in winning the Georgia contract. The settlement was, therefore, a subterfuge on the part of Viisage aimed at preventing these facts from coming to light.

9.    On August 19, 2004, the Georgia court entered a TRO enjoining the settlement, and on September 2, 2004 enjoined the settlement as violative of the Court's July 2003 order preliminarily enjoining any "activities related to implementation of or performance under the contract [awarded to Viisage by the DMVS]." Viisage,

5

however, made no public disclosure of the August TRO until late October and no public disclosure of the September injunction until mid-November. During the period it concealed these rulings, Viisage secured State drivers' license contracts with other States and when it finally disclosed the Georgia court's injunction in mid-November 2004, still publicly maintained that the Georgia litigation was focused solely on alleged wrongdoing by the DMVS. Moreover, in late October 2004, Viisage increased its guidance for 2004 initially provided on May 3, 2004, stating that annual revenue was then anticipated to be between $66-68 million, an increase from the prior guidance of $60-63 million, and Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") was then anticipated to be between $11.5-12.5 million, an increase from Viisage's previous guidance of $11-12 million. Viisage represented in its SEC filings that it "reports EBITDA as a financial performance measure and as an indicator of future performance."

10.    On December 22, 2004, the Georgia court found, based upon an extensive evidentiary record developed after Viisage finally cooperated with the Georgia court's discovery orders, "that there were significant instances of misconduct and misrepresentations by Defendant Viisage." As a result, the Georgia court disallowed the $2 million in payments Viisage claimed it was owed for services it purportedly performed under the contract, and directed a re-bid of the DMVS contract. Viisage did not issue a press release regarding this ruling until December 27, 2004 and that press release omitted any information concerning the Georgia court's finding of Viisage's misconduct.

11.    On February 7, 2005, Viisage belatedly revealed that EBITDA for 2004 was expected to fall below the increased guidance it had provided in late October 2004,

6

the principal reason being the $2 million disallowed by the Georgia court on December 22, 2004. As noted above, however, the Georgia court had preliminarily enjoined the payment on September 2nd -- over one month prior to when Viisage increased EBITDA guidance without disclosure that the increase was premised on receipt of the enjoined funds.

12.    On March 2, 2005, investors were again surprised by news concerning Viisage. In announcing fourth quarter financial results, Viisage revealed that its internal accounting controls were so flawed that they qualified as a "material weakness" under Public Company Accounting Oversight Board's Accounting Standard No. 2 and, as such, violated the provisions of the Sarbanes-Oxley Act relating to the Company's ability to file accurate financial statements. In each of Viisage's Form 10-Q filings during the relevant period, however, Viisage had represented and its principal officers had certified that "[t]here were no changes in our internal controls over financial reporting that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." These internal control failures were so serious that Viisage announced on March 17, 2005 that it was unable to file its Form 10-K for its 2004 fiscal year on time. Viisage did not file its 2004 fiscal year Form 10-K until more than three months later.

13.    As a result of the Company and Individual Defendants' false and misleading statements, Viisage's stock price traded at artificially inflated levels throughout the relevant period.  Viisage took advantage of this artificial inflation by acquiring Imaging Automation ("IA") for $34.1 million, including $26.2 million of Viisage stock, and completing a secondary offering of 7.5 million shares on July 22, 2004 for

7

proceeds to Viisage of over $37 million (the "Secondary Offering"). These proceeds were used to pay off $30.3 million in indebtedness owed by the Company to, among others, Defendant Beck and a company controlled by Defendant Berube. In addition, certain of the Individual Defendants (as noted below) sold over 1,163,000 shares of Viisage stock during the relevant period for collective proceeds of approximately $8,673,000.

14.    During the relevant period, the Company's stock traded as high as $10.34 per share on May 26, 2004. Prior to the late December 2004 public revelation of Viisage's wrongful conduct in connection with its bid for the DMVS contract, Viisage's stock was trading at almost $10 per share. Following the revelations in late December, 2004, and subsequent revelations concerning Viisage's preliminary 2004 results on February 7, 2005, and lack of adequate internal financial controls on March 2, 2005, Viisage's stock traded at $4.50 per share and traded in the ninety day period following these revelations at an average price of $3.53 per share. Indeed, just between the close of trading on March 2, 2005 and the close of trading on March 3, 2005, the stock closed down almost 18% on heavy trading volume.

15.    Following the negative news concerning the Company and resulting decline in the Company's stock price, numerous securities class action lawsuits were filed against the Company and certain of its officers and directors. These cases were consolidated and on February 27, 2006 a consolidated amended class action complaint was filed. The consolidated complaint alleges claims against the Company, and certain of its officers and directors, including Defendants Bailey, Aulet, Berube, Beck, Levine, Reilly, Principato, Nessen, Mouchly-Weiss and Yon, for violations of Sections 11 and 15

8

of the Securities Act, Sections 10(b) and 20(a) of the Securities Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5. The Company is now faced with massive liability from the consolidated securities class action lawsuits and has incurred and will continue to incur legal and investigatory fees and expenses in connection with defending the Company and the Individual Defendants against those lawsuits. Moreover, the Company's corporate image has been irreparably damaged, its market capitalization greatly diminished and its ability to obtain debt and equity financing impaired.

### THE PARTIES

16.    Plaintiff Olympia Levinson Stiegele ("Stiegele" or "Plaintiff") is and was at all times relevant hereto, an owner and holder of Viisage common stock. Stiegele is a citizen of Florida.

17.    Nominal Defendant Viisage is a Delaware corporation with its principal place of business located in Massachusetts. Viisage delivers technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, providing access control and protecting personal privacy. The Company's business involves two related segments: secure credentials and biometrics. The secure credentials solutions segment involves the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies. The focus of the biometric technology solutions segment is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts.

I:\Viisage\Derivative\AmendedComplaint.doc

18.    Defendant Bailey, at all relevant times, served as President and Chief Executive Officer of Viisage. Bailey joined Viisage in August 2002 as Chief Executive Officer and was appointed a Director of Viisage in April 2004. Bailey signed Viisage's Form 10-Qs for its quarters ended March 28, 2004, June 27, 2004 and September 26, 2004, certified that each of those Form 10-Qs "did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that any change in Viisage's internal control over financial reporting was disclosed in the Form 10-Qs. In addition, Bailey signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.    As C.E.O., Bailey was responsible for ensuring that the financial statements and reporting processes, including the system of internal controls, were in compliance with GAAP and relevant rules, regulations and statutes.

19.    Defendant Aulet, at all relevant times, served as the Chief Financial Officer of Viisage. Aulet joined Viisage in February 2003 as Chief Financial Officer. Aulet signed Viisage's Form 10-Qs for its quarters ended March 28, 2004, June 27, 2004 and September 26, 2004, and certified that each of those Form 10-Qs "did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that any change in Viisage's internal control over financial reporting was disclosed in the Form 10-Qs.   In addition, Aulet signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21,

10

2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock. Aulet resigned his position in the fall of 2005. As CFO, Aulet was responsible for ensuring that the financial statements and reporting processes, including the system of internal controls, were in compliance with GAAP and relevant rules, regulations and statutes.

20.    Defendant Principato has served as a Director of Viisage since May, 2001. Additionally, Principato serves as the Chief Financial Officer of non-party Lau Acquisition Group, the largest shareholder of Viisage and until the fourth quarter of 2004, Viisage's source of last resort for liquidity. Principato signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

21.    Defendant Nessen has served as a Director of Viisage since its incorporation in May, 1996. Defendant Nessen was Chairman of Viisage's Audit Committee during the relevant period. As a member of the Audit Committee, Nessen had the responsibility of overseeing the Company's accounting, financial reporting, data processing, regulatory and internal control environments. This responsibility included, but was not limited to: (1) serving as an independent and objective body to monitor the Company's financial reporting process and internal control system; (2) evaluate the Company's financial reporting and compliance with laws and regulations; and (3) overseeing management's establishment and enforcement of financial policies. Defendant Nessen signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed

11

with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

22.    Defendant Reilly has served as a Director of the Company since 1996. Defendant Reilly also served on Viisage's Audit Committee during the relevant period. As a member of the Audit Committee, Reilly had the responsibility of overseeing the Company's accounting, financial reporting, data processing, regulatory and internal control environments.  This responsibility included, but was not limited to:  (1) serving as an independent and objective body to monitor the Company's financial reporting process and internal control system; (2) evaluating the Company's financial reporting and compliance with laws and regulations; and (3) overseeing management's establishment and enforcement of financial policies.  Reilly sold 10,000 shares of Viisage common stock during the relevant period and realized proceeds of $87,000. Reilly signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

23.    Defendant Berube, at all relevant times, served as Chairman of the Board of Viisage, and has served in that capacity since the Company's incorporation in 1996. Berube is Executive Vice President and Chief Operating Officer of Lau Technologies ("Lau").    Lau is the largest holder of Viisage common stock, directly owned approximately 17% of Viisage's issued and outstanding common stock prior to the relevant period and had provided financing to the Company.  During the relevant period, Lau sold 380,602 shares of Viisage common stock on the open market, realizing proceeds of $2,946,685.20.  In addition, Lau realized proceeds of $779,779.00 from the

sale of 141,778 shares of Viisage common stock that were included in Viisage's Secondary Offering of 7.5 million shares of common stock. Berube signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock. Viisage repaid in full its $4.3 million debt obligation to Lau from the proceeds of the Secondary Offering. Berube left his position as Chairman in late 2005. In addition, Berube has a consulting agreement with Viisage under which he receives additional annual compensation of $125,000. Further, Berube is the Executive Vice-President and Chief Operating Officer of Lau Acquisition Group. Berube's spouse also receives $125,000 annually as a consultant to Viisage. Further, the combination of his and his spouse's holdings in Lau, makes them the *de facto* controllers of Lau and Viisage.

24.    Defendant Beck has served as a Director of Viisage since February, 2004. Beck also has a consulting agreement with Viisage under which he receives additional annual compensation of $300,000. Beck was the President and Chief Executive Officer of Trans Digital Technologies Corporation from 1998 until its acquisition by Viisage in February 2004. In connection with that acquisition, the Company issued a $15.3 million promissory note to Beck. Prior to the relevant period, Beck owned 5,869,651 shares, representing 16.4 percent of Viisage's issued and outstanding common stock. During the relevant period, Beck realized proceeds of $779,779 from the sale of 141,778 shares of Viisage common stock that were included in Viisage's Secondary Offering of 7.5 million shares of common stock. Beck signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended

Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock. Viisage repaid in full its $15.3 million debt obligation to Beck from the proceeds of the Secondary Offering.

25. Defendant Levine has served as a Director of Viisage since 1998. Defendant Levine also served on Viisage's Audit Committee during the Relevant Period. As a member of the Audit Committee, Levine had the responsibility of overseeing the Company's accounting, financial reporting, data processing, regulatory and internal control environments. This responsibility included, but was not limited to: (1) serving as an independent and objective body to monitor the Company's financial reporting process and internal control system; (2) evaluating the Company's financial reporting and compliance with laws and regulations; and (3) overseeing management's establishment and enforcement of financial policies. Levine sold 13,500 shares of Viisage common stock during the relevant period and realized proceeds of $100,710. Levine signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

26. Defendant Yon, since June 2004, has served as a Director of Viisage. Yon was CEO of ZN Vision Technologies, a company acquired by Viisage in 2003. Yon is the Chief Executive Officer of Odeon Venture Capital AG, which, prior to the relevant period, owned 949,325 shares of Viisage common stock. Yon has sole voting and dispositive power over the shares beneficially owned by Odeon. During the relevant period, Odeon sold 770,473 shares of Viisage common stock on the open market realizing proceeds of $6,127,489.69. In addition, Odeon realized proceeds of

14

$743,363.50 from the sale of 135,157 shares of Viisage common stock that were included in Viisage's Secondary Offering of 7.5 million shares of common stock. Yon signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

27.     Defendant Mouchly-Weiss, has served as Director of Viisage since 1996 and signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

28.     Defendants Bailey, Principato, Nessen, Reilly, Berube, Beck, Levine, Mouchly-Weiss, Yon and Aulet are referred to collectively as "Individual Defendants."

29.     Defendants Bailey, Principato, Nessen, Reilly, Berube, Beck, Mouchly-Weiss, Yon and Levine are referred to collectively as "Director Defendants or "Defendant Directors."

30.     Non-party Lau Acquisition Corp. ("Lau"), d/b/a Lau Technologies, beneficially owns approximately 13.8% of the Company's stock. The Company has significant relationships with Lau, including two (2) directors, Berube and Principato, being part of Lau's senior management team.  Also, the Company had previously acquired Lau Security Systems from Lau, which resulted in the large ownership interest that Lau has in Viisage, the consulting agreement for Berube, and other financial ties. Prior to the offering described below, Lau provided the Company with a credit facility in an aggregate principal amount of $7.3 million, which was secured by some of the Company's assets.

31.     Viisage's Board of Directors, at the time this lawsuit was filed, consisted of nine (9) members: Bailey, Principato, Nessen, Reilly, Berube, Beck, Levine, Mouchly-Weiss and Yon.  Each of these Directors has been named as a Defendant herein.  As further alleged herein, the Board was incapable of making an impartial determination as to whether to institute legal proceedings to redress the wrongful conduct alleged herein because there is a substantial likelihood that a majority its members would be found liable for non-exculpated breaches of fiduciary duties to the Company by intentional misconduct and/or completely failing to perform their oversight duties to the Company, failing to oversee the Company's compliance with legally mandated disclosure standards and the systemic failure to assure that a reasonable information and reporting system existed.  In addition, a majority of the Defendant Directors, i.e., Berube, Beck, Yon, Levin and Reilly, received a personal financial benefit not shared by other shareholders and the Company from their insider sales of Viisage shares during the relevant period.  The majority of the Directors are also incapable of making an impartial decision concerning whether to institute legal proceedings against the Individual Defendants because of their extensive personal and business entanglements, because of Berube's domination and control of the Board, and the other financial connections between certain Director Defendants and the Company outlined more fully below which compromised their independence from other interested directors.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of their positions as officers, directors and/or fiduciaries of Viisage and because of their ability to control the business and corporate affairs of Viisage, the Individual Defendants owed Viisage and its shareholders fiduciary

16

obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Viisage in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Viisage and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

33.    Each director and officer of the Company owes to Viisage and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

34.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Viisage, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Viisage, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Viisage.

35.    To discharge their duties, the officers and directors of Viisage were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such

17

duties, the officers and directors of Viisage were required to, among other things:

    a.    Refrain from acting upon material inside corporate information to benefit themselves;

    b.    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

    c.    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    d.    Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

    e.    Remain informed as to how Viisage conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

    f.    Ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

36. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations and duties as directors and officers of Viisage, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37. The Individual Defendants breached their duties of loyalty and good faith by allowing the other Defendants to cause or by themselves causing the Company to

misrepresent its condition and business prospects and/or by profited from the sale of their personally held Company shares based on non-public adverse information concerning the Company and by failing to prevent the Individual Defendants from taking such illegal actions.  As a result of the Individual Defendants' illegal actions and course of conduct during the relevant period, the Company is now the subject of several class action lawsuits that allege violations of federal securities laws.  As a result, Viisage has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

      a.    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

      b.    Costs incurred in investigating and defending Viisage and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

38.    Moreover, these actions have irreparably damaged Viisage's corporate image and goodwill.  For at least the foreseeable future, Viisage will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Viisage's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## SUBSTANTIVE ALLEGATIONS

39.    As early as 2002, the Defendants embarked upon a course of conduct designed to mislead the investing public concerning the business prospects of the Company and to enrich certain of the Individual Defendants and their business associates at the expense of the Company and its shareholders.  In doing so, the Company utilized not only SEC filings, press releases and interviews but also the Yahoo Message Board devoted to discussions concerning and the coverage of Viisage and its

stock.   The Individual Defendants also utilized an unsuspecting enthusiast and supporter of facial recognition technology (who has since become a source of Plaintiff's) (the "Source" or "Plaintiff's Source") who had regular communications with numerous Viisage shareholders and investors.[1]   Viisage and the Individual Defendants shared information to the Source knowing that it would be passed on to current potential investors who the Source was in regular contact with.  The goal, among other things, was to prop up the Company's stock price and to complete a secondary offering which greatly benefited certain of the Individual Defendants.

### The Company's Facial Recognition Technology and its Dealings with Piper Jaffray

40.    Initially, Defendants' conduct involved misleading investors concerning the capability and financial prospects of Viisage's facial recognition technology.

41.    In 2002, Viisage reported that it had successfully tested its facial recognition technology at Boston Logan International Airport.  In a May 13, 2002 press release, entitled "Viisage Achieves High Performance in Identifying Subjects at Boston Logan International Airport" the Company, in part, stated:

> Viisage Technology, Inc. (NASDAQ:  VISG), the leader in face-recognition technology and identification systems and solutions, announced today that Viisage has achieved strong results as part of the first phase of its face recognition voluntary pilot program to enhance passenger security at the airport.  Viisage, together with the Massachusetts Port Authority (Mass Port) and the Massachusetts State Police, successfully achieved a high detection rate on planted subjects using Viisage's *FaceFINDER*™ face-recognition screening technology.
>
> An initiative spearheaded by Mass Port, Logan International has become the third airport in the nation to test or use Viisage's *FaceFINDER*™ face recognition technology to enhance the

---

[1]    The Source maintains that his interest in Viisage and its technology was due to the fact he felt in was needed for homeland security purposes.

security of civilian flights.   *FaceFINDER*™ is a fully operational turnkey screening solution from Viisage Technology currently being used at Fresno International Airport in St. Petersburg-Clearwater International Airport.

Face-recognition works by comparing ticketed passengers against the database of terrorists as part of the standard screening procedures.   Mass Port has been instrumental in providing operational and human factor design input that has strengthened Viisage's robust design for all airports.

* * *

According to Tom Colatosti, CEO and President of Viisage Technology, "Our face recognition products provide an important additional security tool as an integral part of an overall layered security system that privately and conveniently improves passenger security.  Our products round out the security process by screening for dangerous people, while the legacy system checks for dangerous things.   As we all learned from the September 11 attacks, the rules of terror have changed, and the new weapon is the dangerous person."

* * *

Colatosti added, "…   We believe achieving these superb performance results in the demanding real world aviation environment demonstrates the efficacy of our technology and will absolutely speed its adoption by airports and other high risk facilities."

Dennis Berube, Chairman of the Board, comments, "Our success at Logan confirms that the airport market represents solid and viable business opportunities for our face recognition products.  We are a leading player in the airport market just as we are a leading player in the casino market where we have 95% share of the installed market."

The system is proving to be a powerful new technology to conveniently improve passenger security by focusing on the human identification of terrorists and other national security risks.

42.   The Company continued to hype the capabilities of its face recognition technology in subsequent press releases.  In a May 16, 2002 press release entitled

"Manchester Airport to Implement Viisage Face Recognition Technology to Enhance Airport Security," "VIISAGE ACHIEVES HIGH PERFORMANCE IN IDENTIFYING SUBJECTS AT BOSTON'S LOGAN INTERNATIONAL AIRPORT" the Company, in part, stated:

> Viisage Technology, Inc. (NASDAQ: VISG), the leader in face-recognition technology and identification systems and solutions, announced today that New Hampshire's Manchester Airport will implement Viisage's SecureFLIGHT™ face recognition system to enhance security and safety for their travelers. Manchester becomes the fourth U.S. airport to adopt this important breakthrough technology that enables security personnel to screen for terrorists and other human threats.
>
> * * *
>
> Commenting on the award, Mark Hodosh, Viisage's Director of Business Development, said, "I am pleased that Manchester Airport has recognized the value and importance of our facial recognition technology."
>
> * * *
>
> Tom Colatosti, CEO and President of Viisage Technology added, "Airport security is a critical linchpin to our Homeland Security. Airports need new security tools and technology that improve security, that are cost-effective, that are sustainable over time and that are convenient and passenger friendly. Face recognition is clearly a powerful technology that uniquely provides such a security solution. We are delighted that Manchester has become part of a growing list of airports choosing Viisage's proven security technology.

43. On May 31, 2002, Viisage issued a press release entitled "Viisage Clarifies Fresno Airport Deployment." The press release stated in part:

> Viisage Technology, Inc. (NASDAQ: VISG), the leader in face-recognition technology and identification systems and solutions, today responded to an incomplete report published yesterday on Bloomberg News which discussed the deployment of Viisage's technology and a pilot program at Fresno's Yosemite International Airport in California.

22

On May 30, 2002 Viisage learned that its trial period at Fresno had ended approximately 30 days ago.  As part of the original agreement, Viisage worked with systems integrator Pelco, a privately held contractor based in California, to demonstrate the effectiveness of its face recognition solution.  At the time of the trial period, all parties involved were pleased with the technical results achieved by Viisage's face recognition technology.

Viisage had made a decision that the requirements for local, on-site support requested by Pelco were not justified in terms of any present or future financial returns.  Further, the Company declined to support Pelco's request to merge its technology with that of a competitor's.

Viisage is currently supporting an increasing number of paying customers, as opposed to pilot programs, including Manchester Airport in New Hampshire and St. Petersburg International Airport in Florida.  Viisage must also support new interest from regional airports and other customers following the Company's successful detection solution results at Boston's Logan International Airport test.

Said Dennis Berube, Chairman, "Management decisions were proper for choosing to maintain a separation of our technology from that of our competitors and for choosing to focus our resources on contracts that will result in revenues for the company."

44.    In a September 2002 letter to the Editor of WPI Transformations Journal, Berube defended the effectiveness of the Company's face recognition technology against critics in the media:

In regards to the issue of performance, face-recognition technology works well in appropriate applications.  Applications for which it is well suited include, Visa identification, border crossings, driver's licenses, airport screening and police booking systems.

There has been a considerable amount of inaccurate information reported and repeated from non-technical sources with regard to the performance of Viisage Technology at Boston's Logan International Airport and the airport in Fresno.  Logan conducted the most comprehensive test of face-recognition technology anywhere in the nation.  **Viisage achieved 90% performance rates during that test - - incredible by any standards, and**

23

**certainly sufficient to help to deter a terrorist from joining one of us on an airplane**.  Face-recognition technology can play an important role in making our airports safer at a nominal cost.  (The Fresno airport, by the way, issued a denial of the story mentioned in the letter shortly after it appeared).

There are 14 companies selling face-recognition technology.  Prior to 9/11, 2 face-recognition companies were acknowledged as competent by the U.S. Department of Defense; Viisage was one of them.  Often, a report by the news media about a failure of face-recognition technology is, in fact, about the failure of a particular company's technology.  With so many newcomers to this arena, there are plenty of opportunities to find negative news.  But generalizing from these individual failures is a disservice to the competent companies that provide a good product and deploy it appropriately.

(emphasis added).

45.    Earlier, in May 2002, the Source, who by then was becoming well-known on the Yahoo Message Board for Viisage as of an authority on and advocate of facial recognition technology, including Viisage's, was invited to the Company's headquarters by Viisage employees Sean Mack ("Mack") and Cam Queeno ("Queeno").[2]  Mack and Queeno served respectively, as the Vice President, Controller and Treasurer and the Vice President, Marketing of the Company.

46.    During his encounter with Mack and Queeno at the Company's headquarters, the Source was told he could tell which company would be receiving a contract from the Transportation Safety Administration (TSA) to install facial recognition technology at airports.  According to the Source, he was told by Queeno and Mack that he could tell based on which company's equipment was still at Logan in May 2002.  At that time, Visionics, now Identix, had already pulled their equipment from the Airport but

---

[2]    According to the Source, Berube regularly followed the postings on the Yahoo Message Board and would often become upset over what he would read.  The Source was told this by Tom Colatosti, Viisage's former President.

Viisage's equipment was still there.  The Source said he observed Viisage's technology in use during a visit to the airport with Queeno and Mack.  Following the visit, the Source posted on the Yahoo Message Board that he believed Viisage would be receiving a contract from the TSA.  According to the Source, he did so believing it was obvious based on the fact that Visionics had pulled its equipment.  What he did not know at the time, the Source explained, was neither the TSA nor Mass Port ever indicated to Viisage that there would be any contract resulting from the testing done at Logan Airport in 2002; and that Visionics had pulled their equipment from the Airport simply because the testing period was over.

47.    In June 2002, Berube personally invited the Source to a conference in Washington, D.C.  Before the conference began, Berube spent about 30 minutes speaking to the Source.  According to the Source, Berube told the Source about his plan to have Viisage's facial recognition technology installed in every regional airport in the country.  Berube explained to the Source that Viisage's technology would have almost certainly prevented the way 9/11 unfolded.  Also, according to the Source, Berube "was very clear about Viisage's supposed success at Logan Airport."  He assured the Source that the federal government knew Viisage's technology worked and large contracts for facial recognition technology would be coming very soon.  When asked by the Source why he was so sure of this, Berube offered three reasons:  (1) the technology worked; (2) his wife sat on the Department of Defense Technology Board and, (3) he had an "in" at the State Department.  He also told the Source that he had plans in the future, when Viisage had enough cash, to bring a lawsuit against Viisage's largest competitor for patent infringement.  By the time he was done speaking with

25

Berube, the Source, he said, was convinced beyond any shadow of a doubt that Viisage's facial recognition technology should be employed at every airport, customs or border check and about anywhere else terrorists might travel to or through.

48.    Also, it was in June 2002, at a conference in the City of New York where Viisage was presenting, when the Source first heard the expression "watch the tape." According to the Source, the phrase "watch the tape" was used by Berube to indicate that good news concerning the Company would be coming soon.  Often, according to the Source, Berube's use of the phrase would be followed shortly by a positive announcement concerning Viisage.

49.    While attending this June 26, 2002 conference, the Source received a telephone call from Chris Johnson ("Johnson"), an employee of Piper Jaffray, a securities broker/dealer.  According to the Source, Piper Jaffray and its clients were large investors in Viisage securities.  Piper Jaffray also acted as a co-manager of Viisage's 2004 secondary offering.  According to the Source, Johnson first began communicating with the Source in early 2002.  Over the course of their relationship, Johnson and the Source talked over 100 times and constantly exchanged e-mails. According to the Source, Johnson would call him almost daily asking him to speak with Piper Jaffray clients and reassure them that Viisage was a good company.  According to the Source, he did speak positively concerning the Company with Piper Jaffray's clients, believing what he said to be true.  In any event, during their June 26th telephone conversation, Johnson told the Source that Berube had told Johnson that he should watch the tape that afternoon because Viisage would be releasing good news.

50.    According to the Source, good news did in fact come.  In fact on June 26, 2002 the Company announced that it had formed a strategic alliance with Enterprise Air, Inc. to integrate that company's advanced wireless mobility platform together with Viisage's face-recognition technology and H.D.S.I.'s PECOS command and control software environment.    The Press Release issued by Viisage concerning the announcement stated in part:

> Commenting on this breakthrough technology and partnership, Cam Queeno, Chief Marketing Officer at Viisage, said, "Continuing our strategy of partnering with best-in-class market leaders, we are delighted to be working with Enterprise Air and H.D.S.I. to provide government and commercial customers with an unparalleled, robust, and integrated secure wireless solution to their security and command and control needs.

51.    By the fall of 2002, the Source's presence on the Yahoo Message Board was growing, and, according to the Source, Berube even thanked him for his support. During this time period, according to the Source, the Source was in touch and communicated with well over 100 hundred Viisage investors that controlled probably 5-10% of Viisage stock.

52.    Viisage continued to hype its facial recognition technology throughout 2002, 2003 and into 2004 in subsequent press releases and elsewhere.  As a result, the Company had convinced many investors and much of the public, including Plaintiff's Source, that Viisage had viable facial recognition technology that would serve as a valuable tool in the war on terrorism.

53.    The reality of the situation however, was, as the Defendants knew at the time, Viisage's facial recognition technology was not what the Company had advertised it to be.  The further reality of the situation was that the Company and Berube had

shared confidential inside information about the Company with Piper Jaffray which Piper Jaffray utilized to profit by trading Viisage stock.

54.     In January 2003, the Source noticed that the federal government was not allocating money for biometrics the way it was needed and that programs were being delayed and, in some cases, cancelled.  Also, by this time, according to the Source, it was pretty clear that the United States was going to war in Iraq.  At this time the Source told Piper Jaffray's Johnson that he could no longer support Viisage stock the way that he had because money from the government was not coming in the way it was needed. Johnson told the Source to hang in because "there was a lot going on at Viisage that I didn't know about."  The Source said Johnson also told the Source that he would be buying Viisage stock.

55.     According to the Source, Johnson also told him that he (Johnson) had talked with Berube several times and Berube told him about what would be said in upcoming conference calls and also about a contract that Viisage had but that not been announced.   In fact, according to the Source, Johnson was privy to information concerning the Company that other investors in Viisage were not.   According to the Source, Johnson knew what Viisage was working on, what contracts it was in line to get and what its financial guidance would be.  Also in January 2003, Johnson was told by a large client of Piper Jaffray and Johnson's, Bahram Akradi, that Akradi was going to be buying all the Viisage stock that he could.  Akradi told the Source that we was going to raise money to buy the stock by selling property that he owned in Chicago and that he was going to stop short of 5% ownership of the Company which would trigger SEC reporting requirements.   In fact, everything Johnson told the Source that he claimed

28

Berube had told him, came to fruition, the Source said. According to the Source, Viisage gave the guidance Johnson indicated and announced acquisitions as Johnson said Viisage would. Also, according to the Source, Johnson was accurate with his prediction about a driver's license contract with the State of Oklahoma that the Company received. According to the Source, Piper Jaffray was able to use the inside information it had concerning Viisage to buy Viisage stock when it was close to its lows, when other investors were not buying or were selling the stock, knowing Viisage would be making favorable announcements in the near future.

56.    Some of this information was shared by Johnson with the Source in a telephone conversation of which Plaintiff's counsel has obtained a recording.

> Source:    There is a situation there I'm not comfortable with. … What's happening here, investors, I'm getting more calls and more questions in the last few days than I have in the last few weeks.  People feel they need to make a decision because we're approaching the conference call. Either sell before the conference call, during or after. … The question is, that people are asking me, and they are asking me … we've seen nothing from the Company in over sixty days, do you have confidence in the management?
>
> Johnson:    Talked to Dennis [Berube] yesterday and talked to Bernard [Bailey] this morning for probably 15 minutes. … Here's what I would tell these guys [investors]. Look, number one, they're going to give their guidance for next year and he said it's going to be nice organic growth. I don't know what that means, 20%, 30%, whatever. They're doing two acquisitions which will be announced, and that's why things have been so quiet.  They're going to do two acquisitions - - you're probably dead on on the one.  Those will probably be 30 to 45 days.  He's going to make it clear on the conference call that they're working on them. They'll probably be done in six weeks - - something like that. They sound like really good ones.  And then, screwed up my notes here, oh and then he brought in this new CFO.

29

Johnson further related during this conversation that it sounded like the Oklahoma contract was coming next week.

57.    Also in January 2003, Johnson told the Source that Viisage was trying to negotiate a business relationship with Rudy Giuliani, the former mayor of New York City.  Johnson told the Source that Akradi was intending to purchase Viisage stock before any announcement about Giuliani was released by Viisage.  The Source said Johnson told him over and over not to say a word to anyone about it; and that if he did, Johnson could get in big trouble and it would cause problems.[3]

58.    According to the Source, Piper Jaffray profited from the inside information concerning the Company received from Defendant Berube and the Company.  The Source said that there were times during 2003 and 2004 that Johnson told him Piper Jaffray was buying and selling Viisage stock.  The Source said that one e-mail he received from Johnson in March 2004 stated that Piper Jaffray had made $12 million plus selling out part of its Viisage stock position.  The Source said Johnson spoke of selling $500,000 shares in one week and still having more to sell.

59.    The fact that the Company's facial recognition technology was not what the Company had stated it to be, and that the Defendants knew it, was confirmed by former employees of the Company in telephone conversations with Plaintiff's Source.

60.    In one such conversation, in response to the question what made you think that the testing procedure at Logan Airport  (that Berube spoke about in his September 2002 letter to the editor) was bogus, former Viisage Vice President, Bob Schmidt replied:

---

[3]    In fact, the prospective Rudy Giuliani relationship never came to fruition.

> It was the way it was conducted. …  The problem was that when you use a limited number of people to go through a checkpoint, and you're doing that for I don't know how many days, they did it for 30 days or something, the person who is sitting there basically remembers the people you know by face.  And you have to … look at the whole procedure, the way the thing was run.  That if you really get into the intricacies of it you can see exactly what was going on.

61.    Similarly, the Source asked a former Viisage employee who conducted demonstrations of Viisage's facial recognition technology to potential clients.  Don Van Dyne about whether the testing at Logan Airport was "bogus."  In response to this question Van Dyne related:

> It was a false demonstration.  It was rigged so that they could get the results that they wanted.

62.    Van Dyne further explained:

> What I effectively did is I went into Bob [sic] [Skip] Cusak's office and what I basically said was this is not a test.  You've got everything rigged and what you're doing is, instead of doing facial recognition, you're going to have somebody watching the screen and they're going to go through, and they're going to see these people walking through and they're going to get used to them.  And this system, this is just a false test.  And that's what I, I basically told him.  He said well that's the only way we can possibly pass.  And he said and that what's Dennis Berube wants.

63.    Van Dyne continued in the conversation:

> This [90%] was a criteria that was set up before even any of these meetings [about Logan Airport] started.  Yes, that is a fact.

64.    Van Dyne continued:

> But everybody knew that.  The criteria was 90%.  Okay, that's what we had to meet in order to be successful at this, for the demonstration.

65.    The conversation continued:

31

> Source:      So it's your feeling that the testing parameters were set up that way to achieve 90%?
>
> Van Dyne:   (inaudible), possibly do it, guarantee it, basically.
>
> Source:      So in your mind it wasn't a legitimate test.
>
> Van Dyne:   No, it was not a legitimate test.

66.    Van Dyne continued:

> The 90% criteria was the factor that we worked towards. When I heard, when I heard how the test was going to be performed I went to Skip [Cusack] and I said, Skip, this is not a test. This is just, this is a, this is something you're doing just to, so we can assure a 90% success rate. And he said, yes that's true Don but it's the only way we can do it.[4]

67.    Van Dyne further agreed with the Source that "everybody" knew that it was a bogus 90% result. Van Dyne further related that during this time period Cusak was working directly under Berube. Van Dyne further agreed with the Source that it was a true statement that everybody knew that Viisage's technology was not what it was hoped to be.

68.    With respect to the contract at the Manchester Airport, announced in the Company's May 10, 2002 press release, Van Dyne confirmed that Viisage returned the $125,000 payment for same and the equipment was never installed. According to Van Dyne, Viisage reneged. Van Dyne further agreed with the Source that the only logical explanation for this was that Viisage did not want the embarrassment of going forward with the contract knowing that the technology would not work the way it was advertised.

---

[4]    Viisage did achieve 90% during a small part of the test using the admittedly flawed testing procedures.

69. In response to the question, looking back on it would you call the Company's actions a deceptive practice being perpetrated by the Company to buy time until it could figure out what to do, Van Dyne responded, "That would make more sense that anything else at this time."

70. The Source further related that Mark Hodish, Viisage's former director business development, stated that he did not think that facial recognition technology was capable of reaching 50% performance much less 75% or 90%. In fact, according to the Source, Hodish told him that Viisage would have been happy to have achieved 50% performance.

### The State of Georgia Drivers' License Contract

71. On May 24, 2002, the Georgia Technology Authority ("GTA") issued RFP No. GTA 000051 ("RFP") on behalf of the Georgia Department of Motor Vehicle Safety ("DMVS") seeking proposals to provide a digitized license system for the DMVS. Sealed proposals were due by July 19, 2002 and were submitted by Viisage, Digimarc (the incumbent provider of such services to the DMVS) and a third bidder.

72. Although the contract was awarded to Viisage on November 12, 2002, Digimarc challenged the award and, after exhausting administrative remedies, filed an action in the Superior Court of Fulton County, Georgia against the GTA and DMVS on March 5, 2003.

73. After a brief period of expedited discovery, on May 20, 2003, Digimarc filed a motion seeking to preliminarily enjoin further implementation of and performance under the contract awarded to Viisage. By order dated July 31, 2003, the Georgia court granted Digimarc's motion and entered the injunction until further order of the court

33

finding, *inter alia,* that "[t]he Plaintiff has made a compelling case that irregularities occurred during the procurement process, and if the case proceeds to a full trial on the merits, there is a substantial likelihood that the Plaintiff will prevail." These "irregularities" referred to by the Georgia court included substantial wrongdoing by Viisage. Accordingly, by consent of the parties, the Georgia court entered an order on November 7, 2003 directing that Viisage be added to the action as "a necessary party." Digimarc filed its First Amended Complaint adding Viisage as a defendant on November 12, 2003.

74.    As was subsequently confirmed by Digimarc with the benefit of discovery, there existed substantial evidentiary support for Digimarc's contentions that Viisage had made material misrepresentations to the GTA and DMVS in connection with its bid.

75.    For example, a requirement of the RFP was for sample drivers' licenses to be submitted for review by GTA's Technical Evaluation Team to insure the samples met the specifications identified in the RFP. In an e-mail dated August 2, 2002 from Barry Shepard, Contracting Officer for the GTA, to Mohammed Siddiqui, Marketing Director of Viisage's 3SI Division (and person in charge of Viisage's RFP proposal), the GTA informed Viisage that although Viisage had submitted an independent lab report with its proposal attesting that Viisage's samples met the RFP requirements, GTA's Technical Evaluation Team concluded that they failed "durability standards." In the e-mail, Mr. Shepard explained that the sample of the temporary document provided by Viisage "tore easily" and with respect to the sample of the permanent document:

> Lamination easily removed, information left intact on card face; information easily altered; OVD [optical variable device] remained

34

intact on removed lament and showed no signs of fracture.

This meant that the printed information on the permanent card samples submitted by Viisage could be altered and the cards then reassembled without detection. Mr. Shepard requested confirmation from Viisage that the actual cards to be produced would, in fact, meet the RFP specifications and requested 18 new samples of each of the temporary and permanent cards and that such samples be "actual production cards." Viisage, however, could not make that representation. As confirmed by Viisage's Senior Director of ID Services, Ifti Ahmed, during his deposition, Viisage believed it could not resubmit additional samples of the same permanent cards as they would have failed the requirements of the RFP.

76.    Accordingly, on August 26, 2002, Viisage submitted a "Temporary and Permanent Card Re-Submission," which included two entirely new proposed permanent card solutions, which it claimed were "production quality samples" as required by the GTA and DMVS. Viisage referred to the first in its submission as the "Georgia Design Sample 3M Confirm Laminate" (the "Georgia Design Card"). It referred to the second as "Production Quality Card 3M Confirm Laminate" (the "New York Design Card"). The latter, however, was a drivers' license containing artwork and graphics from New York State. As confirmed by testimony contained in Digimarc's submissions to the Georgia Court, a Viisage competitor, De La Rue, manufactured the New York Card Design Card. As De La Rue used a 3M laminate, De La Rue had provided samples of their finished cards to 3M as a courtesy for 3M's own use; not, as 3M's account representative in charge of the De La Rue account testified, to be provided to a competitor -- Viisage -- to help it win a bid.

35

77.    Moreover, as Ifti Ahmed testified, Viisage did not know how the New York Design Cards it submitted -- as its own "production quality" cards -- were made or what materials were used to make them. He testified: "I do not know how [a] New York card is made. I know it uses a 3M Confirm material which is the issue that we were trying to address, but I do not know exactly how the New York card is made." Another Viisage witness, Craig Vosseteig, testified as follows:

> Q.    As far as you know, Mr. Vosseteig, were the New York driver's license samples that were given to Viisage by 3M made using the same production method, means, equipment and construction as the Georgia design samples that you got made with 3M's assistance?
>
> A.    I don't know that. I don't know what were those New York samples came from.[sic] Or how they were produced.

Thus, to avoid being precluded from further consideration on the bid, Viisage had deceptively submitted to the DMVS and GTA sample cards that were not its own, that Viisage did not have authority to submit, and as to which it did not even know the method of production.

78.    On August 28, 2002, Charles Nixon, Contracting Officer for GTA, advised Mohammed Siddiqui by e-mail that the submitted samples "do not appear to be production quality, as the lamination is removed intact with very little effort." Mr. Nixon further asked Mr. Siddiqui in his e-mail to either confirm that the Georgia Design Card, which had not been labeled "production quality," was in fact "production quality" or to submit additional samples of the New York Design Card, as Viisage had submitted only one sample of it. In Mr. Nixon's e-mail, he emphasized that "production quality"

cards "should be produced using the same methods, materials, equipment and specifications as what is being proposed for Georgia."

79.    In an August 28, 2002 letter by Mohammed Siddiqui to Charles Nixon, Viisage conceded that the samples of the Georgia Design Card it provided were not "production quality" samples, but that it was delivering "17 additional production quality samples" of the New York Design Card.

80.    This representation was also false and misleading, as these were simply additional samples made by De La Rue that were improperly provided by Viisage. None of these additional samples were "production quality."

81.    The RFP also required each bidder to describe its plan to produce permanent cards in the event that a disaster disrupted the ability to issue cards from the primary issuance facility in Georgia. Viisage stated in its response to the RFP that it "had made arrangements with Arthur Blank and Company to use their card printing facility as a backup, in case of disaster at the permanent facility in Georgia." As Craig Voesseteig testified, however, Arthur Blank and Company did not have experience in printing the types of cards being proposed by Viisage nor did it have the equipment necessary to laminate or die-cut the individual cards. Moreover, Viisage had no binding agreement with Arthur Blank and Company to produce the cards even if Arthur Blank had the ability to produce the cards. Indeed, none of the witnesses put forward by Viisage as knowledgeable about the arrangement with Arthur Blank and Company could confirm that Viisage had in fact a binding arrangement with Arthur Blank and Company as represented in Viisage's RFP response. Craig Vosseteig testified that he had no idea why Viisage had stated that Arthur Blank and Company would serve as

the necessary back-up as he knew that it did not have the equipment necessary to do so.

82.    In an attempt to conceal these facts, Viisage engaged in a determined effort to stymie Digimarc's discovery efforts while at the same time concealing from the investing public its own wrongdoing in connection with responding to the RFP. Therefore, when Digimarc sought full discovery from the defendants concerning its contentions that Viisage as well as the GTA and DMVS had engaged in significant improprieties, Viisage was recalcitrant. This necessitated the filing of a motion to compel by Digimarc on April 20, 2004.

### Additional False and Misleading
### Statements During the Relevant Period

83.    Notwithstanding the evidence of Viisage's own wrongdoing and the fact that it was integral to Digimarc's claims, Viisage characterized the litigation brought by Digimarc, in its Form 10-Q for the period ending March 28, 2004, filed with the SEC on May 12, 2004, as one **solely concerned** with allegations that the DMVS failed to comply with its own bid process. Specifically, Viisage represented in the Form 10-Q that was signed by Defendants Bailey and Aulet that:

> On July 31, 2003 the superior court for Fulton County, Georgia issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install a new drivers' license system for the State of Georgia. This injunction is the result of a lawsuit filed in March 2003 by one of our competitors, Digimarc ID Systems, LLC. The suit claims that the Department of Motor Vehicle Safety did not comply with its own bid process when selecting a vendor for the digital drivers' license program. The merits of Digimarc Corporation's claims against the Department of Motor Vehicle Safety are to be addressed in further court proceedings. The Department of Motor Vehicle Safety has

38

confirmed that our contract with them remains in place. However, if the lawsuit is successful and we lose the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years. In addition, although we expect that the Department of Motor Vehicle Safety would be required to reimburse us for our costs incurred under the contract, if we are unable to obtain reimbursement of those costs, we could be required to recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

84.    Viisage further stated in its Form 10-Q under Item 4 - Controls And Procedures:

(a) Evaluation of disclosure controls and procedures. Our management, with the participation of our Chief Executive Officer, or CEO, and Chief Financial officer, or CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of March 28, 2004.

* * *

Based on this evaluation, our CEO and CFO concluded that, as of March 28, 2004, our disclosure controls and procedures were (1) designed to ensure that material information relating to us, including our consolidated subsidiaries, is made known to our CEO and CFO by others within those entities, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms.

85.    In Exhibits 31.1 - 31.2 to the Form 10-Q, Defendants Bailey and Aulet each certified pursuant to Section 302 of the Sarbanes-Oxley Act Of 2002, among other things, that:

- Based upon each of their respective knowledge, "this quarterly report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report."

39

- The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15 (e) and 15d-15(e)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

- The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

86.    Only ten days later, on May 21, 2004, Viisage filed an Amendment to a

Form S-3 Registration Statement to register for resale 5,221,454 Viisage shares held

by six beneficial owners of Viisage stock, including 1,054,798 shares held by Odeon

Venture Capital AG for which Defendant Yon had sole voting and dispositive power

and 1,054,798 shares held by Dr. Christoph v.d. Malsburg, then a member of Viisage's board of directors. Defendants Bailey, Aulet, Berube, Levine, Mouchly-Weiss, Principato, Nessen and Reilly signed this Registration Statement. At the time this Registration Statement was filed, Viisage stock was trading at $8.51 per share. This Form S-3/A contained the same material misrepresentations and omitted the same material information concerning the Georgia litigation, as the aforementioned Form 10-Q and indeed incorporated that Form 10-Q by reference.

87.     On June 3, 2004, the Georgia court granted Digimarc's motion to compel Viisage to produce certain witnesses for deposition pursuant to Rule 30(b)(6) and for Viisage to produce, among other things, the following categories of documents:

- documents relating to post-November 12, 2002 changes in Viisage's technical proposal with respect to Viisage's proposed back-up card production facility;

- documents reflecting changes to Viisage's proposed vendor costs in connection with the change in POS vendor;

- documents reflecting how Viisage came to submit New York State drivers' licenses to the DMVS as being production samples of Viisage;

Viisage was also directed to certify to the Georgia court by affidavit that "a thorough and diligent search has been completed and any responsive documents produced."

88.     On June 21, 2004, Viisage filed a Form 10-Q/A, signed by Defendants Bailey and Aulet, for the quarterly period ending March 28, 2004 to include certain pro forma information with respect to its previous acquisitions of ZN Vision Technologies AG and Trans Digital Technologies Corporation. No change, however, was made in its

disclosures concerning the Georgia litigation or concerning the Company's internal financial controls.

89.    Also on June 21, 2004, the Company filed a Form S-3 Registration Statement containing a preliminary prospectus for a Secondary Offering of 7.2 million shares of newly issued common stock by Viisage and for the sale of 300,000 shares by Lau, Yon, and Beck. The June 21, 2004 Registration Statement was signed by Defendants Bailey, Aulet, Berube, Mouchly-Weiss, Principato, Levine, Nessen, Reilly, Beck, and Yon. The Registration Statement incorporated by reference, *inter alia,* Viisage's Form 10-Q and amended Form 10-Q for the quarterly period ended March 28, 2004.

90.    The Secondary Offering was essential for Viisage. It was also extremely beneficial to Defendant Directors, Berube, Beck and Yon.  Viisage had not reported a profit in 2001, 2002, or 2003 and had reported a net loss in the first quarter of 2004 as well. As of March 28, 2004, Viisage had total debt of $31,423,000, of which $15.3 million was owed to Defendant Beck and approximately $5 million was owed to Lau. The interest expense on the debt was substantially hampering its ability to report a profit. The principal stated purpose of the Secondary Offering was to repay approximately $30.3 million of indebtedness, which would virtually eliminate interest expense from Viisage's balance sheet. Disclosure of the true state of affairs concerning Viisage's bid for the Georgia DMVS could have jeopardized the offering or the ability to raise sufficient funds to extinguish the debt, including the debt owed Defendant Director Beck and Defendant Director Berube via Lau. Accordingly, the Registration Statement merely continued the same disclosures contained in its Forms 10-Q and 10-Q/A for the

42

quarter ended March 28, 2004, and in its May 21, 2004 Form S-3/A without any mention of the wrongdoing with which Viisage was charged.

91.    Substantial efforts were made to ensure the success of the Secondary Offering. Viisage representatives appeared at numerous conferences in May 2004 to generate interest in the Company's Secondary Offering. On May 5, 2004, Defendant Aulet presented the Company and its prospects at the JP Morgan 32nd Annual Tech and Telecom Conference in San Francisco. On May 18, 2004, Defendant Bailey presented again at the American Electronics Association Micro Cap Financial Conference in Monterey, California. On May 19, 2004, Defendant Aulet presented for the second time that month at the Piper Jaffray Technology Conference in New York City.

92.    On July 1, 2004, Digimarc moved the Georgia court to compel Viisage to comply with the Georgia court's June 3, 2004 discovery order and for sanctions against Viisage due to its abject failure to produce the ordered documents-documents Digimarc reasonably maintained were necessary before the directed depositions could go forward.

93.    In the face of this motion, and with the planned Secondary Offering only weeks away, Viisage sought to prevent the requested documents or depositions from ever occurring by agreeing with the DMVS to terminate the contract Digimarc was challenging. Thus, on July 21, 2004, Viisage issued a press release relating to the Georgia litigation. In that press release entitled "Viisage Takes Initiative to Help End Stalemate in Georgia Drivers' License Contract Dispute: Viisage to receive $2.5 million payment; New request for proposals to be issued by Georgia Department of Motor

Vehicle Safety", Viisage stated that:

> the Company has taken decisive action to resolve the continuing stalemate over the implementation of the State of Georgia drivers' license contract. Under the terms of the agreement with the Georgia Department of Motor Vehicle Safety (DMVS), Viisage will receive a settlement of $2.5 million as reimbursement for work completed on the drivers' license contract awarded to Viisage in November 2002. This settlement terminates the current Georgia DMVS contract with Viisage. The agency has confirmed that it intends to file a motion to dismiss the lawsuit initiated by a Viisage competitor contesting the contract award. The Georgia DMVS also has confirmed that it plans to issue a new request for proposals for a new drivers' license system as soon as possible and no later than the end of October 2004.

In addition, Defendant Bailey stated in that press release:

> The State of Georgia Department of Motor Vehicle Safety has a responsibility to protect its citizens from identity-related crimes. Recognizing that the State has been unable to fulfill this responsibility for the past year due to the litigation, we chose to take a proactive step to help resolve this issue. Viisage and the State agreed that for the benefit of both our constituents, it was best to terminate our contract, settle final payments and enable the State to issue a request for proposals for a new contract.
>
> This is an amicable agreement with a valued customer on a contract that we believe was appropriately awarded to Viisage. We fully intend to compete for the new contract and are confident that, if re-awarded the contract, our advanced technology identity solutions would successfully fulfill the Georgia DMVS's needs for a state-of-the art solution.

94.    On that same day, July 21, 2004, Viisage also issued a press release announcing its financial results for its second quarter ended June 27, 2004, in which Defendant Aulet reaffirmed that Viisage expects "revenue between $60-63 million and EBITDA of $10-11 million" for 2004.

95.    In a conference call with analysts held the following day on July 22, 2004, Defendant Bailey elaborated further on the termination of the Georgia DMVS contract stating:

44

*Viisage was never a party to this lawsuit, which has dragged on and on for a year and a half nor were any allegations of impropriety ever lodged against our company.* Still and all, with more than $1m spent already in legal fees as a related party and no prospect of a breakthrough in the logjam within the foreseeable future, we decided it was time to act.

Let me put this in context. Almost two years ago, when I joined Viisage, I said that we would build this company from the customer end. Central to that was a core value that states that we are committed to the success of our customers. That means making sure that they are successful in all they do, not just implementing on our contracts. *As a result, we had to make sure that we lived by our core values.* So rather than continue to let the State waste money and continue to deprive their customer of the advantages of Advanced Identity Solutions documents, we took action.

We offered an approach that allowed the State to move this procurement from the courts to the marketplace where we believe it belongs. The terms of this settlement are spelled out in the press release we issued.  What's most important are two facts. First, this step will enable the State to end the ongoing legal battle with its enormous costs for all parties.  Second, the State will be reissuing an RFP for this contract before the end of 2004, allowing its citizens to finally get the secure identity document that they require for their protection.

(emphasis added).

96.    In the conference call, Defendant Aulet stated further that "[t]he cash total

will be increased by the payment we are receiving from the State of Georgia of $2.5

million, which will be recorded in the third quarter of this year."[5]

---

[5] Also, Plaintiff's Source had a conversation with Berube concerning the issues surrounding the Georgia state driver's license contract.  The Source spoke with Berube concerning the protest and the eventual lawsuit that Viisage's competitor Digimarc filed. Berube assured the Source that Viisage did nothing wrong and even in the worst case scenario, Viisage would recoup all money for the work it had done for and invested in the contract.  Gerry O'Toole who posted frequently on the Yahoo Message Board under the title "thetruthwinsout", and who according to the source was regularly provided significant information concerning the Company from Berube, echoed on the Yahoo

45

97.     On July 22, 2004, Viisage filed an Amended Registration Statement with the SEC with respect to Viisage's Secondary Offering.   The Amended Registration Statement was signed by Defendants Bailey, Aulet, Berube, Mouchly-Weiss, Principato, Levine, Nessen, Reilly, Beck and Yon.    In the Amended Registration Statement, Viisage stated:

> In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department *of* Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract.

Thus, Viisage asserted that the Georgia DMVS had "terminated the contract for convenience" in a further effort to avoid any disclosure of its own wrongdoing, and to maintain the fiction that it was not even a defendant in the action.  Viisage also reported

---

Message Board the words that Berube had said to the Source concerning the Georgia state drivers license contract.   According to the Source, Tom Colaosti the former President of Viisage, told him that O'Toole, who was one of Berube's closest friends, was being given significant information concerning the Company by Berube.

that the DMVS had filed a motion to dismiss the Georgia litigation based upon termination of the contract. In reality, Viisage also filed a motion to dismiss Digimarc's complaint on the same day the DMVS' motion was filed - July 21, 2004. The Amended Registration Statement incorporated by reference, among other things, Viisage's Form 10-Q and Amended Form 10-Q for the quarterly period ended March 28, 2004, and Viisage's July 21, 2004 Press Release that was included in a Form 8-K filed by Viisage with the SEC on that date.

98.    On July 23, 2004, Digimarc filed a motion for the entry of a temporary restraining order preventing the DMVS and Viisage from consummating the announced settlement on the grounds that the termination of the contract awarded to Viisage and payment of $2.5 million would violate the Georgia court's injunction issued on July 31, 2003. Specifically, Digimarc contended that the settlement payment of $2.5 million Viisage characterized in its Press Release dated July 21, 2004 "as reimbursement for work completed on the driver's license contract awarded to Viisage in November 2002" constituted "activity related to ... performance under the contract" which was prohibited by the July 31, 2003 injunction order.

99.    On or about August 4, 2004, the Amended Registration Statement for the Secondary Offering became effective and on August 5, 2004, Viisage filed with the SEC a prospectus (the "Prospectus") for the Secondary Offering stating that the shares were being offered at $5.50 per share. In the Prospectus, Defendants repeated virtually verbatim the misleading and incomplete disclosure it made in the Amended Registration Statement concerning the Georgia litigation and again falsely asserted that the Georgia DMVS **had merely** "terminated the contract for convenience" and

47

falsely implied that Viisage was not a party to the litigation. Viisage added only one sentence to the Prospectus concerning the Georgia litigation that was not contained in the Form S-3/A, indicating that Digimarc sought to enjoin the payment of $2.5 million. The Prospectus incorporated by reference the same documents as the Amended Registration Statement. The Secondary Offering raised approximately $37.1 million for Viisage, of which $30.3 million was used to repay indebtedness, principally to Beck and Lau, and approximately $2.3 million for Defendants Berube, Beck, and Yon from their sales of Viisage stock.

100.    On August 11, 2004, Viisage filed its Form 10-Q for the quarter ended June 30, 2004. In that Form 10-Q, signed by Defendants Bailey and Aulet, with regard to the Georgia litigation, Viisage merely repeated the false and misleading disclosure it had provided in the Prospectus. It further stated under Item 4 - Controls And Procedures:

> (a) Evaluation of disclosure controls and procedures. Our management, with the participation of our Chief Executive Officer, or CEO, and Chief Financial officer, or CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of June 27, 2004.
>
> Based on this evaluation, our CEO and CFO concluded that, as of June 27, 2004, our disclosure controls and procedures were (1) designed to ensure that material information relating to us, including our consolidated subsidiaries, is made known to our CEO and CFO by others within those entities, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms.

101.    It also contained the same Sarbanes-Oxley Section 302 Certifications by Defendants Bailey and Aulet as they provided in Viisage's Form 10-Q for the prior quarterly period, but with respect to the second quarter.

102.    On August 19, 2004, the Georgia court granted Digimarc's motion for a TRO enjoining consummation of the settlement announced by Viisage on July 21, 2004 just before its completion of the Secondary Offering. The Georgia court held that the TRO would be in place until September 2, 2004 - the day after the Georgia court was going to hold a hearing on whether to enter a preliminary injunction regarding Viisage's settlement with the DMVS.

103.    On August 23, 2004, Digimarc filed it Second Amended Complaint against the GTA, DMVS and Viisage. Based in part upon the discovery obtained by Digimarc described above, the Second Amended Complaint spelled out in detail the highly improper conduct by Viisage, including the fact that Viisage did not have the ability to manufacture the cards it had submitted to the Georgia DMVS and had submitted another manufacturer's card as its "production quality" samples without disclosing that fact.

104.    On August 23, 2004, Digimarc also filed its motion to preliminarily enjoin consummation of the settlement agreement. In that motion, Digimarc detailed much of the evidence supporting its allegations of Viisage's improper conduct described above.

105.    The Georgia court held a hearing on Digimarc's motion on September 1, 2004 and by order dated September 2, 2004:

> Enjoined the proposed settlement between GTA and DMVS and Viisage of $2.5 million and transfer of certain goods and equipment by Viisage to the State finding the settlement "constitutes 'activities related to implementation of or

49

performance under the contract dated November 12, 2002'
which is prohibited under the July 31, 2003 Injunction Order."
Granted Digimarc's second motion to compel finding that
Viisage had "not yet completed its discovery obligations under
this Court's previously issued Order dated June 3, 2004"

Granted Digimarc's motion for attorneys' fees of $5,761.50; and

Denied the motions to dismiss filed by Viisage as well as the
GTA and DMVS.

Viisage made no disclosure of this ruling at or about this date.

106.   On October 5, 2004, Viisage issued a press release announcing that it had acquired Imaging Automation ("IA") for approximately $5 million in cash, $3.9 million newly issued shares of Viisage common stock, and the assumption of $2.9 million in debt. The press release further indicated that the number of shares necessary to acquire Imaging Automation was "based upon the 20 day market closing price average of Viisage common stock as of two days prior to the completion of the transaction, which is $6.74." Viisage still made no disclosure of the Georgia court's rulings in the press release.

107.   On October 11, 2004, the parties in the Georgia litigation filed cross motions for summary judgment - one by Viisage, one by the GTA and DMVS, and a partial summary judgment motion by Digimarc. Responses to those motions were filed on October 20, 2004. In its response, Digimarc provided an even fuller factual record of Viisage's wrongdoing in connection with its RFP proposals, as Viisage had finally provided the discovery Digimarc had been seeking all year.

108.   On October 21, 2004, Viisage announced that it has been awarded four contracts within the drivers' license market, including a $7 million contract to provide digital drivers licenses to the Wisconsin Department of Motor Vehicles and a $2 million

contract through Hewlett-Packard to produce secure drivers' licenses and IDs for the Maryland Department of Motor Vehicles. Viisage did not provide the names of the other two public entities that had awarded Viisage contracts totaling $1.91 million.

109.    After the close of the market on October 25, 2004, Viisage announced "record" results for the third quarter ended September 30, 2004 -- Viisage's first profitable quarter in three years -- and increased Viisage's revenues and earnings guidance for 2004. Specifically, Viisage stated in a press release:

> On the basis of its results for the nine months, Viisage is increasing its guidance for 2004, with annual revenue now anticipated to be between $66-68 million, increased from $60-63 million, and EBITDA anticipated to be between $11.5-12.5 million, increased from EBITDA of $11-12 million.

In that press release, Defendant Bailey also stated that "The Company's performance for the third quarter, combined with our accomplishments so far this quarter, give us the confidence to increase both our revenue and EBITDA guidance for 2004." Defendant Aulet added:

> Viisage continued to significantly improve its financial performance and strengthen its balance sheet in the past quarter while maintaining the necessary financial flexibility. Our strong revenue performance coupled with careful expense management enabled us to produce our first profitable quarter on a GAAP basis in several years. At the same time, our focus on growing EBITDA (earnings before interest, taxes, depreciation and amortization) proved successful as it increased to $3.4 million this past quarter, from $1.5 million in the same quarter last year.

Again, Viisage made no disclosure of the Georgia court's September 2, 2004 rulings in the press release. In addition, even though by that ruling, the Georgia court had preliminarily enjoined payment of the $2.5 million to Viisage, Viisage **included the $2.5 million payment in its increased EBITDA guidance for 2004.**

110.    On October 26, 2004, Viisage held a conference call with analysts,

51

during which it made similar representations regarding Viisage's increased guidance for 2004. In addition, Defendant Aulet highlighted the significant benefits achieved from the Company's August 5, 2004 offering and that Viisage had obtained a commitment for a new $25 million line of credit to replace its prior credit line, stating:

> At the end of the third quarter of 2004 we had a cash position of approximately $37.36m compared to $12.6m at the end of the second quarter, reflecting the addition of net proceeds of approximately $37.9m from our follow-on offering, offset by the initial repayment of related party debt of approximately $10m. Of our cash position only approximately $3m or less than 10 percent is encumbered.
>
> As Bernard mentioned, we're pleased to announce as well today that we have received a commitment letter from a major bank for a $25m line of credit to replace our existing bank facilities. This new arrangement will not only give us valuable flexibility but will also reduce our rates of borrowing, significantly simplify our covenants, and increase yields on our money in the bank, all while making our G&A operations more productive by providing services locally and worldwide to meet our rapidly evolving needs.
>
> In the fourth quarter we will be able, if we so choose, to reduce our outstanding debt quite significantly, and after paying off early prepayment fees save approximately $600,000 a year in interest expense. We will be monitoring this closely, and our actions will be affected directly by our M&A program. But in any case, we have new financial flexibility that will be very valuable to support our growth, as well as being highly cost effective.

111.    With the new State contracts and new line of credit secured, Defendant Bailey, for the first time, revealed on the October 26, 2004 call the existence of the August 19, 2004 TRO over the settlement it had announced on July 21, 2004. However, Viisage continued to conceal the Georgia court's September 2, 2004 injunction, the order sanctioning Viisage, or the order compelling Viisage to comply with the Georgia court's prior discovery orders, or one order denying the motions to dismiss filed by the

GTA, DMVS, and Viisage. Moreover, as had been the case since the Georgia litigation had been commenced, Viisage made no disclosure that Viisage's own wrongdoing was a material subject of the litigation, or that Viisage was even a defendant in the litigation.

112.   On November 10, 2004, Viisage filed its Form 10-Q for the third quarter ended September 30, 2004. In that Form 10-Q, Viisage repeated the revenue and earnings figures announced on October 25, 2004.   The Form 10-Q was signed by Bailey and Aulet.  With regard to the Georgia litigation, the Form 10-Q stated:

> In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency has informed the court that it intends to issue a new request for proposals for a digital drivers' license system before the end of 2004. In response to a motion filed by the competitor, the Georgia court has issued a preliminary injunction prohibiting the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

This November 10, 2004 disclosure marked Viisage's first public acknowledgement that the Georgia court had preliminary enjoined the settlement with the GTA and DMVS -- more than two months earlier -- while at the same time Viisage continued to, among other things, falsely represent to the public that Viisage was entitled to the $2.5 million payment from the Georgia DMVS discussed above. In addition, Viisage made no disclosure of the Georgia court's September 2, 2004 order sanctioning Viisage, compelling Viisage to comply with the Georgia court's prior discovery orders, or denying the motions to dismiss filed by the GTA, DMVS, and Viisage. Indeed, the disclosure indicated that the motion to dismiss was still pending. Moreover, as had been the case since the Georgia litigation had been commenced, Viisage continued to conceal the fact that Viisage's own wrongdoing was a material subject of the litigation, and that Viisage was even a defendant in the litigation.

113.    Viisage again stated under Item 4 - Controls And Procedures:

(a) Evaluation of disclosure controls and procedures. Our management, with the participation of our Chief Executive Officer, or CEO, and Chief Financial officer, or CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of September 26, 2004.

* * *

Based on this evaluation, our CEO and CFO concluded that, as of September 26, 2004, our disclosure controls and procedures were (1) designed to ensure that material information relating to us, including our consolidated subsidiaries, is made known to our CEO and CFO by others within those entities, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms.

114.  It also contained the same Section 302 Certifications by Defendants Bailey and Aulet provided in Viisage's Form 10-Qs for the prior quarterly periods, but with respect to the third quarter.

115.  On December 14, 2004, Viisage issued a press release announcing that it had entered into a loan agreement with Citizens Bank of Massachusetts permitting Viisage the right to borrow up to $25 million, subject to certain financial covenants.

116.  On December 15, 2004, Viisage issued a press release stating that the Florida Department of Highway Safety and Motor Vehicles had awarded a $1.1 million contract to Viisage to provide automatic document authentication technology to detect falsified documents and ensure that state drivers' licenses are issued only to the rightful owners.

117.  On December 22, 2004, the Georgia Court in which Digimarc's lawsuit was pending ruled on the cross-motions for summary judgment and concluded, based upon a substantial evidentiary record, "that there were significant instances of misconduct and misrepresentations by Defendant Viisage." As a result, the Georgia Court permanently disallowed the $2.5 million in payments Viisage claimed it was owed for services it purportedly performed under the then terminated contract.

118.  In its ruling, the Georgia court found, among other things, the following facts concerning Viisage's misconduct and misrepresentations to be **undisputed**:

> • "On August 26, 2002, Defendant Viisage submitted two entirely new proposed permanent card solutions - both made with 3M products [without authorization from the manufacturer of the cards]. Defendant Viisage submitted a sample called the "Georgia Design Sample 3M Confirm Laminate" and a single card sample called the "Production Quality Card 3M Confirm Laminate," which was a

55

driver's license card containing artwork and graphics from New York State. Defendant Viisage failed to label the Georgia Design Sample as "production quality" even though these cards met the specifications of production quality cards as defined by DVMS. These cards were discovered to be defective because the laminate was easily removed, leaving the underlying information on the card intact and subject to alteration; thus, the Evaluation Team concluded they were not production quality."

- "Defendant GTA subsequently asked Defendant Viisage to submit 17 samples of the New York cards, *which Defendant Viisage had already falsely represented were production quality.* Defendant Viisage then arranged for 3M to send 17 additional samples of the New York cards, indicating that they were its "production quality cards." The New York card samples were actually made by De La Rue and not Defendant Viisage and De La Rue never gave 3M or Defendant Viisage permission to use the New York card samples and they were only given to Defendant Viisage for marketing purposes. *In short, Defendant Viisage submitted another vendors' sample cards, which it had no permission to use, in an attempt to submit acceptable permanent card samples."* (emphasis added).

- "In a further attempt to secure the contract with Defendants GTA and DMVS, Defendant Viisage misrepresented the existence of a back-up card production facility. The RFP required that each bidder describe what plans it had to produce permanent cards on a central issuance basis in the event that a disaster disrupted the ability to issue cards from the primary central issuance facility in Georgia. Prior to its July 19, 2002, initial proposal, Defendant Viisage had no alternative central issuance production facility in service for another state. Instead, it asked permission of Arthur Blank & Company to include them in the Georgia proposal as a back-up card printing facility in case of disaster at the permanent facility in Georgia. *In fact, Arthur Blank & Company did not have the*

56

> *capacity to provide back-up card production facilities, and Defendant Viisage had no binding contract with Arthur Blank & Company that could serve as a basis for Defendant Viisage's assertion in its proposal that it had secured this company as its back-up card production facility. In fact, Defendant Viisage had not procured specific pricing information from Arthur Blank & Company regarding how much money it would require from Defendant Viisage in order to prepare itself to serve as a back-up card production facility."* (emphasis added).

119.   However, the Georgia court found that Digimarc had not convinced it that "but for the alleged acts of Defendants Viisage, GTA and DMVS Plaintiff Digimarc would have been awarded the contract at issue," and ordered that the GTA and DMVS be permitted to re-bid the RFP allowing both Viisage and Digimarc to participate.

120.   Viisage made no disclosure of this ruling on December 22, 2004. Rather it waited until after wire reports of the Georgia court's rulings began circulating on December 27, 2004 that were causing Viisage's stock price to drop. As reported by the Comtex News Network, "VISG is seeing sharp sell pressure this morning following wire reports that Digimarc received a favorable court ruling in Georgia related to a drivers license contract awarded to VISG."

121.   On December 27, 2004, Digimarc issued a press release stating:

> the Fulton County Superior Court in Georgia has disallowed the State's 2002 drivers license contract award to Viisage, finding that "there were significant instances of misconduct and misrepresentation by Defendant Viisage." The Court's ruling clears the way for the State to re-bid the contract and for Digimarc to compete to retain the State of Georgia's driver license business.

Digimarc further disclosed details of the Georgia court's ruling, as follows:

The Court found, among other things, that:

-- Viisage's "temporary card sample tore easily" and its "permanent card samples easily delaminated and that the information on the card could be easily altered";

-- Viisage submitted another vendor's sample cards, which it did not have permission to use in an attempt to submit acceptable permanent card samples; -- "key representatives of Defendant Viisage did not know how these card samples were made or whether Defendant Viisage was, in fact, capable of making the cards it proposed ...;" and that

-- Viisage "misrepresented the existence of a back-up card production facility" in its bid submission.

This marked the first public recitation of Viisage's wrongdoing regarding the DMVS contract.

122.   Finally, following Digimarc's press release, on December 27, 2004, Viisage issued its press release regarding the Georgia court's ruling. Attempting to put a false positive spin on that ruling, Viisage omitted any information concerning the Georgia Court's finding of Viisage's misconduct. Rather, Defendant Bailey stated:

Viisage learned today that the Georgia court has issued a summary judgment ruling permitting the state to move forward in its rebid of the state's drivers' license contract and permitting Viisage to compete to retain its contract with the state. We are pleased that the state will finally be permitted to begin the rebid process and *that the judge has agreed with us and the state on virtually all aspects of the summary judgment motions.*

(emphasis added).

123.   In addition, Viisage admitted without explanation that the Georgia court had ruled that $2 million of the purported $2.5 million settlement discussed above could not be paid to Viisage.

124.   In spite of Viisage's attempt to put a positive spin on the Georgia Court's ruling --and omit material information regarding Viisage's improper conduct with

58

respect to that contract -- as this news seeped into the market during the holidays, Viisage's stock price began to immediately decline -- from a relevant period high of $9.64 per share on December 23, 2004 (the previous trading day) to a low of $8.38 on December 27, 2004, or a 15% drop, closing at $8.82 on high volume.

125.   On February 7, 2005, Viisage announced that it would meet its previously stated revenue guidance for 2004 and report $66-$67 million in revenues for 2004. However, the Company also stated that it would not meet its previously issued earnings guidance of $11.5 - $12.5 million in EBITDA and would instead report only $8-9 million in EBITDA. In addition, rather than report a $1.5 loss as previously projected, Viisage anticipated a loss of approximately $7-8 million. The Company claimed that the earnings shortfall was "primarily due to several non-recurring factors, including a non-cash impairment charge of $2 million in connection" with the Digimarc litigation relating to the Georgia DMVS contract. Thus, Viisage had continued to include the settlement payment from the DMVS in its public projections even though the Georgia court had enjoined it on August 19, 2004. Further, Viisage blamed a tax election taken in the fourth quarter but which it stated was related to its acquisition of TDT on February 14, 2004 i.e. the first quarter of 2004. Viisage also blamed "Sarbanes-Oxley Section 404 Compliance" claiming that "despite work undertaken in prior quarters, Viisage experienced higher than anticipated costs related to its Sarbanes-Oxley compliance efforts" totaling $550,000 in the fourth quarter.

126.   That day, Defendants Bailey and Aulet held a conference call with analysts in which they attempted to downplay the significance of the earnings shortfall and, at the same time, highlight Defendants' claim that Viisage had met its revenue

guidance for 2004. Defendant Bailey also discussed the $2 million asset write down due to the court's December 22, 2004 ruling in the Digimarc litigation, stating:

> I think many of you saw our press release on the conclusion of this legal matter last month. We have now had the opportunity to assess the situation more thoroughly in light of the most recent judge's decision to reduce our compensation-related to terminating our contract with the State of Georgia, and we were able to discuss with our lawyers and our auditors what prudent measures we should take. As a result, we are taking a one-time, noncash, $2m write-down during the fourth quarter of 2004 for an impairment charge to assets currently on our balance sheet. This, we believe, is taking an appropriately conservative approach to the situation. As you'll recall, the December summary judgment ruling, in essence, sent the dispute in contract back to the Department of Motor Vehicle Safety in Georgia for a rebid -- exactly what we had asked for.

127.  Defendant Bailey further explained in response to a question posed during the call: "this was just that $2 million portion that we had agreed with the state was unique to their specific situation, and we should have been reimbursed for those expenses." Contrary to Defendant Bailey's belief, the Georgia court concluded otherwise.

128.  The market's reaction was immediate. On February 8, 2005, Viisage's shares plunged as much as 24.3% -- from $7.27 to a low of $5.85 -- on extraordinarily high volume of over 4.6 million shares. The market, therefore, considered the $2 million impairment charge to be material.

129.  On March 2, 2005, Viisage again surprised the market when it announced that a "material weakness" existed in Viisage's internal accounting controls. Specifically, Viisage stated:

> In connection with the preparation of the Company's consolidated financial statements for the year ended December 31, 2004, the Company determined that it had an internal control deficiency that

constitutes a "material weakness" as defined by the Public Company Accounting Oversight Board's Accounting Standard No. 2. The Company has concluded that it had insufficient personnel resources and technical accounting expertise within the accounting function to resolve non-routine or complex accounting matters. As a result, management will be unable to conclude that the Company's internal controls over financial reporting are effective as of December 31, 2004. Therefore, BDO Seidman LLP, the Company's external accounting firm, will issue an adverse opinion with respect to the effectiveness of the Company's internal controls over financial reporting. In addition, as part of the Sarbanes-Oxley Section 404 compliance review, the Company is in the process of reviewing all of its other key internal control processes as well. While the evaluation is ongoing, management believes that it will likely conclude that the Company had significant deficiencies, which could constitute a material weakness, in the control processes around information technology systems as well.

In addition, Viisage announced that revenues for the first quarter 2005 would be $15-$17 million.

130.    The Company held a conference call before the market opened on March 3, 2005 to discuss its press release. During that conference call, Defendant Aulet admitted that the Company recognized it had internal control deficiencies "months ago" had been "working to remedy the issues for some time." Aulet further acknowledged "for the last *six to eight months,* we have been working hard on our internal controls with the goal of full compliance rating for the year 2004 in our Sarbanes-Oxley 404 review." In response to a question, Defendant Bailey also admitted that the Company's internal control deficiencies were well known throughout 2004. He stated "[w]e have been going through an exhaustive, detailed analysis of our entire control system in this company for the entire year."

131.    The market's reaction to these latest revelations was again immediate. On March 3, 2005, Viisage's shares plunged as much as 27.2% -- from the close of $5.47

the previous day to a low of $4.30 on March 3, 2005 on extraordinarily high volume of over 6.2 million shares.

132.    On March 17, 2005, Viisage filed a Notification of Late Filing of its Form 10-K for 2004 with the SEC. The reasons it noted for its inability to file a timely Form 10-K were that: "Financial and other information for the filing of a complete and accurate Annual Report on Form 10-K for the period ended December 31, 2004, particularly with respect to the valuation of goodwill with respect to acquisitions completed by the Company in 2004 and completion of a review of pending litigation involving the Company could not be provided within the prescribed time period without unreasonable effort and expense." The effect of Viisage's Notification of Late Filing was to give Viisage a 15-day extension until March 31, 2005 in which to file its Form 10-K.

133.    On March 31, 2005, however, Viisage did not file its Form 10-K for 2004. Rather, Viisage issued a press release advising that it did not know when it would be able to file it's Form 10-K and that, as a result, it expected to receive a notice from the Nasdaq National Market that it was not in compliance with the filing requirements for continued listing on Nasdaq and that its securities may be subject to delisting from the Nasdaq National Market.

134.    On April 8, 2005, Viisage issued a press release announcing that it had received a notice from the staff of The Nasdaq Stock Market indicating that the Company is subject to potential delisting from The Nasdaq National Market as a result of Viisage's failure to file its Form 10-K for the fiscal year ended December 31, 2004 in a timely fashion, as required under Nasdaq Marketplace Rule 4310(c)(14). Viisage

further announced that it intended to appeal the Nasdaq Staff determination.

135.    Viisage did not file its Form 10-K or its Form 10-Q for the first quarter until June 30, 2005, which it then amended on July 7, 2005 to provide further information about its internal control deficiencies.  Viisage's Form 10-K filings included the report of its auditors, BDO Seidman, LLP, on the identified material weaknesses in Viisage's internal financial controls. In that report, BDO Seidman, LLP explained that: "A material weakness is a control deficiency, or combination of control deficiencies, that results in *more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."* (emphasis added).

136.    The Company further revealed in the Form 10-Q that its internal controls had still not been fully remedied by April 3, 2005:

> In connection with the preparation of this Quarterly Report on Form 10-Q, an evaluation was performed under the supervision and with the participation of our management, including the CEO and CFO, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of April 3, 2005. In performing this evaluation, management reviewed our internal controls over financial reporting, noting that there were two that had significant deficiencies that constituted material weaknesses in our control processes. The first of these is with regard to insufficient personnel resources and technical accounting expertise within the accounting function to effect timely financial close process and to effectively evaluate and resolve non-routine and/or complex accounting transactions. The second is with regard to inadequate or ineffective control processes around information technology systems, including inadequate security, inadequate restricted access to systems, inadequate segregation of duties within systems, lack of appropriate system documentation, ineffective change management processes and insufficient disaster recovery plans. Based on that evaluation, our CEO and CFO concluded that our disclosure controls and procedures were not effective as of April 3, 2005.

Nor were they effective as of July 3, 2005, according to Viisage's Form 10-Q filed with the SEC on August 12, 2005. Indeed, Viisage has not yet disclosed that they have been fully remedied.

### Reasons Why Viisage's and the Individual Defendants' Statements Were Improper

137.    Viisage's filings with the SEC on May 12, 2004, May 21, 2004, June 21, 2004, July 22, 2004, August 5, 2004, August 11, 2004 and November 10, 2004, Viisage's press releases issued July 21, 2004, October 5, 2004, October 25, 2004 and December 27, 2004, and Viisage's conference calls with the investment community on July 22, 2004 and October 26, 2004, referenced above were materially false and misleading for, among others, the following reasons:

    a.    Each misrepresented the nature of the Georgia litigation initiated by Digimarc by falsely portraying the litigation as solely alleging that the DMVS "did not comply with its own bid process when it selected a vendor for its new digital drivers' license program." In reality, as set forth above, Viisage had been added as a party to the litigation on November 12, 2003 and the litigation was also focused on materially false and misleading information provided by Viisage to the GTA and DMVS in an effort to secure the contract, as described in detail above;

    b.    Viisage's press release of July 21, 2004, Defendant Bailey's comments during Viisage's July 22, 2004 conference call, Viisage's S-3/A filing with the SEC on July 22, 2004, Viisage's August 5, 2004 filing of the Prospectus, and Viisage's August 11, 2004 and November 10, 2004 Form 10-Q filings each also: (i) falsely represented the reason for the settlement it had initiated with the DMVS in that they falsely stated that the settlement with the DMVS was reached for "convenience" when it was initiated by Viisage in an attempt to avoid having to comply with the discovery demands of Digimarc which were directed at Viisage's wrongful conduct; (ii) falsely represented that only the DMVS had filed a motion to dismiss the Georgia litigation due to the settlement in an effort to avoid any indication that Viisage was a party to the action and that its wrongful conduct was a significant subject of the action. To the contrary, as a party to the lawsuit, Viisage had also filed a motion to dismiss Digimarc's complaint on the same day the DMVS' motion

64

was filed - July 21, 2004; and (iii) with respect to the aforementioned disclosures in this subparagraph prior to November 10, 2004, Viisage failed to disclose that there was a substantial risk that the settlement violated the Georgia court's July 2003 injunction order and the substantial risk that it was not entitled to the $15 million payment because it violated the injunction and because of its own wrongdoing described above including, *inter alia,* that Viisage had submitted another manufacturer's cards to the Georgia DMVS as if they were Viisage's "production cards" without any authorization.

c.    During Viisage's July 22, 2004 conference call, Defendant Bailey falsely stated that "***Viisage was never a party to this lawsuit, which has dragged on and on for a year and a half nor were any allegations of impropriety ever lodged against our company.***" Bailey further falsely stated on the call that the settlement was a product of Viisage living up to its "core values." To the contrary, as detailed above, Viisage initiated the settlement in an effort to avoid having to comply with the Georgia court's discovery orders which required Viisage to provide full discovery of its own wrongdoing.

d.    Viisage's October 25, 2004 press release and October 26, 2004 conference call also omitted any disclosure of the Georgia court's September 2, 2004 ruling preliminarily enjoining the proposed settlement between GTA and DMVS and Viisage of $2.5 million and transfer of certain goods and equipment by Viisage to the State as violating the Georgia court's July 31, 2003 Injunction Order; imposing sanctions against Viisage for its repeated failure to comply with the court's discovery orders; and denying the motions to dismiss filed by Viisage as well as the GTA and DMVS.

e.    Viisage's November 10, 2004 Form 10-Q also failed to disclose any of the Georgia court's rulings other than the entry of the preliminary injunction. Thus, in it, Viisage still falsely represented that the motion to dismiss filed solely by the DMVS was still pending, when it, as well as its own motion to dismiss had been denied on September 2, 2004.

f.    Viisage's Form 10-Qs filed with the SEC on May 12, 2004, June 21, 2004, August 11, 2004 and November 10, 2004, and the Amended Registration Statement and Prospectus (each of which incorporated by reference Viisage's May 12, 2004 10-Q) also falsely represented that Viisage's "disclosure controls and procedures were . . . effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded,

65

processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms." In addition, the Section 302 Certifications of Defendants Bailey and Aulet falsely represented that the above disclosure "presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation" and that each Form 10-Q disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting." To the contrary, as acknowledged by Defendants Bailey and Aulet on a conference call with the investment community on March 3, 2005, the Company's internal control deficiencies were well known throughout 2004. Further by their Section 302 Certifications, Defendants Bailey and Aulet falsely represented that based upon each of their respective knowledge that each "quarterly report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report." The costs of remedying its deficient internal controls were significant. On February 7, 2005, Viisage stated that, "in the fourth quarter alone, compliance-related costs totaled $550,000." In addition, although Viisage represented in its March 2, 2005 press release that it expected "to reach profitability during 2005," in its July 5, 2005, press release, it stated that "ongoing higher compliance expenses" were a principal reason why the Company no longer anticipated "reaching GAAP profitability in 2005 and may not increase its cash generation compared to 2004 as previously expected." For the reasons set forth above, each of Viisage's Form 10-Qs filed with the SEC during the relevant period was materially false and misleading.

g.    The EBITDA guidance for 2004 provided by Viisage and Defendants Bailey and Aulet on July 21 and 22, 2004 of $10-11 million and their increase in EBITDA guidance to $11.25 - $12.5 million on October 25 and 26, 2004 lacked a reasonable basis in that, as these Defendants knew, it was predicated on receipt of the $2.5 million settlement with the DMVS. The receipt of this settlement amount was materially in doubt as the settlement violated the terms of the Georgia court's July 2003 Injunction Order and required the DMVS - a public entity - to compensate Viisage for Viisage's own deception of the DMVS. Even after it had been enjoined by the Georgia court on September 2, 2004, these Defendants increased Viisage's guidance without any disclosure of this injunction. On February 7, 2005, Viisage revealed that it

66

anticipated reporting EBITDA for 2004 of only $8-9 million due in significant part to the Georgia court's determination in December 2004 that to pay Viisage $2 million of the $2.5 million would unjustly enrich Viisage for its own wrongdoing.

**Defendants Berube, Beck, Yon, Levine and Reilly Obtained a Substantial Improper Benefit not Shared by the Company and Other Viisage Shareholders**

138.    The misrepresentations of the Company and the Individual Defendants (i) enabled Viisage to complete, in August 2004, the Secondary Offering of approximately 7.5 million shares by which it sold approximately 7.2 million shares and received net proceeds of approximately $37.4 million at a time when it was struggling to report a profit; (ii) Lau, controlled by Defendant Berube, realized proceeds of $779,779.00 from the sale of 141,778 shares of Viisage common stock in the Secondary Offering, Beck realized proceeds of $779,779 from the sale of 141,778 shares of Viisage common stock in the Secondary Offering, and Odeon, controlled by Defendant Yon, realized proceeds of $743,363.50 from the sale of 135,157 shares of Viisage common stock in the Secondary Offering. Significantly, the proceeds of the Secondary Offering to Viisage were used, in substantial part, to repay in full a $15.3 million promissory note issued to Defendant Beck and to repay in full a $4.3 million remaining debt obligation to Lau. As represented in Viisage's SEC filings, "as a result of their ownership, both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions, including mergers and acquisitions."

139.    In addition to the $2,302,921.50 in proceeds from sales In the Secondary offering, certain of the Individual Defendants reaped millions of dollars of proceeds from open market sales of Viisage stock.

140.  Lau, controlled by Defendant Berube, sold the following shares of Viisage on the open market:

| 3 NAME | | DATE | SHARES SOLD | PROCEEDS |
|---|---|---|---|---|
| Lau | Acq. | 5/26/2004 | 8,000 | $14,040.00 |
| Lau | Acq. | 6/17/2004 | 17,000 | $44,200.00 |
| Lau | Acq. | 7/15/2004 | 6,602 | $17,165.00 |
| Lau | Acq. | 11/30/2004 | 50,000 | $395,000.00 |
| Lau | Acq. | 12/1/2004 | 25,000 | $200,000.00 |
| Lau | Acq. | 12/2/2004 | 75,000 | $604,000.00 |
| Lau | Acq. | 12/7/2004 | 100,000 | $839,000.00 |
| Lau | Acq. | 12/13/2004 | 77,000 | $627,030.00 |
| Lau | Acq. | 12/15/2004 | 25,000 | $206,250.00 |
| **TOTALS** | | | 380,602 | $2,946,685.20 |
| | | | | |

141.  Odeon, controlled by Yon, sold the following shares of Viisage stock on the open market:

68

| 3 NAME | DATE | SHARES SOLD | PROCEEDS |
|---|---|---|---|
| Odeon    Acq. | 11/2/2004 | 16,649 | $122,037.00 |
| Odeon    Acq. | 11/3/2004 | 21,860 | $159,797.00 |
| Odeon    Acq. | 11/4/2004 | 19,000 | $137,940.00 |
| Odeon    Acq. | 11/5/2004 | 26,000 | $190,840.00 |
| Odeon    Acq. | 11/8/2004 | 23,025 | $168,083.00 |
| Odeon    Acq. | 11/9/2004 | 15,769 | $112,118.00 |
| Odeon    Acq. | 11/10/2004 | 11,000 | $77,770.00 |
| Odeon    Acq. | 11/16/2004 | 2,000 | $14,140.00 |
| Odeon    Acq. | 11/30/2004 | 61,764 | $484,847.00 |
| Odeon    Acq. | 12/1/2004 | 183,300 | $1,470,066.00 |
| Odeon    Acq. | 12/2/2004 | 105,190 | $846,780.00 |
| Odeon  Acq. | 12/8/2004 | 81,507 | $661,837.00 |
| Odeon  Acq. | 12/9/2004 | 20,409 | $163,476.00 |
| Odeon    Acq. | 12/132004 | 21,000 | $176,400.00 |
| Odeon  Acq. | 12/14/2004 | 162,000 | $1,341,360.00 |
| **TOTALS** | | 770,473 | $6,127,491.00 |

142.    Also, during the period from May 17, 2004, through January 18, 2005, Defendant Levine sold 13,500 Viisage shares for proceeds of $100,710.   And on December 13, 2004, Defendant Levine sold 10,000 Viisage shares for proceeds of $87,000.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

143.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, the same if as set forth fully herein.

69

144.    Plaintiff brings this action derivatively in the right and for the benefit of Viisage, to redress injuries suffered and to be suffered by Viisage as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.    Viisage is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

145.    Plaintiff will adequately and fairly represent the interests of Viisage in enforcing and prosecuting its rights.

146.    Plaintiff has been a holder of the common stock of Viisage during the time period in which the Individual Defendants' wrongful course of conduct alleged herein was occurring, through the present.

147.    At the time this lawsuit was filed, Viisage's Board of Directors consisted of the following nine (9) individuals: Defendants Bailey, Principato, Nessen, Reilly, Berube, Beck, Levine, Mouchly-Weiss and Yon.  Plaintiff has not made any demand on these directors to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

a.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the Director Defendants knew the adverse non-public information which made the representations made by the Company false and misleading. While in possession of this material adverse non-public information regarding the Company, the Defendant Directors participated in the illegal insider selling and/or other wrongful conduct;

b.    During the Relevant Period, Berube benefited from Lau's sale of 345,000 shares of Viisage stock for total proceeds exceeding $2.8 million. Because Berube and his spouse are the controlling shareholders of Lau, it

70

is reasonable to infer that Berube personally benefited from this sale. Because Defendant Berube received a personal financial benefit from the challenged insider trading transactions and faces a substantial likelihood of liability for same, this Defendant is interested and any demand upon him would be futile;

c.      During the Relevant Period, Defendant Beck received from the proceeds of Viisage's secondary offering in connection with which false and misleading statements were made by the Individual Defendants and the Company, a payment of $15.3 million in satisfaction of a note issued by Viisage.  Beck also received proceeds of $779,779 from sales of his personally held Viisage shares in the secondary offering.  Because this Defendant received personal financial benefits from these transactions, and faces a substantial likelihood of liability for his insider stock sales, this Defendant is interested and any demand upon him would be futile;

d.      Defendant Levine received proceeds of $100,710 from sales of his personally held Viisage shares during the relevant period.  Because this Defendant received a personal financial benefit from these insider trading transactions and faces a substantial likelihood of liability for same, this Defendant is interested and any demand upon him would be futile;

e.      Defendant Reilly received proceeds of $87,000 from sales of his personally held Viisage shares during the relevant period.  Because this Defendant received a personal financial benefit as a result of these insider trading transactions and faces a substantial likelihood of liability for same, this Defendant is interested, and any demand upon him would be future;

f.      Defendant Yon, individually and via Odeon, received proceeds of nearly $8 million from insider sales of Viisage stock during the relevant period. Because this Defendant received a personal benefit as a result of these insider trading transactions and faces a substantial likelihood of liability for same, this Defendant is interested and any demand upon him would be futile;

g.      According to the Company's SEC filings, the Audit Committee of the Board oversees the Company's accounting, financial reporting, data processing, and regulatory and internal control environments.   The primary duties and responsibilities of the Audit Committee include, but are not limited to:   (1) serving as an independent and objective body to monitor the Company's financial reporting process and internal control systems; (2) evaluating the Company's financial reporting and compliance with laws and regulations; and (3) overseeing management's establishment and enforcement of financial policies.   Because the Company has admitted to material weaknesses in its internal controls and accounting systems, it is self-evident that the Audit Committee failed in its

71

obligations. Because Defendants Nessen, Reilly and Levine served on the Audit Committee and now face a substantial likelihood of liability because of their failure to fulfill their duties and obligations to the Company, demand on Defendants Nessen, Reilly and Levine would be futile;

h.    A majority of Viisage's Board of Directors and senior management participated in the wrongs complained of herein. Viisage's directors are not disinterested or independent due to the following: Bailey, Principato, Nessen, Reilly, Berube, Beck, Levine, Mouchly-Weiss, and Yon, served on the Board during the relevant period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced Defendants breached the fiduciary duties that they owed to Viisage in that they failed to prevent and correct material misrepresentations made by the Company. Each of these Defendant Directors also signed documents filed with the SEC in which false and misleading statements were made. Further, Defendants Bailey, Principato, Berube and Beck are not independent because of their stake in the financial performance of the Company because Bailey is the Company's C.E.O., Berube and Principato are executives with Lau, and Beck was owed money via an outstanding promissory note;

i.    The Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein;

j.    Defendant Berube is the spouse of Joanna Lau, the C.E.O. of Lau, and the largest shareholder of Viisage. Further, Viisage came into being after being spun-off from Lau in 1996. In 2002, Viisage acquired the assets of Lau and, *inter alia,* agreed to pay a licensing royalty fee of 3.1%, not to exceed $27.5 million, over the next twelve and one-half (12 ½) years. Berube, Nessen, Mouchley-Weiss and Reilly have served as Directors of the Company since its founding in 1996. Further, Director Principato is the C.F.O. of Lau and has served on Viisage's Board since 2001. In addition to his compensation as Chairman of the Board, Berube and his spouse each receive $125,000 per year as consultants to Viisage. Likewise, Defendant Beck receives $300,000 annually in consulting income from the Company, in addition to his compensation as a Board member and payments on the promissory note.

k.    Defendant Principato is beholden to Berube and Berube's wife for his position as CFO of Lau. Therefore, any demand upon Principato to institute an action against Berube to redress Berube's breaches of fiduciary duties as alleged herein would be futile.

72

l.    Defendant Bailey is beholden to Defendant Director Berube for his positions as CEO and President of Viisage. Bailey earns considerable compensation from the Company for his service in these positions. For instance, for the years 2002 through 2004, respectively, Bailey received compensation of $237,888, $452,721 and $577,826. In addition, for the year 2002, Bailey received options to purchase 720,000 shares of Viisage stock. Bailey would not jeopardize his positions with the Company by bringing an action against Berube and any demand to do same would be futile.

m.    Defendant Directors Berube and Beck exercise *de facto* control of the Company and its Board of Directors. The Company's Form 10-k for the year ending December 31, 2004, filed with the SEC on June 30, 2005, makes the following disclosure:

>    Certain of our stockholders have significant relationships with us, which could result in us taking actions that are not supported by unaffiliated stockholders.

>    Lau Technologies, or Lau, and Mr. Buddy Beck, the former sole stockholder of TDT who is now a director and Vice Chairman of our Board of Directors, beneficially own approximately 11.4% and 11.9%, respectively, of our outstanding common stock. As a result, both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions, including mergers and acquisitions. In addition, we have significant relationships with each of Lau and Mr. Beck, including:

>    ▪  We acquired significant intellectual property, contracts and distributions channels through a transaction with Lau in January 2202 under which we agreed to pay Lau a 3.1% royalty on our face recognition revenues through June 30, 2014, up to a maximum of $27.5 million;

>    ▪  In connection with the above transaction with Lau, we entered into consulting agreements with Joanna Lau, the President of Lau, and her spouse Denis K. Berube, the Chief Operating Officer of Lau who also serves

73

as the Chairman of our Board of Directors, under which we will pay each of Ms. Lau and Mr. Berube $125,000 per year for ten years;

▪ The Chairman of our Board of Directors and his spouse own a majority of Lau's voting stock;

▪ In connection with the acquisition of TDT in February 2004, Mr. Beck was elected a member of our Board of Directors and appointed Vice Chairman;

▪ In connection with the acquisition of TDT, we entered into a consulting agreement with Mr. Beck under which we will pay Mr. Beck $300,000 per year for two years, provided that Mr. Beck devotes his full business time to developing business opportunities for us; and

An additional purchase price adjustment of $2.6 million, payable to Mr. Beck, was incurred upon TDT's selection by the U.S. Department of Defense for the production of smart cards as part of the agency's CAC program. This amount has been paid in full.

n. The Defendant Directors of Viisage, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Viisage's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

o. Plaintiff's Source has informed Viisage's Board of Directors about Viisage's and Berube's misrepresentations concerning the effectiveness of the Company's facial recognition technology and their improper dealings with Piper Jaffray, including the alleged insider trading by Piper Jaffray, yet, the Board of Directors has taken no action to remedy same. For instance, on June 23, 2005, the Source wrote Defendant Nessan concerning same. The June 23, 2005 e-mail provided in part:

In addition to believing I was used/manipulated, I will be able to show information was passed from Viisage to a brokerage

house that was not available to the investment community as a whole.  Further, I will be able to show this brokerage house and its clients were involved in a plan to benefit themselves at other shareholders expense.  …  I will also be able to prove I was intentionally misled/lied to by a person who was then a senior member of Viisage's management.  This was done knowing I was in touch or contact with over 100 of Viisage investors that literally controlled millions of Viisage shares at the time that there were only 20 million or so outstanding shares.  I will also be able to prove that Mr. Berube was not honest with investors concerning statements he made about the technology Viisage possesses.

The e-mail further requested a meeting with Defendant Nessan.  According to the Source, he also spoke with Nessan on the telephone concerning this and wrote the other directors as well.  Nevertheless, Viisage's Board of Directors has taken no action concerning the wrongdoing alleged by Plaintiff's Source.  Accordingly, any demand upon them to do so would have been futile.

p.     In order to bring this suit, a majority of the Directors of Viisage would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

q.     The acts complained of constitute violations of the fiduciary duties owed by Viisage's officers and directors and these acts are incapable of ratification;

r.     Any suit by Viisage Directors (at the time this lawsuit was filed) to remedy these wrongs would likely expose the Individual Defendants and Viisage to additional liability for violations of the securities laws (Bailey, Berube, Levine, Mouchly-Weiss, Beck, Yon, Principato, Nessen and Reilly are presently defendants in the securities class action lawsuits); thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

s.     Viisage has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Viisage any part of the damages Viisage suffered and will suffer thereby or to recover the profits received by Berube, Beck, Levine, Reilly and Yon through illegal insider trading;

t.     If the Viisage Directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations contained in the class action lawsuits for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand would be futile; and

u.     If Viisage's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Viisage. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, it is believed that the directors' and officers' liability insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Viisage against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Viisage, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Viisage to sue them, since they will face a large uninsured liability.

148.    Plaintiff has not made any demand on shareholders of Viisage to institute this action since such demand would be a futile and useless act for the following reasons:

a.     Viisage is a publicly held company with approximately 48 million shares outstanding, and thousands of shareholders;

b.     Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

c.     Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

76

## FIRST CAUSE OF ACTION

### Against Berube, Beck Levine, Reilly and Yon for Breach of
### Fiduciary Duties, for Insider Selling, and for Misappropriation of Information

149.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, the same as if set forth fully herein.

150.  At the time of the stock sales set forth herein by Lau, Odeon, Beck, Levine Reilly, and Berube, Defendants Beck, Levine, Reilly, Yon and Berube knew the non-public adverse information concerning the Company information described above, and sold Viisage common stock on the basis of such information.

151.  The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the insider selling Defendants used for their own benefit when they sold Viisage common stock.

152.  The insider selling Defendants sale of Viisage common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

153.  Since the use of the Company's proprietary information for the insider selling Defendants' own gain constitutes a breach of their fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## SECOND CAUSE OF ACTION

### Against All Defendants for Breach of Fiduciary Duty

154.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, the same as if set forth fully herein.

77

155.    The Individual Defendants owed and owe Viisage fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Viisage the highest obligation of good faith, fair dealing, loyalty and due care.

156.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

157.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

158.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Viisage has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### THIRD CAUSE OF ACTION

### Against All Defendants for Abuse of Control

159.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, the same as if set forth fully herein.

160.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Viisage, for which they are legally responsible.

78

161.   As a direct and proximate result of the Individual Defendants' abuse of control, Viisage has sustained significant damages.

162.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### Against All Defendants for Gross Mismanagement

163.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, the same as if set forth fully herein.

164.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Viisage in a manner consistent with the operations of a publicly held corporation.

165.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Viisage has sustained significant damages in excess of tens of millions of dollars.

166.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## FIFTH CAUSE OF ACTION

### Against All Defendants for Waste of Corporate Assets

167.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, the same as if set forth fully herein.

168.   As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to

conduct proper supervision, the Individual Defendants have caused Viisage to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

169.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## SIXTH CAUSE OF ACTION

### Against All Defendants for Unjust Enrichment

170.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, the same as if set forth fully herein.

171.    By their wrongful acts and omissions, the Insider Selling Defendants were unjustly enriched at the expense of and to the detriment of Viisage.

172.    Plaintiff seeks restitution to the Company from the Insider Selling Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, from their wrongful conduct and breaches of fiduciary duties.

## SEVENTH CAUSE OF ACTION

### Contribution and Indemnification

173.    Plaintiff incorporates by reference each and every paragraph alleged above, the same as if set forth fully herein.

174.    Viisage is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to Viisage.

80

175.    Viisage's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants as alleged above, and Viisage is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, are or may in the future be asserted against Viisage by virtue of the Individual Defendants' misconduct.

## EIGHTH CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duties for Insider Selling and for Misappropriation of Information

176.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, the same as if set forth fully herein.

177.    Each of the Individual Defendants aided and abetted the insider selling and misappropriation of Viisage's proprietary non-public information concerning the Company's financial condition and future business prospects alleged herein against the Insider Selling Defendants and Piper Jaffray.

178.    The Individual Defendants are liable to the Company for any improper proceeds received by the Insider Selling Defendants and Piper Jaffray as a result of illegal insider selling and misappropriation of information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual

Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, and imposing a constructive trust on or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.      Awarding to Viisage restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.


**JURY DEMAND**

Plaintiffs demand a trial by jury.


Dated: July 26, 2006

           ___s/William B. Federman_____
           William B. Federman
           Counsel for Derivative Plaintiff
           FEDERMAN & SHERWOOD
           120 N. Robinson, Suite 2720
           Oklahoma City, OK  73102
           Phone: (405) 235-1560
           Fax: (405) 239-2112
           wfederman@aol.com

           and

I:\Viisage\Derivative\AmendedComplaint.doc

Alan L. Kovacs (BBO No. 278240)
LAW OFFICE OF ALAN L. KOVACS
2001 Beacon Street Suite 106
Boston, MA 02135
Phone: (617) 964-1177/Fax: (617) 332-1223

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on July 26, 2006, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Mitchell H. Kaplan
John R. Baraniak, Jr.
Aloknanda S. Bose
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
(617) 248-5000
mkaplan@choate.com
jb@choate.com

**Attorneys for Defendants**

\_\_s/William B. Federman_____
William B. Federman

84

I:\Viisage\Derivative\AmendedComplaint.doc