# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

OLYMPIA LEVINSON STIEGELE,    )
Derivatively on behalf of Nominal    )
Defendant Viisage Technology, Inc.    )
        Plaintiff,    )
    )
vs.    )  Case No. 05-CV-10677-MLW
    )
BERNARD C. BAILEY, PAUL T.    )
PRINCIPATO, PETER NESSEN,    )
THOMAS J. REILLY, DENIS K.    )
BERUBE, B.G. BECK, CHARLES    )
E. LEVINE, and WILLIAM K. AULET,    )
MARCEL YON and HARRIET    )
MOUCHLEY-WEISS    )
    )
        Defendants,    )
    )
and    )
    )
VIISAGE TECHNOLOGY, INC.,    )
    )
        Nominal Defendant.    )

**PLAINTIFF'S RESPONSE AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## TABLE OF CONTENTS

I.    Introduction …………………………….…………………………………1

II.   Factual Allegations …………………………………………………….…1

      A.    Parties ……………………………………………………………...1

      B.    Overview …………………………………………………………..2

      C.    The Company's Facial Recognition Technology and its Dealings with
            Piper Jaffray …………………………………………………………3

      D.    The State of Georgia Drivers' License Contract ……………………9

      E.    Defendants False and Misleading Statements Concerning the DMVS
            Contract and Related Litigation …………………………………...12

      F.    Viisage's Internal Control Deficiencies ……………………………18

      G.    Defendants Berube, Beck, Yon, Levine and Reilly Obtained a
            Substantial Improper Benefit not Shared by the Company and Other
            Viisage Shareholders as a Result of Defendants' Improper Conduct ……….20

III.  Plaintiff Has Alleged Facts Sufficient to Demonstrate Demand Futility …………..21

      A.    Plaintiff has Alleged that a Majority of the Board is Disinterested …………22

            1.    Duties of Officers and Directors of Delaware Corporations ………...23

            2.    Each of the Defendant Directors Faces a Substantial Likelihood
                  Of Liability for Misleading Investors and Shareholders to the
                  Detriment of the Company ………………………………………24

            3.    Breach of the Duty of Loyalty Through Insider Trading …………...28

            4.    The Director Defendants Breached Their Duties of Good Faith by
                  Abdicating their Oversight Responsibilities …………………………31

            5.    Plaintiff has Alleged Injury to Viisage ………………………………32

            6.    The Articles of Incorporation does not Protect Defendants …………34

B.    Defendants Berube, Beck, Yon, Levine, Reilly, Bailey, Principato, Nessen and Mouchley-Weiss are not Independent of other Interested Directors ………………………………………………………………..36

IV.    Conclusion ………………………………………………………………..39

TABLE OF AUTHORITIES

**Cases**

3 Fletcher §888 ......................................................................................................... 34

3 Fletcher, *Encyclopedia of the Law of Private Corporations*, §888 (2003) ............... 34

*Adams v. Kinder Morgan, Inc.*, 340 F.3d 1083, 1100 (10th Cir. 2003 ......................... 29

Aronson v. Lewis, 473 A.2d at 814 ............................................................................. 22

*Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004). ................................................. 22

*Brophy v. Cities Services Co.*, 70 A.2d 5, 7 (Del. 1949)............................................. 29

*Colorado Petroleum Marketers Association v. Southland Corp.*, 476 F.Supp. 373, 377 (D. Colo. 1979)........................................................................................................................ 33

*D'Addario v. Geller, 264 F.Supp.2d 367, 394 (E.D. Va. 2003)* ................................. 32

Directors Liability for Y2K:  A Corporate Governance Litigation Bear and A Securities Litigation Bull, 24 Del. J. Corp. L. 835 (1999) ..................................................... 23

Directors Take a Active Role, Courts and Regulators Heightening Scrutiny of Board Independence, Oversight, 230 NYLJ 9 (Sept. 29, 2003)............................................ 21

*Dollens v. Zionts*, 2002 WL 1632261 at *5 (N.D. Ill. July 22, 2002)................... 22, 34

*Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001);......................................... 23

Fed. R. Civ. P. 8(a) .................................................................................................... 33

*Fina v. Calarco Corp.*, 2005 WL 3112894, *7 (Conn. Super. 2005)......................... 24

Grimes v. Donald, 673 A.2d 1207, 1217 (Del. 1996)................................................. 22

Grobow v. Perot, 539 A.2d 180, 195 (Del. 1988)....................................................... 22

Guttman v. Huang, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ..................................... 24

*Howard v. Eversex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000) ......................... 24

*In re Biopure Corp. Deriv. Litig.*, 424 F.Supp.2d 305, 308 (D. Mass. 2006).............. 26

*In re Campbell Soup Co. Sec. Litig.*, 145 F.Supp.2d 574, 599 (D. N.J. 2001) ........... 26

In re Caremark International, Inc. Deriv. Litig., 698 A.2d 959, 971 (Del. Ch. 1996)................. 31

*In re Cendant Corp. Derivative Action Litigation*, 189 F.R.D. 117, 129 (D.N.J. 1999) ........ 28, 32

*In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279 (E.D. N.Y. 2002)......................... 26

*In re Disney*, 906 A.2d at 67 ..................................................................................... 31

*In re Electronic Data Systems Corp., Sec. and "ERISA" Litig.*, 298 F. Supp. 2d 554, 557 (E.D. Tex. 2004)....................................................................................................................... 26

*In re FirstEnergy*, 320 F.Supp.2d 621 (N.D. Ohio 2004)........................................... 32

In re Genta In. Sec. Litig., 2005 WL 2416970 at *6 (D. N. J. Sept. 30, 2005) ............ 29

*In re Independent Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 767 (S.D.N.Y. 2001) ........................................................................................................................... 24

*In re LTV Steel Co., Inc.*, 333 B.R. 397, 428 (N.D. Ohio, Bkrtcy Sept. 2, 2005)........ 33

*In re New Valley Corp. Derivative Litigation*, 2001 WL50212 (Del. Ch. Jan. 11, 2001) ........... 39

*In re Northpoint Commc'ns Group, Inc. Sec. Litig.*, 221 F.Supp.2d 1090, 1104 (N.D. Cal. 2002) ........................................................................................................................... 26

*In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 937-938 (Del Ch. 2003).................... 36

*In re Oxford Health Plans, Inc. Sec. Litig.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000) .... 32

*In re Ply Gem Industries, Inc. Shareholders Litigation*, 2001 WL 755133 at *10 (Del. Ch. June 26, 2001) ........................................................................................................... 35, 39

*In re Polymedica Corp.*, 15 Mass. L. Rptr. 115, 2002 WL 1809095 (Mass.Super. July 16, 2002) ........................................................................................................................... 30

In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 67 (2nd Cir. 2001) ............................................. 29

*In re Taser International Int'l. Shareholder Deriv. Lit.*, 2006 WL 687033 (D. Ariz. March 17, 2006) .............................................................................................................................. 25, 30

*In re Veeco*, 434 F.Supp.2d at 278 ............................................................................................. 32

*In re Viacom Pharmaceuticals, Inc.*, 2005 WL 2989674 at * 5-6 (E.D. Pa. July 1, 2005) .......... 26

In re Vicuron Pharmaceuticals, Inc., 2005 WL 2989674 at *5-6 (E.D. Pa. July 1, 2005)............. 29

*In re Walt Disney Company Derivative Litigation*, 825 A.2d 275, 286 (Del. Ch. 2003). ............ 23

*In re Westell Techs., Inc. Sec. Litig.*, No. 00 C6735, 2001 WL 1313785 (N.D. Ill. Oct. 26, 2001) ........................................................................................................................................... 27

*International Equity Capital Growth Fund, LP v. Clegg*, 1997 WL 208955 at *2 (Del.Ch. April 22, 1997), ............................................................................................................................. 36

*Kahn v. Tremont Corp.*, 694 A.2d 422, 430 (Del. 1997) .............................................................. 38

Levine v. Smith, 591 A.2d 194, 207 (Del. 1991) ...................................................................... 21, 22

*Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001) .......................................................... 35

*McCall v. Scott*, 239 F.3d 808 .............................................................................................. 32, 35

*McMullen v. Bearn*, 765 A.2d 910, 926 (Del. 2000). ................................................................. 35

*McSparran v. Career Education Corp.*, 2006 WL 250698 ......................................................... 32

*Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ........................................................... 23, 34, 39

Orman 794 A.2d at 23 ................................................................................................................... 23

*Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del. Ch. 2001)...... 36, 37

*Plotkin v. IP Axess, Inc.*, 407 F.3d 691, 700 (5th Cir. 2005) ...................................................... 26

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ...................................................................... 21, 23

Rattner v. Bidzos, 2003 WL 22284323 at *8-9 ............................................................................ 23

Rethinking Corporate Federalism in the Era of Corporate Reform, 29 J.Corp.L. 625, 645 (Spring 2004) .................................................................................................................................... 21

*Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002) .......................................................... 33

Rule 8, Fed. R. Civ. P. ................................................................................................................. 32

*S.E.C. v. Warde*, 151 F.3d 42, 49 (2d. Cir. 1998) ..................................................................... 31

*Saito v. McCall*, 2004 WL 3029876 at *6-7 (Del. Ch. Dec. 20, 2004)................................... 31, 32

*Schnall v. Annuity and Life Re (Holdings), LTD.*, 2004 WL 231439 at *9 (D. Conn. Feb. 4, 2004). ................................................................................................................................... 28

Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995)......................................................... 23

*SMC Corp. v. PeopleSoft USA, Inc.*, 2004 WL 2538641 at *3 (S.D. Ind. Oct. 12, 2004)............ 33

*Takara Trust v. Molex, Inc.*, 429 F.Supp.2d 960, 981 (N.D. Ill. 2006) ..................................... 30

*Telxon Corp. v. Myerson*, 802 A.2d 257, 264 (Del. 2002). ................................................. 36, 38

Trends in the Delaware Law:  Director Liability and Indemnification, 1405 PLI/Corp. 331, 333 (Jan. 14, 2004) ..................................................................................................................... 21

*Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798 (2nd Cir. 1980)................................. 34

*Zimmerman v. Braddock*, 2005 WL 2266566 at *8 (Del. Ch. Sept. 8, 2005)............................. 29

Plaintiff Olympia Levinson Stiegele ("Plaintiff") submits this Response and Opposition to the Motion to Dismiss Plaintiff's Amended Shareholder Derivative Complaint filed by Defendants Bernard C. Bailey ("Bailey"), Paul T. Principato ("Principato"), Peter Nessen ("Nessen"), Thomas J. Reilly ("Reilly"), Denis K. Berube ("Berube"), B.G. Beck ("Beck"), Charles E. Levine ("Levine") (collectively "Defendant Directors"), Marcel Yon ("Yon") and Harriet Mouchley-Weiss ("Mouchley-Weiss") (collectively the "Defendant Directors") and William K. Aulet ("Aulet"),.

## I.     INTRODUCTION

This is a shareholder derivative lawsuit brought against certain current and former officers and directors of Viisage Technology, Inc. ("Viisage" or the "Company"). Defendants argue that (1) Plaintiff has failed to plead with particularity that demand on the Board of Directors to bring this suit would have been futile; (2) the Defendants are insulated from liability by provisions of Viisage's Articles of Incorporation; and (3) Plaintiff has failed to allege any cognizable damage suffered by Viisage. Defendants' Motion is without merit and should be denied.

## II.     FACTUAL ALLEGATIONS

### A.     Parties

Plaintiff is, and was at all relevant times, an owner of Viisage common stock. Verified Amended Shareholder Derivative Complaint ("Complaint") at ¶16. Viisage is incorporated in the state of Delaware. *Id*. at ¶17. The Company's business involves two related segments: secure credentials and biometrics. *Id*. at ¶17. The secure credentials solutions segment involves the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric

technologies. *Id.* The focus of the biometric technology solutions segment is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts. *Id.* At the time this derivative action was filed, Viisage's Board of Directors consisted of nine (9) members - - Bailey (the Company's CEO), Principato, Nessen (Chairman of the Audit Committee), Reilly (a member of the Audit Committee), Berube (Chairman of the Board), Beck, Levine (a member of the Audit Committee), Mouchly-Weiss and Yon. *Id.* at ¶¶18-27, 31. Subsequently Yon resigned and five new Board members were added bringing the total to thirteen (13) at the time Plaintiff filed her Amended Complaint.

**B.    Overview**

As early as 2002, the Defendants embarked upon a course of conduct designed to mislead the investing public and shareholders concerning the business prospects of the Company and to enrich certain of the Individual Defendants and their business associates at the expense of the Company and its shareholders. *Id.* at ¶39. In doing so, the Company and the Individual Defendants utilized not only SEC filings, press releases and interviews but also the Yahoo Finance Message Board devoted to discussions concerning Viisage and its stock. *Id.* The Individual Defendants also utilized an unsuspecting enthusiast and supporter of facial recognition technology, who has since become a source of Plaintiff's (the "Source" or "Plaintiff's Source"), who had regular communications with numerous Viisage shareholders and investors. *Id.* During the Relevant Period, Viisage and the Individual Defendants shared information with the Source knowing that it would be passed on to current and potential investors who the Source was in regular contact with. *Id.* The goal, among other things, was to prop up the Company's stock price and to complete a secondary offering which greatly benefited certain of the Individual Defendants. *Id.* Among other things, the Defendants' scheme allowed

certain of the Individual Defendants to sell their personally held Viisage shares at artificially inflated prices and/or to receive payments on loans they had personally made to the Company.

### C.    The Company's Facial Recognition Technology and its Dealings with Piper Jaffray

Initially, Defendants' misconduct involved misleading investors concerning the capability and financial prospects of Viisage's facial recognition technology. *Id*. at ¶40.

In 2002, Viisage reported that it had successfully tested its facial recognition technology at Boston Logan International Airport. *Id*. at ¶41. In a May 13, 2002, press release, entitled "Viisage Achieves High Performance in Identifying Subjects at Boston Logan International Airport" the Company announced that Viisage had achieved strong results as part of the first phase of its face recognition voluntary pilot program to enhance passenger security at the airport. *Id*. According to the press release, Viisage successfully achieved a high detection rate on planted subjects using Viisage's *FaceFINDER*™ face-recognition screening technology." *Id*. In the press release Defendant Berube and then Viisage CEO Tom Colatosi praised the results of the Logan test and the efficiency of the Company's facial recognition technology:

> Colatosti added, "… We believe achieving these superb performance results in the demanding real world aviation environment demonstrates the efficacy of our technology and will absolutely speed its adoption by airports and other high risk facilities."
>
> Dennis Berube, Chairman of the Board, comments, "Our success at Logan confirms that the airport market represents solid and viable business opportunities for our face recognition products. We are a leading player in the airport market just as we are a leading player in the casino market where we have 95% share of the installed market."
>
> The system is proving to be a powerful new technology to conveniently improve passenger security by focusing on the human identification of terrorists and other national security risks.

*Id*. at ¶41.

The Company continued to hype the capabilities of its facial recognition technology in subsequent press releases. *Id.* at ¶¶42-44.

In a September 2002 letter to the Editor of WPI Transformations Journal, Berube defended the effectiveness of the Company's face recognition technology against critics in the media:

> There has been a considerable amount of inaccurate information reported and repeated from non-technical sources with regard to the performance of Viisage Technology at Boston's Logan International Airport and the airport in Fresno.  Logan conducted the most comprehensive test of face-recognition technology anywhere in the nation.  **Viisage achieved 90% performance rates during that test - - incredible by any standards, and certainly sufficient to help to deter a terrorist from joining one of us on an airplane**.  Face-recognition technology can play an important role in making our airports safer at a nominal cost.

*Id.* at ¶44 (emphasis added).

Viisage's false and misleading hype of its facial recognition technology was not limited to mainstream sources.  Viisage also utilized the message boards of financial websites.  In May 2002, Plaintiff's Source, who by then was becoming well-known on the Yahoo Message Board for Viisage as an authority on and advocate of facial recognition technology, including Viisage's, was invited to the Company's headquarters by Viisage employees Sean Mack ("Mack") and Cam Queeno ("Queeno").  *Id.* at ¶45-46.  According to the Source, Berube regularly followed the Viisage postings on the Yahoo Message Board and would often become upset over what he would read.[1]  In any event, during his encounter with Mack (Viisage's Vice President, Controller and Treasurer) and Queeno (Viisage's Vice President of Marketing), Mack and Queeno indicated to the Source that the Company would be receiving a contract from the Transportation Safety Administration ("TSA") to install facial recognition technology at airports.  *Id.*  Following the visit, the Source posted on the Yahoo Message Board that he believed Viisage would be

---

[1]    The Source was told this by Tom Colatosti, Viisage's former President. *Id.* at p. 24 n.2.

receiving a contract from the TSA. *Id.* at ¶46. According to the Source, however, he later learned that neither the TSA nor Mass Port ever indicated to Viisage that there would be any contract resulting from the testing done at Logan Airport in 2002. *Id.*

In June 2002, Berube personally invited the Source to a conference in Washington, D.C. *Id.* at ¶47. Before the conference began, Berube spent about 30 minutes speaking to the Source. *Id.* According to the Source, Berube told the Source about his plan to have Viisage's facial recognition technology installed in every regional airport in the country. *Id.* Also, according to the Source, Berube "was very clear about Viisage's supposed success at Logan Airport." *Id.* He assured the Source that the federal government knew Viisage's technology worked and large contracts for facial recognition technology would be coming very soon. *Id.* By the time he was done speaking with Berube, the Source, he said, was convinced beyond any shadow of a doubt that Viisage's facial recognition technology should be employed at every airport, customs or border check and about anywhere else terrorists might travel to or through. *Id.* at ¶47. Of course, he shared this information with visitors to the Yahoo message board and others. In fact, by the Fall of 2002 the Source's presence on the Yahoo message board was growing, and, according to the Source, Berube even thanked him for his help. *Id.* at ¶51. During this time period, the Source said, he was in touch with well over 100 Viisage investors that controlled 5-10% of Viisage stock. *Id.*

Viisage continued to hype its facial recognition technology throughout 2002, 2003 and into 2004 in subsequent press releases and elsewhere.[2] *Id.* at ¶52. As a result, the Company had convinced many investors and much of the public, including Plaintiff's Source, that Viisage had viable facial recognition technology that would serve as a valuable tool in the war on terrorism.

---

[2]   Defendants contend that these allegations are too vague and conclusory to meet the pleading requirements of Rule 23.1. Plaintiff cal allege specific instances when this in fact occurred upon amendment if necessary.

*Id.* Unbeknownst to the Source, however, the Company's facial recognition technology was not all that Defendants, including Berube, represented it to be.

The fact that the Company's facial recognition technology was not what the Company had stated it to be, and that the Defendants knew it, was confirmed by former employees of the Company in telephone conversations with Plaintiff's Source. *Id.* at ¶¶59-70. In one such conversation, in response to the question what made you think that the testing procedure at Logan Airport (that Berube spoke about in his September 2002 letter to the editor) was bogus, former Viisage Vice President, Bob Schmidt replied:

> It was the way it was conducted. … The problem was that when you use a limited number of people to go through a checkpoint, and you're doing that for I don't know how many days, they did it for 30 days or something, the person who is sitting there basically remembers the people you know by face. And you have to … look at the whole procedure, the way the thing was run. That if you really get into the intricacies of it you can see exactly what was going on.

*Id.* at ¶60.

Similarly, a former Viisage employee who conducted demonstrations of Viisage's facial recognition technology to potential clients, Don Van Dyne, told the Source that the testing at Logan Airport was a "false demonstration." *Id.* at ¶61. According to Van Dyne, it was rigged so that they could get the results that they wanted." *Id.* at ¶61. Van Dyne further explained:

> What I effectively did is I went into Bob [sic] [Skip] Cusak's office and what I basically said was this is not a test. You've got everything rigged and what you're doing is, instead of doing facial recognition, you're going to have somebody watching the screen and they're going to go through, and they're going to see these people walking through and they're going to get used to them. And this system, this is just a false test. And that's what I, I basically told him. He said well that's the only way we can possibly pass. **And he said and that's what Dennis Berube wants.**

*Id.* at ¶62 (emphasis added).  Van Dyne continued:

> Source:      So it's your feeling that the testing parameters were set up that way to achieve 90%?
>
> Van Dyne:    (inaudible), possibly do it, guarantee it, basically.
>
> Source:      So in your mind it wasn't a legitimate test.
>
> Van Dyne:    No, it was not a legitimate test.

*Id.* at ¶65.  Van Dyne continued:

> The 90% criteria was the factor that we worked towards.  When I heard, when I heard how the test was going to be performed I went to Skip [Cusack] and I said, Skip, this is not a test.  This is just, this is a, this is something you're doing just to, so we can assure a 90% success rate.  And he said, yes that's true Don but it's the only way we can do it.[3]

*Id.* at ¶66.    Further, Van Dyne agreed with the Source that "everybody" knew that it was a bogus 90% result.  *Id.* at ¶67.

Van Dyne further related that during this time period Cusak was working directly under Berube, *id.* at ¶67, and further agreed with the Source that it was a true statement that everybody knew that Viisage's technology was not what it was hoped to be.  *Id.* at ¶67.  Certainly it was nowhere near capable of achieving 90% effectiveness.  In fact, Mark Hodosh, Viisage's former director of business development told the Source that Viisage would have been happy to have achieved 50% performance.  *Id.* at ¶70.

During the same time period in which Defendants were misrepresenting the efficacy of the Company's facial recognition technology (and as will be further discussed below, its drivers license contract with the State of Georgia) certain of the Individual Defendants (as will be

---

[3]    Viisage did achieve 90% during a small part of the test using the admittedly flawed testing procedures.

discussed below) and third party Piper Jaffray - - through the aid of Defendant Berube - - were profiting from their use of this and other non-public information concerning the Company.

At a June 2002, conference in the City of New York where Viisage was presenting, the Source first heard the expression "watch the tape." *Id*. at ¶47. According to the Source, the phrase "watch the tape" was used by Berube to indicate to Company outsiders that good news concerning the Company would be coming soon. *Id*. at ¶48. Moreover, according to the Source, Berube regularly shared inside information concerning Viisage with Chris Johnson ("Johnson"), an employee of Piper Jaffray, a securities broker/dealer that, along with its clients, was a large investor in Viisage securities and also acted as a co-manager of Viisage's 2004 secondary offering. *Id*. at ¶¶49-50, 54-58. According to the Source, Johnson told him that he (Johnson) had talked with Berube several times and Berube told him about what would be said in upcoming conference calls and also about a contract that Viisage had but that not been announced. *Id*. at ¶55. In fact, according to the Source, Johnson was privy to information concerning the Company that other investors in Viisage were not. *Id*. at ¶55. According to the Source, Johnson knew what Viisage was working on, what contracts it was in line to get and what its financial guidance would be. *Id*. at ¶55. In fact, in a taped telephone conversation Johnson shared with the Source, certain of the confidential information passed along to him by Berube. *Id.* at ¶56.

According to the Source, Johnson and Piper Jaffray profited from the inside information shared with them by Berube; utilizing such information to buy and sell Viisage stock at opportune times during the Relevant Period. *Id*. at ¶¶53, 58. The Source said that one e-mail he received from Johnson stated that Piper Jaffray had made $12 million plus selling out of part of its Viisage stock position. *Id*. at ¶58.

Viisage's Board of Directors was specifically made aware - - of Defendant Berube's and the Company's misrepresentations concerning the Company's facial recognition policy as well as their improper tipping of Piper Jaffray - - by at least June 2005 but took no action.  *Id*. at ¶147(o).  For instance, in a June 23, 2005 e-mail the Source wrote Defendant Director Nessen:

> In addition to believing I was used/manipulated, I will be able to show information was passed from Viisage to a brokerage house that was not available to the investment community as a whole.  Further, I will be able to show this brokerage house and its clients were involved in a plan to benefit themselves at other shareholders expense. … I will also be able to prove I was intentionally misled/lied to by a person who was then a senior member of Viisage's management.  This was done knowing I was in touch or contact with over 100 of Viisage investors that literally controlled millions of Viisage shares at the time that there were only 20 million or so outstanding shares.  I will also be able to prove that Mr. Berube was not honest with investors concerning statements he made about the technology Viisage possesses.

*Id*. at ¶147(o).  The e-mail further requested a meeting with Defendant Nessen.  *Id*.  According to the Source, he also spoke with Nessen on the telephone concerning this and wrote the other directors as well.  *Id*.  Nevertheless, Viisage's Board of Directors took and has taken no action concerning the wrongdoing alleged by Plaintiff's Source.  *Id*.

## D.    The State of Georgia Drivers' License Contract

The Company's and Individual Defendants' misconduct also involved misleading the State of Georgia, shareholders and investors in connection with Viisage's secure credentials business.  On May 24, 2002, the Georgia Technology Authority ("GTA") on behalf of the Georgia Department of Motor Vehicle Safety ("DMVS") sought proposals to provide a digitized license system for the DMVS.  *Id*. at ¶71.  Proposals were submitted by Viisage, Digimarc (the incumbent provider of such services to the DMVS) and a third bidder.  *Id*.  Although the contract - - which Viisage expected to generate $19.7 million in revenue over 5½ years - - was awarded to Viisage on November 12, 2002, Digimarc challenged the award and,

after exhausting administrative remedies, filed an action in the Superior Court of Fulton County, Georgia against the GTA and DMVS on March 5, 2003. *Id.* at ¶¶71, 83.

On May 20, 2003, Digimarc filed a motion seeking to preliminarily enjoin further implementation of and performance under the contract awarded to Viisage. *Id.* at ¶72. By order dated July 31, 2003, the Georgia court granted Digimarc's motion and entered an injunction until further order of the court finding, *inter alia,* that "[t]he Plaintiff has made a compelling case that irregularities occurred during the procurement process, and if the case proceeds to a full trial on the merits, there is a substantial likelihood that the Plaintiff will prevail." *Id.* at ¶73. These "irregularities" referred to by the Georgia court included substantial wrongdoing by Viisage. *Id.* Accordingly, by consent of the parties, the Georgia court entered an order on November 7, 2003, directing that Viisage be added to the action as "a necessary party." *Id.* Digimarc added Viisage as a defendant on November 12, 2003. *Id.*

As was subsequently confirmed by Digimarc with the benefit of discovery, including deposition testimony of Viisage employees, there existed substantial evidentiary support for Digimarc's contentions that Viisage had made material misrepresentations to the GTA and DMVS in connection with its bid. *Id.* at ¶¶74-82. In fact, the evidence demonstrated that Viisage had wrongfully submitted to DMVS sample cards as "production quality" cards that were in fact produced by a competitor and falsely informed DMVS that Viisage had secured a back-up card production facility to take over license production. *Id.*

Following the completion of discovery, the George court entered its ruling on December 22, 2004. In its ruling on cross-motions for summary judgment filed by Digimarc and Viisage the Court concluded, based upon a substantial evidentiary record, "that there were significant instances of misconduct and misrepresentations by Defendant Viisage." *Id.* at ¶117.

In its ruling, the Georgia court found, among other things, the following facts concerning Viisage's misconduct and misrepresentations to be **undisputed**:

- "On August 26, 2002, Defendant Viisage submitted two entirely new proposed permanent card solutions - both made with 3M products [without authorization from the manufacturer of the cards]. Defendant Viisage submitted a sample called the "Georgia Design Sample 3M Confirm Laminate" and a single card sample called the "Production Quality Card 3M Confirm Laminate," which was a driver's license card containing artwork and graphics from New York State. Defendant Viisage failed to label the Georgia Design Sample as "production quality" even though these cards met the specifications of production quality cards as defined by DMVS. These cards were discovered to be defective because the laminate was easily removed, leaving the underlying information on the card intact and subject to alteration; thus, the Evaluation Team concluded they were not production quality."

- "Defendant GTA subsequently asked Defendant Viisage to submit 17 samples of the New York cards, *which Defendant Viisage had already falsely represented were production quality.* Defendant Viisage then arranged for 3M to send 17 additional samples of the New York cards, indicating that they were its "production quality cards." The New York card samples were actually made by De La Rue and not Defendant Viisage and De La Rue never gave 3M or Defendant Viisage permission to use the New York card samples and they were only given to Defendant Viisage for marketing purposes. *In short, Defendant Viisage submitted another vendors' sample cards, which it had no permission to use, in an attempt to submit acceptable permanent card samples."* (emphasis added).

- "In a further attempt to secure the contract with Defendants GTA and DMVS, Defendant Viisage misrepresented the existence of a back-up card production facility. The RFP required that each bidder describe what plans it had to produce permanent cards on a central issuance basis in the event that a disaster disrupted the ability to issue cards from the primary central issuance facility in Georgia. Prior to its July 19, 2002, initial proposal, Defendant Viisage had no alternative central issuance production facility in service for another state. Instead, it asked permission of Arthur Blank & Company to include them in the Georgia proposal as a back-up card

printing facility in case of disaster at the permanent facility in Georgia. ***In fact, Arthur Blank & Company did not have the capacity to provide back-up card production facilities, and Defendant Viisage had no binding contract with Arthur Blank & Company that could serve as a basis for Defendant Viisage's assertion in its proposal that it had secured this company as its back-up card production facility. In fact, Defendant Viisage had not procured specific pricing information from Arthur Blank & Company regarding how much money it would require from Defendant Viisage in order to prepare itself to serve as a back-up card production facility.***" (emphasis added).

### E.     Defendants' False and Misleading Statements Concerning the DMVS Contract and Related Litigation

Throughout the Relevant Period, the Company and the Individual Defendants, including each of the Defendant Directors, made false and misleading statements concerning the circumstances surrounding the DMVS Contract and the related litigation. The Individual Defendants repeatedly mischaracterized Viisage's involvement in the litigation and in fact for a long time falsely maintained that it was not even a party to the proceedings.

For instance, notwithstanding the evidence of Viisage's own wrongdoing and the fact that it was integral to Digimarc's claims, Viisage characterized the litigation brought by Digimarc, in its Form 10-Q for the period ending March 28, 2004, filed with the SEC on May 12, 2004, and signed by Defendant Bailey, as one ***solely concerned with*** allegations that the DMVS failed to comply with its own bid process. *Id.* at ¶83.

Only ten days later, on May 21, 2004, Viisage filed an Amendment to a Form S-3 Registration Statement to register for sale 5,221,454 Viisage shares held by six beneficial owners of Viisage stock, including 1,054,798 shares held by Odeon Venture Capital AG ("Odeon") for which Defendant Yon had sole voting and dispositive power and 1,054,798 shares held by Dr. Christoph v.d. Malsburg, then a member of Viisage's board of directors. *Id.*

at ¶86.  The Registration Statement, which was signed by Defendant Directors Bailey, Berube, Levine, Mouchley-Weiss and Reilly contained the same material misrepresentations and omitted the same material information concerning the Georgia litigation, as the aforementioned Form 10-Q and indeed incorporated that Form 10-Q by reference.  *Id*. at ¶86.

A Form 10-Q/A, signed by Defendant Director Bailey, for the quarterly period ending March 28, 2004, and filed with the SEC on May 21, 2004, made no change in the disclosures concerning the Georgia litigation.  *Id*. at ¶88.

On June 21, 2004, the Company filed a Form S-3 Registration Statement containing a preliminary prospectus for a Secondary Offering of 7.2 million shares of newly issued common stock by Viisage and for the sale of 300,000 shares by Lau Technologies ("La) - - a company owned by Berube and his wife Joanna Lau - - Yon and Defendants Yon, and Beck.  *Id*. at ¶89. The Registration Statement was signed by Defendant Directors Bailey, Berube, Mouchly-Weiss, Principato, Levine, Nessen, Reilly, Beck, and Yon and incorporated by reference, *inter alia,* Viisage's Form 10-Q and amended Form 10-Q for the quarterly period ended March 28, 2004. *Id*. at ¶¶23, 89, 147(j).

The Secondary Offering was essential for Viisage.  *Id*. at ¶90.  It was also extremely beneficial to Defendant Directors, Berube, Beck and Yon.  *Id*. at ¶90.  Viisage had not reported a profit in 2001, 2002, or 2003 and had reported a net loss in the first quarter of 2004 as well.  *Id*. at ¶90.  As of March 28, 2004, Viisage had total debt of $31,423,000, of which $15.3 million was owed to Defendant Beck and approximately $5 million was owed to Lau.  *Id*. at ¶90.  The interest expense on the debt was substantially hampering its ability to report a profit.  *Id*. at ¶90. The principal stated purpose of the Secondary Offering was to repay approximately $30.3 million of indebtedness, which would virtually eliminate interest expense from Viisage's balance

sheet. *Id*. at ¶90. Disclosure of the true state of affairs concerning Viisage's bid for the Georgia DMVS could have jeopardized the offering and the ability to raise sufficient funds to extinguish the debt, including the debt owed Defendant Director Beck and Defendant Director Berube, via Lau. *Id*. at ¶90. Accordingly, the Registration Statement merely continued the same disclosures contained in its Forms 10-Q and 10-Q/A for the quarter ended March 28, 2004, and in its May 21, 2004, Form S-3/A without any mention of the wrongdoing with which Viisage was charged. *Id*. at ¶90.

On July 1, 2004, Digimarc moved the Georgia court to compel Viisage to comply with a discovery order entered June 3, 2004, by the Georgia court and for sanctions against Viisage due to its abject failure to produce the ordered documents Digimarc reasonably maintained were necessary before the court directed depositions could go forward. *Id*. at ¶93. In the face of this motion, and with the planned Secondary Offering only weeks away, Viisage sought to prevent the requested documents from being produced or depositions from ever occurring by agreeing with DMVS to terminate the contract Digimarc was challenging. *Id*. at ¶93. Thus, in a July 21, 2004, press release entitled "Viisage Takes Initiative to Help End Stalemate in Georgia Drivers' License Contract Dispute: Viisage to receive $2.5 million payment; New request for proposals to be issued by Georgia Department of Motor Vehicle Safety," Viisage announced that it had reached a settlement with DMVS, Viisage would receive $2.5 million from DMVS for work performed on the contract pursuant to the settlement and Viisage would be allowed to re-bid the contract. *Id*.

In a conference call with analysts held the following day on July 22, 2004, Defendant Bailey stated:

> ***Viisage was never a party to this lawsuit, which has dragged on and on for a year and a half nor were any allegations of impropriety ever***

> ***lodged against our company.*** Still and all, with more than $1m spent
> already in legal fees as a related party and no prospect of a breakthrough
> in the logjam within the foreseeable future, we decided it was time to act.

*Id*. at ¶95 (emphasis added). This statement was made despite the fact that in July 2003 the Georgia court had concluded that Digimarc had "made a compelling case that irregularities occurred during the procurement process" and in November 2003, Viisage was named as a Defendant in the Georgia lawsuit. *Id*. at ¶73.

On July 22, 2004, Viisage filed an Amended Registration Statement with the SEC with respect to Viisage's Secondary Offering. *Id*. at ¶97. The Amended Registration Statement, which was signed by Defendant Directors Bailey, Berube, Mouchly-Weiss, Principato, Levine, Nessen, Reilly, Beck and Yon, asserted that Georgia DMVS had "terminated the contract for convenience." *Id*. at ¶97. This was a further effort by the Company to avoid any disclosure of its own wrongdoing, and to maintain the fiction that it was not even a defendant in the action. *Id*. Viisage also reported that DMVS had filed a motion to dismiss the Georgia litigation based upon termination of the contract, omitting the fact that Viisage also filed a motion to dismiss Digimarc's complaint on the same day the DMVS' motion was filed - July 21, 2004. *Id*. at ¶95. The Amended Registration Statement also incorporated by reference, among other things, Viisage's Form 10-Q and Amended Form 10-Q for the quarterly period ended March 28, 2004, and Viisage's July 21, 2004, press release that was included in a Form 8-K filed by Viisage with the SEC on that date, each of which contained false and misleading statements. *Id*. at ¶97. The Secondary Offering raised approximately $37.1 million for Viisage, of which $30.3 million was used to repay indebtedness, principally owed to Beck and Lau, and approximately $2.3 million for Defendants Berube, Beck, and Yon from their sales of Viisage stock in the offering. *Id*. at ¶99.

On August 19, 2004, and September 2, 2004, the Georgia court entered a TRO and injunction, respectively, enjoining consummation of the $2.5 million settlement announced by Viisage on July 21, 2004, just before its completion of the Secondary Offering. *Id*. at ¶¶102, 105. On September 2, 2004, the Court also denied Viisage's motion to dismiss and ordered it to pay attorney fees for failure to meet is discovery obligations. *Id*. at ¶105.

After the close of the market on October 25, 2004, Viisage announced "record" results for the third quarter ended September 30, 2004 -- Viisage's first profitable quarter in three years -- and increased Viisage's revenues and earnings guidance for 2004 to $66-68 million in revenues and earnings of $11.5-$12.5 million. *Id*. at ¶109. Again, Viisage made no disclosure of the Georgia court's September 2, 2004, rulings in the press release. *Id*. In addition, even though the Georgia court had preliminarily enjoined payment of the $2.5 million to Viisage, Viisage included the $2.5 million payment in its increased EBITDA guidance for 2004. *Id*. at ¶109. In an October 26, 2004, conference call with analysts, Viisage reiterated its increased financial guidance for 2004. *Id*. at ¶110. In addition, Defendant Aulet highlighted the significant benefits achieved from the Company's August 5, 2004, offering and that Viisage had obtained a commitment for a new $25 million line of credit to replace its prior credit line. *Id*. at ¶110.

With the new State contracts and new line of credit secured, Defendant Bailey, for the first time, revealed on the October 26, 2004, call the existence of the August 19, 2004, TRO on the settlement it had announced on July 21, 2004. *Id*. at ¶111. However, Viisage continued to conceal the Georgia court's September 2, 2004, injunction, the order sanctioning Viisage, the order compelling Viisage to comply with the Georgia court's prior discovery orders and the order denying the motions to dismiss filed by the GTA, DMVS, and Viisage. *Id*. at ¶111. Moreover, as had been the case since the Georgia litigation had been commenced, Viisage made no

disclosure that Viisage's own wrongdoing was a material subject of the litigation, or that Viisage was even a Defendant in the litigation.

On November 10, 2004, Viisage filed its Form 10-Q for the third quarter ended September 30, 2004. In that Form 10-Q, Viisage repeated the revenue and earnings figures announced on October 25, 2004. *Id*. at ¶112. The Form 10-Q was signed by Defendant Bailey. *Id*. at ¶112. The Form 10-Q disclosed for the first time that the Georgia court had preliminary enjoined the settlement with the GTA and DMVS -- more than two months earlier -- while at the same time Viisage continued to, among other things, falsely represent to the public that Viisage was entitled to the $2.5 million payment from the Georgia DMVS discussed above. *Id*. at ¶112. Moreover, as had been the case since the Georgia litigation had been commenced, Viisage continued to conceal the fact that Viisage's own wrongdoing was a material subject of the litigation and that Viisage was even a defendant in the litigation. *Id*.

On December 22, 2004, the court entered its ruling. *Id*. at ¶117. As a result, the Georgia court permanently disallowed the $2.5 million in payments Viisage claimed it was owed for services it purportedly performed under the then terminated contract. *Id*. at ¶117.

Viisage made no disclosure of this ruling on December 22, 2004. Rather it waited until after wire reports of the Georgia court's rulings began circulating on December 27, 2004, that were causing Viisage's stock price to drop. *Id*. at ¶120. As reported by the Comtex News Network, "VISG is seeing sharp sell pressure this morning following wire reports that Digimarc received a favorable court ruling in Georgia related to a drivers license contract awarded to VISG." *Id*. at ¶120.

In spite of Viisage's attempt to put a positive spin on the Georgia court's ruling –and its omission of material information regarding Viisage's improper conduct with respect to that

contract, *id*. at ¶¶122-23 -- as the news seeped into the market during the holidays, Viisage's stock price began to immediately decline -- from a Relevant Period high of $9.64 per share on December 23, 2004 (the previous trading day) to a low of $8.38 on December 27, 2004, or a 15% drop, closing at $8.82 on high volume of trading. *Id*. at ¶124.

On February 7, 2005, Viisage announced that it would not meet its previously issued EBITDA earnings guidance of $11.5 - $12.5 million and would instead report only $8-9 million. *Id*. at ¶125. In addition, rather than report a $1.5 million loss as previously projected, Viisage anticipated a loss of approximately $7-8 million. *Id*. The Company claimed that the earnings shortfall was "primarily due to several non-recurring factors, including a non-cash impairment charge of $2 million in connection" with the Digimarc litigation relating to the Georgia DMVS contract. *Id*. Thus, Viisage had continued to include the settlement payment from the DMVS in its public projections even though the Georgia court had enjoined it on August 19, 2004. *Id*.

The market's reaction to this news was immediate. On February 8, 2005, Viisage's shares plunged as much as 24.3% -- from $7.27 to a low of $5.85 -- on extraordinarily high volume of over 4.6 million shares. *Id*. at ¶128.

F.    **Viisage's Internal Control Deficiencies**

On March 2, 2005, Viisage again surprised the market when it announced that a "material weakness" existed in Viisage's internal accounting controls and that BDO Seidman would issue an adverse opinion with respect to the Company's controls over financial reporting. *Id*. at ¶129. The Company held a conference call before the market opened on March 3, 2005, to discuss its press release. *Id*. at ¶130. During that conference call, Defendant Aulet admitted that the Company recognized it had internal control deficiencies "months ago" and had been

"working to remedy the issues for some time." *Id.* at ¶130. Aulet further acknowledged that "for the last *six to eight months,* we have been working hard on our internal controls with the goal of a full compliance rating for the year 2004 in our Sarbanes-Oxley 404 review." *Id.* at ¶130. In response to a question, Defendant Bailey also admitted that the Company's internal control deficiencies were well known throughout 2004. *Id.* at ¶130. He stated "[w]e have been going through an exhaustive, detailed analysis of our entire control system in this company for the entire year." *Id.* at ¶130. The market's reaction to these latest revelations was again immediate. On March 3, 2005, Viisage's shares plunged as much as 27.2% -- from the close of $5.47 the previous day to a low of $4.30 on March 3, 2005 - - on extraordinarily high volume of over 6.2 million shares. *Id.* at ¶131.

Despite the fact that the Defendants had been aware of the Company's material internal control deficiencies the Defendants, including each of the Defendant Directors, repeatedly represented in documents signed by the Defendant Directors and filed with the SEC during the Relevant Period that Viisage's internal controls were effective.[4] *Id.* at ¶¶84-86, 88-90, 97, 100-101, 113-14.

Viisage did not file its Form 10-K or its Form 10-Q for the first quarter until June 30, 2005, which it then amended on July 7, 2005, to provide further information about its internal control deficiencies. *Id.* at ¶135. Viisage's Form 10-K filings included the report of its auditors, BDO Seidman, LLP, on the identified material weaknesses in Viisage's internal financial controls, including insufficient resources and technical accounting expertise within the accounting function and inadequate or ineffective control processes around information technology systems. *Id.* at ¶¶135-136. In that report, BDO Seidman, LLP explained that: "A

---

[4]   The Defendants' false representations concerning the effectiveness of the Company's internal controls form part of the basis of the related securities class action lawsuits.

material weakness is a control deficiency, or combination of control deficiencies, that results in

*more than a remote likelihood that a material misstatement of the annual or interim*

*financial statements will not be prevented or detected."* *Id.* at ¶135 (emphasis added).

Defendants Nessen, Reilly and Levine's conduct in this regard was especially

egregious. Each served on the Company's Board of Directors' Audit Committee during the

Relevant Period and was specifically charged with the duties of overseeing the Company's

accounting function and control over financial reporting. *Id.* at ¶147(g).

> **G.** **Defendants Berube, Beck, Yon, Levine and Reilly Obtained a Substantial Improper Benefit not Shared by Other Viisage Shareholders as a Result of Defendants' Improper Conduct**

The misrepresentations of the Company and the Individual Defendants (i) enabled

Viisage to complete, in August 2004, the Secondary Offering of approximately 7.5 million

shares by which it sold approximately 7.2 million shares and received net proceeds of

approximately $37.4 million at a time when it was struggling to report a profit; (ii) Lau,

controlled by Defendant Berube, realized proceeds of $779,779.00 from the sale of 141,778

shares of Viisage common stock in the Secondary Offering, Beck realized proceeds of $779,779

from the sale of 141,778 shares of Viisage common stock in the Secondary Offering, and Odeon,

controlled by Defendant Yon, realized proceeds of $743,363.50 from the sale of 135,157 shares

of Viisage common stock in the Secondary Offering. *Id.* at ¶138. Significantly, the proceeds of

the Secondary Offering to Viisage were used, in substantial part, to repay in full a $15.3 million

promissory note issued to Defendant Beck and to repay in full a $4.3 million remaining debt

obligation to Lau, owned by Berube and his wife. *Id.* at ¶138. In addition, certain of the

Individual Defendants reaped millions of dollars of proceeds from open market sales of

Viisage stock during the Relevant Period - - Berube, via Lau, nearly $3 million; Yon, via

Odeon, more than $6 million; Levine $100,000; and Reilly $87,000.  *Id.* at ¶¶139-42, 147(b-f).

Thus, these Defendants were able to profit from the artificially inflated price of

Viisage's stock resulting from the Individual Defendants' and the Company's

misrepresentations concerning the Company's facial recognition technology and failure to

disclose adverse facts concerning the Company's contract with DMVS and the related

litigation.

## III.    PLAINTIFF HAS ALLEGED FACTS SUFFICIENT TO DEMONSTRATE DEMAND FUTILITY

Defendants argue that Plaintiff has failed to allege with particularity that a shareholder

demand upon Viisage's Board to bring this action would be futile.  In the present case, the

determination of whether Plaintiff has sufficiently alleged demand futility is determined under

the test set forth in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993).  Under *Rales v. Blasband*:

> [A] court must determine whether or not the particularized factual allegations of a
> derivative stockholder complaint create a reasonable doubt that, as of the time the
> complaint is filed, the board of directors could have properly exercised its
> independent and disinterested business judgment in responding to a demand.

*Id*. at 934.

Pleading futility of demand is not nearly as difficult as Defendants insist.[5]  Although a

plaintiff is held to a particularized standard, plaintiff need not plead evidence.  *Levine v. Smith*,

---

[5]   In fact, "recent Delaware decisions suggest a trend toward stricter judicial scrutiny of director decision-making."
Renee M. Jones, *Rethinking Corporate Federalism in the Era of Corporate Reform*, 29 J.Corp.L. 625, 645 (Spring
2004).   "Delaware's most recent corporate decisions depart dramatically from the tradition of management
deference that preceded Enron."  *Id*. at 654.  "Since Enron, Delaware law has taken a decidedly tougher stance with
respect to director protections."  A. Gilchrest Sparks, III, et. al., *Trends in the Delaware Law:  Director Liability and
Indemnification*, 1405 PLI/Corp. 331, 333 (Jan. 14, 2004).   "Recent case law has tightened the definition of
'independent' and expanded the concept of 'good faith.'"  *Id*.   "Recent judicial decisions . . . indicate that the
traditional safeguards of the business judgment rule, and charter provisions that eliminate personal liability for duty
of care violations, will not protect directors that intentionally disregard their duties."  Louis F. Herzeca and Ruke
Ku, *Directors Take a Active Role, Courts and Regulators Heightening Scrutiny of Board Independence, Oversight*,
230 NYLJ 9 (Sept. 29, 2003).

591 A.2d 194, 207 (Del. 1991).   Instead, the factual allegations of the complaint must be accepted as true and need only raise a "reasonable doubt" as to the directors' disinterestedness or independence.   *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).   The "reasonable doubt" standard is not a restrictive evidentiary test.   Plaintiffs are not required to plead particularized facts sufficient to sustain a "judicial finding" that the test excusing demand is satisfied.   *Grobow v. Perot,* 539 A.2d 180, 195 (Del. 1988).   "Nor must plaintiff demonstrate a reasonable probability on the merits."   *Dollens v. Zionts*, 2002 WL 1632261 at *5 (N.D. Ill. July 22, 2002). "Reasonable doubt can be said to mean that there is a reason to doubt. This concept is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms."   *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996) ("the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule."); *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

Plaintiff's allegations go beyond notice pleading, and raise a reasonable doubt that a majority of Viisage's Board was disinterested and independent - - both at the time this lawsuit was filed and at the time the Amended Complaint was filed.[6]

## A.    Plaintiff has Alleged that a Majority of the Board is Disinterested

Directorial interest may be said to exist when a director receives a personal financial benefit from a transaction which is not actually shared by the stockholders or "a corporate decision will have a materially detrimental impact on a director but not on the corporation and

---

[6]    Demand futility with respect to Plaintiff's allegations concerning the Company's and Individual Defendants misconduct in connection with the company's facial recognition technology is measured against Viisage's Board at the time the Amended Complaint was filed.   *Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006).   Demand futility with respect to Plaintiff's remaining allegations - - claims that were alleged and not dismissed prior to Plaintiff's Amended Complaint - - are measured against the Board that existed when the original complaint was filed.   *See id*., *Harris v. Carter*, 582 A.2d 222 (Del. Ch. 19090).   In any event, measured against either Board demand is excused.

the stockholders." *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002); *Rales*, 634 A.2d at 936;

*Rattner v. Bidzos*, 2003 WL 22284323 at *8-9 (Del. Sept. 30, 2003). A substantial likelihood of

personal liability creates a disabling interest which prevents a director from impartially

considering a demand. *Rattner,* 2003 WL 22284323 at *9; *Seminaris v. Landa*, 662 A.2d 1350,

1354 (Del. Ch. 1995). In the present case, Plaintiff has alleged with particularity facts

demonstrating that a majority of the members of Viisage's Board of Directors received a

personal financial benefit not shared by Viisage shareholders and/or face a substantial likelihood

of personal liability for breaches of their fiduciary duties owed to Viisage and its shareholders.

### 1.    Duties of Officers and Directors of Delaware Corporations

Directors of Delaware corporations have a triad of primary fiduciary duties: due care,

loyalty, and good faith. *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001); *In re Walt

Disney Co. Derivative Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003).

Issues regarding the duty of loyalty arise in many contexts including insider trading.

Reid, Teles, Rosini, *Directors Liability for Y2K:  A Corporate Governance Litigation Bear and a

Securities Litigation Bull*, 24 Del. J. Corp. L. 835; *Oberly v. Kirby*, 592 A.2d 445, 463 (Del.

1991). Moreover, "it is an act of disloyalty for a fiduciary to profit personally from the use of

information secured in a confidential relationship, even if such a profit or advantage is not gained

at the expense of the corporation.". *Id*.

> A failure to act in good faith may be shown … where the fiduciary
> intentionally acts with a purpose other than that of advancing the best
> interest of the corporation, where the fiduciary acts with the intent to
> violate applicable positive law, or where the fiduciary intentionally fails to
> act in the face of a known duty, demonstrating the conscious disregard for
> his duties.

*In re Walt Disney Co. Derivative Litigation*, 906 A2d 27, 67 (Del. 2006). This, however, is not

the exclusive definition of fiduciary bad faith and other examples may be proven or alleged. *Id*.

Moreover, a director cannot act loyally towards the corporation unless he or she acts in good faith. *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

As alleged in the Complaint, each of the Defendant Directors breached one or more of these duties.

> ### 2. Each of the Defendant Directors Faces a Substantial Likelihood of Liability for Misleading Investors and Shareholders to the Detriment of the Company

Each of the Defendant Directors actually engaged in securities fraud thereby exposing the Company to liability for same. They did so by, among other things, disseminating to the public false and misleading statements concerning the circumstances surrounding the Company's contract with Georgia DMVS and the related litigation and the effectiveness of the Company's controls over financial reporting. *See*, *e.g*., Complaint at ¶¶83-86, 88-90, 97, 99-101, 109-110, 112-14. Each of the Defendant Directors signed reports filed with the SEC in which such materially false and misleading statements were made concerning these important aspects of the Company's business and operations. *Id*. Defendants that sign SEC reports and other documents are liable for the material misstatements and omissions contained therein. *See In re Indep. Energy Holdings PLC Sec. Litig*., 154 F. Supp. 2d 741, 767 (S.D.N.Y. 2001) ("by affixing his name to the Prospectus, [defendant] adopted the statements made therein and can be held liable for the alleged misrepresentations"); *see, also Howard v. Eversex Sys., Inc*., 228 F.3d 1057, 1061 (9th Cir. 2000) ("[w]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true"). It also excuses demand. *Fina v. Calarco Corp*., 2005 WL 3112894, *7 (Conn. Super. 2005) (addressing demand futility allegations against directors under Delaware law). In *Fina*, the Court stated:

> Surely the conscious decision to sign off on forms required to be filed with a federal investigative body was intended as a "vouching" for the accuracy and integrity of the information. ... The court concludes there is reasonable doubt these directors (all - - as opposed to a mere majority) are disinterested and independent and there is, thus, reasonable doubt "that the protections of the business judgment rule are available" to them.

2005 WL 3112894 at *7.  *See In re Taser International Int'l. Shareholder Derivative Litig.*, 2006 WL 687033 at *10 (D. Ariz. March 17, 2006) (applying Delaware law) (finding demand was excused where plaintiffs alleged, among other things, that three of the outside directors served on the board's audit committee and plaintiffs argued "by inference that the Audit Committee members 'closely monitored and were aware of declining sales trends' and 'could not possibly approve Company earnings press release and earnings guidance without knowing how the quarter at issue was progressing.'").

Moreover, Defendant Bailey made false and misleading statements in conference calls with securities analysts as well.  *See, e.g*., Complaint at ¶95.  For instance in a July 22, 2004, conference call, Bailey flat out lied upon the Company's status with respect to the Georgia litigation in which it had been named a Defendant on November 12, 2003.  Complaint at ¶¶73, 95.  "Viisage was never a party to this lawsuit, which has dragged on for a year and a half nor were any allegations of impropriety ever lodged against our company," Bailey told analysts during the July 22, 2004, call.

And, Defendant Berube blatantly misrepresented the efficacy of the Company's facial recognition technology and the results achieved at Logan Airport during the testing of same.  *See, e.g*., Complaint at ¶¶41, 43-44, 47.  In particular, in a letter published by the WPI Transformations Journal, Berube wrote "Viisage achieved 90% performance rates during that [the Logan] test - - incredible by any standards," *id*. at ¶44, even though the test, as Berube well knew at the time, had been "rigged" to achieve that result.  *Id.* at ¶¶59-67.  Berube also provided

false information concerning the Company to the Source that was shared - - as Berube had

hoped - - with investors, including followers of Viisage on the Yahoo Finance Message Board.

*Id.* at ¶¶45-47, 51.

The material information misrepresented and omitted by the Company and the Individual

Defendants concerned litigation regarding a key contract and the effectiveness of its facial

recognition technology. Clearly, Defendants would have been apprised of events which placed a

key contract seriously in doubt, and they also would have been aware of the effectiveness of the

Company's facial recognition technology which was critical to the Company as well as investors.

*In re Biopure Corp. Deriv. Litig.*, 424 F.Supp.2d 305, 308 (D. Mass. 2006); *In re Electronic*

*Data Systems Corp., Sec. and "ERISA" Litig.*, 298 F. Supp. 2d 554, 557 (E.D. Tex. 2004)

("contract's sheer magnitude and importance to EDS support an inference that … CEO and CFO

would know its status."); *In re Viacom Pharmaceuticals, Inc.*, 2005 WL 2989674 at * 5-6 (E.D.

Pa. July 1, 2005) ("allegations that key officers and directors must have known misleading

statements because the statements involved the Company's lead product candidate will satisfy

the pleading requirements of scienter."); *Plotkin v. IP Axess, Inc.*, 407 F.3d 691, 700 (5th Cir.

2005) ("It is reasonable to assume, given the importance of these deals [with Lynxus/AGPI] to

the company, that IPaxess would have . . . discovered details about their poor financial condition

. . . [of] Lynxus.); *In re Northpoint Commc'ns Group, Inc. Sec. Litig.*, 221 F.Supp.2d 1090, 1104

(N.D. Cal. 2002) (CFO's scienter inferred because of CFO's position and the fact that the fraud

involved significant financial aspect of the business); *In re CINAR Corp. Sec. Litig.*, 186

F.Supp.2d 279 (E.D. N.Y. 2002) (same). *See also In re Campbell Soup Co. Sec. Litig.*, 145

F.Supp.2d 574, 599 (D. N.J. 2001) ("knowledge may be imputed to individual defendant when

the disclosures involve the company's core business"); *In re Westell Techs., Inc. Sec. Litig.*, No.

00 C6735, 2001 WL 1313785 (N.D. Ill. Oct. 26, 2001); *Aldridge*, 284 F.3d at 84; *Novak*, 216 F.3d at 308.  Certainly the Defendant Directors would have known that the Company's facial recognition technology was nowhere near capable of reaching 90% performance and that in the Georgia litigation Viisage had been named as a Defendant and was alleged to have been involved in serious misconduct with respect to the Georgia contract.

Furthermore, Defendant Bailey admitted that the Company's internal control deficiencies were well known throughout 2004.  Complaint at ¶130.  Moreover, with respect to the facial recognition technology, former Viisage employee Van Dyne confirmed "everybody" knew that 90% purportedly achieved at Logan was bogus and that the technology was not what it was hoped to be.[7]  Complaint at ¶¶66-67.

In *Biopure*, a case decided under Delaware law, the court found that demand was excused where plaintiffs alleged that a majority of the defendant directors, by concealing their knowledge of the FDA's clinical hold on a drug company's important product, subjected themselves to potential personal liability.  *Id.* at 308.  In reaching its decision that there was reason to doubt a majority of the directors were disinterested, the court drew an inference that the defendant officers and directors had knowledge of the FDA's clinical hold based on the importance of the product to the company.  The court observed that, although a defendant's corporate position alone cannot support an allegation of defendant's scienter, "in cases in which a company's primary product or services are in jeopardy, courts have been willing to impute that knowledge to the company's officers and directors."  *Id.*

Moreover, each of the Defendant Directors, Bailey, Berube, Beck, Levine, Reilly,

---

[7]    Principato (a director since 2001), Levine (a director since 1998); Nessen, Reilly, Berube and Mouchley-Weiss (directors since 1996) were all directors at the time of the bogus test at Logan.  Complaint at ¶¶20-23, 25, 27.  Bailey (a director since August 2002) was a director at the time of Berube's false and misleading statements published in the WI Transform Journal.  Complaint at ¶18.

Principato, Nessen, Mouchley-Weiss and Yon - - a majority of the directors at the time this lawsuit as well as the Amended Complaint were filed - - are named as defendants to the securities class action claims, Complaint at ¶¶15, 147(i), for which they face a substantial likelihood of liability.[8]  Such claims include claims under Section 11 of the Securities Act for signing false and misleading Registration Statements (claims that are practically strict liability), claims under Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 and claims under Sections 15 and 20 of the Securities Act and Securities Exchange Act, respectively, based on control person liability.  Complaint at ¶15.  The fact that these Defendants face a "substantial likelihood" of personal liability in the pending class action lawsuit in which they are named defendants, renders them incapable of impartially considering a demand.  *Veeco Instruments, Inc. Sec. Litig.*, 434 F.Supp.2d 267, 275 (S.D.N.Y. 2006); *In re Cendant Corp. Derivative Action Litigation*, 189 F.R.D. 117, 129 (D.N.J. 1999), (the court found each of the named director defendants were interested because each was a defendant in other pending class action suits arising out of the accounting irregularities at issue and faced significant personal liability for the wrongdoing alleged in the complaint) (applying Delaware law).

**3.    Breach of the Duty of Loyalty Through Insider Trading**

Plaintiff has alleged that Defendants Berube, Beck, Levine, Yon and Reilly are directly interested in the insider trading transactions because they received a personal benefit from those transactions, *see* Complaint at ¶¶138-142, 147(b-f), and that each faces a substantial likelihood of liability for engaging in these transactions.

---

[8]    Each of the Defendant Directors at a minimum, signed SEC reports in which false financial information concerning the Company was reported.  Even outside directors can be held liable as control persons when they sign important SEC filings containing misrepresentations and omissions of others.  *Schnall v. Annuity and Life Re (Holdings), LTD.*, 2004 WL 231439 at *9 (D. Conn. Feb. 4, 2004).

Illegal insider trading by an officer or director is a breach of their duty of loyalty.[9] *Brophy v. Cities Services Co.*, 70 A.2d 5, 7 (Del. Ch. 1949). To adequately allege that a director is "interested" in an insider trading claim, a plaintiff need only plead facts which support the inference "that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." *Zimmerman v. Braddock*, 2005 WL 2266566 at *8 (Del. Ch. Sept. 8, 2005). Such allegations are sufficient where the complaint alleges "directly" or by "imputation" that the directors had knowledge of the information and made their trades on that basis. *Id*. Plaintiff has cleared this pleading hurdle.

Defendant Berube, the Company's Chairman, is one of the Company's highest ranking officers. Complaint at ¶23. The fact that a person is the "most senior executive" of the Company is relevant in the scienter equation. *Adams v. Kinder Morgan, Inc.*, 340 F.3d 1083, 1100 (10th Cir. 2003). Furthermore, Defendant Berube had first hand knowledge that Viisage's test of its facial recognition technology at Logan had been "rigged" and encouraged the same if in fact he did not personally direct it. *See* Complaint at ¶¶59-67. Moreover, Defendants Berube, Beck, Levine, Yon and Reilly signed SEC reports in which material facts concerning the DMVS contract and related litigation were misrepresented. *Id* at ¶¶83-86, 88-90, 97, 99, 101, 109-110,

---

[9]   Defendants claim that the Delaware Chancery Court in *In re Oracle Corp.*, 867 A.2d 904, 929-30, notes that an open question exists as to insider trading liability based on a breach of duty under Delaware law. Motion to Dismiss, P. 31. Defendants are simply wrong. The defendants in *In re Oracle Corp.*, argued that *Brophy v. Cities Service, Inc.,* "should no longer form part of Delaware's common law of corporations" because of materialization of federal securities laws designed to discourage improper trading by corporate insiders. *Id*. at 927. However, the Delaware Chancery court in *In re Oracle Corp.*, did not agree with the defendants and, thus, reinforced the insider trading liability holding in *Brophy*:

> *Delaware law has long held-see Brophy v. Cities Service, Inc.-that directors who misuse company information to profit at the expense of innocent buyers of their stock should disgorge their profits. This doctrine is not designed to punish inadvertence, but to police intentional misconduct.* As then-Vice Chancellor Berger noted, *Brophy* is rooted in trust principles that provide "that, if a person in a confidential or fiduciary position, in breach of his duty, uses his knowledge to make a profit for himself, he is accountable for such profit."

*Id*. at 933-34. (emphasis in original). *See also Guttman v. Huang*, 823 A.2d 492, 505 (Del. Ch. 2003).

112-14. Again, the Company's facial recognition technology and the Georgia contract were important aspects of Viisage's business and operations and the Defendant Directors would have been aware of the status of same. *See Biopure*, 424 F.Supp.2d at 308.

Plaintiff has alleged facts from which it can be inferred that these Directors had knowledge, directly or by imputation, of the undisclosed information concerning these important aspects of the Company's business and operations. Finally, given the dollar value of these Defendants' trades (collectively over $10 million), Complaint at ¶¶147(b-f), the materiality of these trades to these Defendants cannot be appropriately determined at the motion to dismiss stage. *See Zimmerman* at *8 n. 84, *see Takara Trust v. Molex, Inc.*, 429 F.Supp.2d 960, 981 (N.D. Ill. 2006) (fact that sales amounted to only 1% of stock sales did not negate possibility that shares were sold to avoid losses upon disclosure of adverse information). In short, where Defendants profit through illegal insider trading (as they have done here), they are not disinterested with respect to demand futility. *See, e.g., Taser Int'l. Inc. Shareholder Derivative Litig.*, 2006 WL 687033 at *10; *In re Polymedica Corp.*, 15 Mass. L. Rptr. 115, 2002 WL 1809095 (Mass.Super. July 16, 2002); *Zimmerman*, at *8-10; *see Felker v. Anderson*, 2005 WL 602974 at *3 (W.D. Mo. Feb. 11, 2005).

Moreover, Defendant Berube faces a substantial likelihood of liability for "tipping" business associates Johnson and Piper Jaffray - - brokerage house, that along with its clients, was a large investor in Viisage securities, complaint at ¶¶49-50 - - with material nonpublic information concerning the Company. Johnson in turn utilized this information in placing Piper Jaffray and its clients in Viisage common stock. This in turn supported the price of the stock and allowed Berube and the other insider sellers to sell their stock at higher prices. This benefited Piper Jaffray in that it was able to buy and sell Viisage securities at opportune times.

In any event, regardless of whether Berube personally benefited from "tipping" Piper Jaffray, he is nevertheless liable for any improper proceeds received by Piper Jaffray as a result of same. "A tippee's gains are attributable to the tipper, regardless whether benefit accrues to the tipper." *S.E.C. v. Warde*, 151 F.3d 42, 49 (2d. Cir. 1998). "The value of the rule in preventing misuse of insider information would be virtually nullified if those in possession of such information, although prohibited from trading for their own accounts, were free to use the inside information on trades to benefit their families, friends, and business associates." *Id.*

For this reason, too, Defendants Berube, Beck, Levine, Yon and Reilly are not disinterested.

### 4. The Director Defendants Breached Their Duties of Good Faith and Loyalty by Abdicating their Oversight Responsibilities

Under Delaware law failure to act in good faith may be shown where the fiduciary intentionally fails to act in the face of a known duty, demonstrating a conscious disregard for his Duties. *In re Disney*, 906 A.2d at 67. "[A] sustained or systematic failure of the board to exercise oversight ... will establish the lack of good faith that is a necessary condition to liability." *In re Caremark International, Inc. Derivative. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996) (failure to oversee management has been upheld as a basis for implicating directors, particularly "outside" directors, in wrongdoing); *Saito v. McCall*, 2004 WL 3029876 at *6-7 (Del. Ch. Dec. 20, 2004) (finding demand excused where plaintiff alleged that directors, including audit committee members abdicated their oversight responsibility). Where a director consciously ignores his or her duties to the corporation thereby causing economic injury to its stockholders, the director's actions are "not in good faith" or "involve intentional misconduct." *Disney*, 825 A.2d at 289.

Defendants Nessen, Reilly and Levine breached their oversight duties by failing to ensure

that the Company implemented effective internal controls over financial reporting. As members of the Audit Committee, they and Bailey, a management Director, were charged with ensuring that an effective system of internal financial accounting controls existed. Complaint at ¶147(g). These individuals clearly failed in their duties as Audit Committee members, and as directors and face a substantial likelihood of liability for same. *In re Oxford Health Plans, Inc. Sec. Litig.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000) (Delaware law); *see, e.g., Saito*, 2004 WL 3029876; *Felker*, 2005 WL 602974 (demand excused where plaintiff alleged facts supporting claim that directors breached their duties to monitor affairs of corporation); *In re Abbott Labs. Derivative Litig.*, 325 F.3d 795 (7th Cir. 2003) (applying Delaware standards); *Cendant*, 189 F.R.D. at 123, 129 (applying Delaware law); *In re FirstEnergy*, 320 F.Supp.2d 621 (N.D. Ohio 2004).

Moreover, Defendant Directors Yon, Levine, Reilly, Bailey, Nessen, Mouchly-Weiss, Principato and Beck were specifically made award of Defendant Berube's improper conduct with respect to the Company's facial recognition technology and his dealings with Piper Jaffray in breach of his fiduciary duties to the Company. Complaint at ¶147(o). Nevertheless, in breach of their own fiduciary duties to the Company these Directors took no action. *Id*. If true, Plaintiff's allegations that these Defendants "failed to exercise appropriate attention to potentially illegal corporate activities would constitute a breach of loyalty subjecting…[these Defendants] to a substantially likelihood of liability." *In re Veeco*, 434 F.Supp.2d at 278. Thus Plaintiff has alleged a reasonable doubt that these Defendants were disinterested and capable of considering whether to pursue a claim on behalf of the corporation. *Id*.

### 5.    Plaintiff has Alleged Injury to Viisage

Defendants assert that Plaintiff has not alleged anything that caused direct harm to the Company. The notice pleading requirements of Rule 8, Fed. R. Civ. P., apply to pleading

damages. *Colorado Petroleum Marketers Ass'n v. Southland Corp.*, 476 F.Supp. 373, 377 (D. Colo. 1979). *SMC Corp. v. PeopleSoft USA, Inc.*, 2004 WL 2538641 at *3 (S.D. Ind. Oct. 12, 2004); *In re LTV Steel Co., Inc.*, 333 B.R. 397, 428 (N.D. Ohio, Bkrtcy Sept. 2, 2005); s*ee Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002). Here, Plaintiff has alleged damages suffered by Viisage as a result of Defendants' breaches of fiduciary duty sufficient to satisfy the pleading requirements of Rule 8.

Undoubtedly the Company has incurred costs, including unnecessary legal and auditors' fees, in connection with the evaluation of the Company's deficient internal control processes as announced on March 2, 2005, as well as the more extensive audit procedures required to be employed by its auditors to overcome the risk associated with same. *See* Complaint at ¶¶125, 129-30, 135-36. Moreover, Viisage has been exposed to millions of dollars in liability for securities fraud and has and will continue to incur legal and investigatory fees and expenses in connection with defending the Company and the Individual Defendants in the securities class action lawsuits. *Id.* at ¶15. In addition, Plaintiff has alleged that the Company's corporate image has been irreparably damaged, and its ability to obtain debt and equity financing impaired. *Id.*

These types of damages are real and present - - not contingent - - and clearly pass muster under the notice pleading standards of Rule 8 as recognized by the court in *Mehlenbacher v. Jitaru*, No. 04-CV-1118, (M.D. Fla. June 6, 2005):

> "[T]he SEC investigation, the securities fraud class actions, and the internal investigations of the Company caused the Company to incur costs related to defending these actions or complying with investigations. Clearly, the Company has been damaged due to the individual defendants' wrongful actions."
>
> These allegations are sufficient to state a claim with respect to recoupment of the defense costs and other expenses Asconi incurred as a result of the directors' alleged wrongdoing. Count II may not be a model of pleading, but it does pass muster under the liberal Fed. R. Civ. P. 8(a) standard.

In short, Plaintiff has sufficiently alleged that the actions of the Defendants have caused harm to the Company. *See Mehlenbacher;* slip op. at 9-10.

Furthermore, as to the alleged insider sales "Delaware law provides [the Company with] a separate claim of breach of fiduciary duty based on insider trading." *Dollens*, 2002 WL 1632261 at *8; *see Oberly v. Kirby*, 592 A.2d 445,463 (Del, 1991). With respect to these claims, Plaintiff is not required to prove that the corporation was damaged by the insider's wrongful conduct. *Brophy*, 70 A.2d at 8 (finding employee liable to the corporation for insider trading and stating "[p]ublic policy will not permit an employee occupying a position of trust and confidence toward his employer to abuse that relation to his own profit, regardless of whether his employer suffers a loss"); 3 Fletcher, *Encyclopedia of the Law of Private Corporations*, §888 (2003) ("So, officers and directors may not retain for themselves profits which they have derived solely from exploiting information gained by virtue of their inside position as corporate officials, even assuming that they have caused no injury to the corporation."); *see also Oberly v. Kirby*, 592 A.2d at 463 (same); *Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798 (2nd Cir. 1980). "In any case some harm to the corporate enterprise may be inferred when officers and directors abuse their position in order to gain personal profits, even in the absence of any specific allegation or proof of damages, since the effect may be to cast a cloud on the corporation's name, injure shareholder relations and undermine public regard for the corporation's securities" 3 Fletcher §888.

### 6.    The Articles of Incorporation does not Protect Defendants

Defendants contend that they are insulated from liability by Section 102(b)(7) of the Delaware Corporations Code. "The purpose of [the statute is] to permit shareholders… to exculpate directors from any personal liability for the payment of monetary damages for

breaches of duties of care, but not for duty of loyalty violations, good faith violations and certain other conduct." *Emerald Partners*, 787 A.2d at 90.  Furthermore, it bars a complaint at the motion to dismiss stage only if it states an "unambiguous, residual" breach of the duty of care claim and nothing else. *Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001).

In the present case, as set forth above, Plaintiff has alleged that the insider trading Defendants, Berube, Beck, Levine, Reilly and Yon, breached their duties of loyalty and good faith to the Company and derived an improper personal benefit.  Also, these management Directors, and the remaining Defendant Directors, and particularly Defendants Nessen, Reilly and Levine, each a member of the Audit Committee,  breached their duties of good faith and loyalty through their active participation in the wrongdoing and/or abdication of their oversight responsibilities to the Company, as described in more detail above.  Therefore, Section 102(b)(7) is in inapplicable as to them.  *Cendant Corp.*, 189 F.R.D. at 133; *Disney*, 825 A.2d at 290.

Moreover, the statutory exculpatory provision contained in Section 102(b)(7) is in the nature of an affirmative defense.  *McCall v. Scott*, 239 F.3d 808, 818 n. 10 (6th Cir. 2001) (applying §102(b)(7)); *McMullen v. Bearn*, 765 A.2d 910, 926 (Del. 2000). "[I]f a complaint adequately alleges . . . disloyalty . . . or if the nature of the alleged breach of duty is unclear, the complaint will not be dismissed on a motion made under Rule 12(b)(6) on the basis of a exculpatory charter provision." *In re Ply Gem Industries, Inc. Shareholders Litigation*, 2001 WL 755133 at *10 (Del. Ch. June 26, 2001).  In short, Plaintiff has alleged with particularity, facts that, if proven true, demonstrate the Defendants' breaches of their duties of good faith and loyalty owed by the Defendants to the Company and its shareholders.  Accordingly, Plaintiff's claims cannot be defeated by the exculpatory provision.

Finally, Section 102(b)(7) by its express terms applies only to directors. *LTV Steel Co.,* 2005 WL 2573515. The Defendants who were not directors would not enjoy §102(b)(7) protection under any circumstances. Stephen A. Radin, *Director Protection\_Statutes and Motions to Dismiss after Emerald Partners*, 13 No. 6 Insights 2, and n. 12 (June 1999).

### B.    Defendants Berube, Beck, Yon, Levine, Reilly, Bailey, Principato, Nessen and Mouchly-Weiss are not Independent of other Interested Directors

If a plaintiff pleads facts that create a reasonable doubt that a majority of the Board could not have acted independently in responding to the demand the presumption of independence is rebutted for pleading purposes.[10] *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004). Directorial independence "focuses on whether the directors, for *any substantial reason*, cannot act with only the best interests of the corporation in mind." *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 938 (Del Ch. 2003) (emphasis in original) (finding reason to doubt independence of special litigation committee, tenured professors at Stanford University, to investigate conduct of directors with ties to the University) (quoting *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del. Ch. 2001) (emphasis in original), *rev'd in part on other grounds*, 817 A.2d 149 (Del. 2002)). The "cases ultimately focus on impartiality and objectivity." *Oracle*, 824 A.2d at 938.

A director may be compromised if he is beholden to or controlled by an interested person. *Oracle* 824 A.2d at 938; *Telxon Corp. v. Myerson*, 802 A.2d 257, 264 (Del. 2002). Beholden in this sense does not just mean owing in the personal financial sense; it can also flow out of "personal or other relationships" to the interested party. *Oracle*, 824 A.2d at 938-39. The evaluation of the independence of the board is necessarily factually specific. *Int'l Equity Capital Growth Fund, LP v. Clegg*, 1997 WL 208955 at *2 (Del.Ch. April 22, 1997), and must be made

---

[10]    A director is compromised if he is either not disinterested or not independent.

in the context of a particular case.  *Beam*, 845 A.2d at 1049.  There are few bright lines.  *Clegg* at

*2.  Moreover, in evaluating the impartiality and objectivity of the board, the court should

employ a common sense application of those terms.  *Parfi*; 794 A.2d at 1234.  A common sense

evaluation of the impartiality and objectivity of the Viisage Directors leads to the conclusion that

the majority of the Board is not independent of other interested directors.

Plaintiff has alleged facts in the Complaint that demonstrate that Director Defendants

Principato, Berube, Beck, Yon, Levine, Reilly, Nessen, Mouchley-Weiss and Bailey are not

independent of other interested directors in particular, Defendant Berube.  Defendant Principato

serves as the CFO of Lau, the largest shareholder of Viisage, and a privately held Company

owned by Berube and his wife.  Complaint at ¶¶20, 23, 147(j).  Berube is the Executive Vice

President and Chief Operating Officer of Lau and the husband of Joanna Lau, the CEO of Lau.

*Id*. at ¶147(j).  Defendant Principato is beholden to Berube (a clearly interested director) and

Joanna Lau, the C.E.O. and Berube's spouse, for his position as CFO of Lau.  *Id*. at ¶147(k).

The Company and its Board is controlled by Defendants Berube and Beck.  *Id*. at

¶147(m).  As disclosed by the Company in its Form 10-K for the year ending 2004 filed with the

SEC on June 30, 2005:

> Certain of our stockholders have significant relationships
> with us, which could result in us taking actions that are not
> supported by unaffiliated stockholders.
>
> Lau Technologies, or Lau, and Mr. Buddy Beck, the former
> sole stockholder of TDT who is now a director and Vice
> Chairman of our Board of Directors, beneficially own
> approximately 11.4% and 11.9%, respectively, of our
> outstanding common stock.  As a result, both Lau and Mr.
> Beck have a strong influence on matters requiring approval
> by our stockholders, including the election of directors and
> most corporate actions, including mergers and acquisitions.
> In addition, we have significant relationships with each of
> Lau and Mr. Beck, …

*Id.* Thus, the remaining Defendant Directors are not independent of Berube and Beck.

Defendant Beck also has a consulting agreement with Viisage under which he receives annual compensation of $300,000. *Id.* at ¶¶24, 147(m). Defendant Beck is beholden to Defendant Berube, the Company's Chairman, Joanna Lau and the remaining Defendant Directors for this consulting agreement.

Defendant Bailey serves as Chief Executive Officer and President of Viisage. *Id.* at ¶17. Defendant Bailey is beholden to Defendant Berube, and his spouse, for his employment at Viisage due to their ability to exercise control and influence over the Company.

Finally, Plaintiff has alleged past actions by the Defendant Directors that raise a reasonable doubt that the Board is capable of acting independently of the interests of Defendant Berube. Directors must not only be independent but also act independently. *Telxon Corp.,* 802 A.2d at 264. "It is the care, attention and sense of individual responsibility to the performance of one's duties . . . that generally touches on independence." *Id.* (quoting *Kahn v. Tremont Corp.*, 694 A.2d 422, 430 (Del. 1997). Doubt concerning the independence of a director can be raised by alleging "particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Orman*, 792 A.2d at 24 (quoting *Aronson*, 473 A.2d at 816).

Defendant Directors Berube, Beck, Yon, Levine, Reilly, Bailey, Principato, Nessen and Mouchly-Weiss were specifically informed by Plaintiff's Source about Viisage's and Berube's misrepresentations concerning the effectiveness of the Company's facial recognition technology and their improper dealings with Piper Jaffray, including the insider trading by Piper Jaffray, yet these Directors took no action to remedy the same. *Id.* at ¶147(o). The aforementioned Director

Defendants have demonstrated a failure to take action to act independently Berube. *See Orman*, 792 A.2d at 24.

In cases such as this one, where courts have found the majority of the board to not be independent, either through current or past business, personal or employment relationship with each other, demand is excused.[11]  *See, e.g., In re New Valley Corp. Derivative Litig.*, 2001 WL 50212 (Del. Ch. Jan. 11, 2001); *In re PlyGem Industries, Inc. Shareholders Litig.*, 2001 WL 1192206 (Sept. 28, 2001).

## IV.    CONCLUSION

For the reasons set forth herein, Defendants' Motions to Dismiss should be denied.  In the event the Court grants Defendants' Motion, any such dismissal should be without prejudice and with leave to amend so that Plaintiff can cure any perceived pleading deficiencies.

Dated: January 12, 2007               Respectfully Submitted,

                                      __ s/ William B. Federman _____
                                      William B. Federman, Bar #OBA #2853
                                      Attorneys for Plaintiff
                                      FEDERMAN & SHERWOOD
                                      10205 N. Pennsylvania Ave.
                                      Oklahoma City, OK  73120
                                      Telephone:  (405) 235-1560
                                      Fax: (405) 239-2112
                                      *wfederman@aol.com*
                                              - and -
                                      2926 Maple Avenue, Suite 200
                                      Dallas, TX  75201

---

[11]    Although mere recitation of the fact of past business or personal relationships will not make the Court automatically questions the independence of a challenged directorial it may be possible to plead additional facts concerning the length, nature or extend of those previous relationships that would put in issue that director's ability to objectively consider the challenged transaction. *See, e.g., In re Ply Gem Industries, Inc. Shareholders Litig.*, Del.Ch.., C.A. No. 15779-NC, let Op. at 4, Noble, V.C., 2001 WL 1192206 (Sept. 28, 2001) (stating that "past benefits conferred by [the allegedly dominating director], or conferred as the result of [that directors] position with Ply Gem, *may establish an obligation or debt (a sense of 'owingness')* upon which a reasonable doubt may be premised")(emphasis added); *In re New Valley Corp. Derivative Litig.*, Del.Ch., C.A. No. 17849, mem. Op. at 19 Chandler, C., 2001 WL 50212 (Jan. 11, 2001).

*Orman*, 794 A.2d at 27 n.55.

I:\Viisage\Derivative\Pleadings\ResponseMotionDismiss1.doc

Alan L. Kovacs
LAW OFFICES OF ALAN L. KOVACS
2001 Beacon Street Suite 106
Boston, MA  02135
(617) 964-1177/Fax: (617) 332-1223

## <u>CERTIFICATE OF MAILING</u>

This is to certify that on January 12, 2007, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:


Mitchell H. Kaplan
John R. Baraniak, Jr.
Aloknanda S. Bose
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
(617) 248-5000
mkaplan@choate.com
jb@choate.com
**Attorneys for Defendants**


\_\_s/ William B. Federman_____
William B. Federman

# EXHIBIT A

## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

KEITH MEHLENBACHER, derivatively on
Behalf of Nominal Defendant ASCONI
CORPORATION,

$\qquad$ **Plaintiff,**

–vs–                                          **Case No.  6:04-cv-1118-Orl-22KRS**

CONSTANTIN JITARU, et al.,

$\qquad$ **Defendants.**

_____

## ORDER

### I. INTRODUCTION

In this shareholder derivative action, Defendants Serguei Melnick and Radu Bujoreanu, and

nominal Defendant Asconi Corporation, have filed motions to dismiss Plaintiff Keith Mehlenbacher's

Amended Complaint.  Mehlenbacher has filed legal memoranda opposing these motions.  Upon

considering the parties' submissions, the Court determines that Asconi and Melnick's joint motion

to dismiss is due to be granted in part and denied in part, while Asconi and Bujoreanu's joint motion

must be denied in its entirety.

### II. BACKGROUND[1]

Asconi, a Nevada corporation with its executive offices and principal place of business in

Florida, is a wine and spirits producer.  Plaintiff Mehlenbacher holds shares in the company.  He

brings this action derivatively on behalf of the corporation.

_____

[1]The statements set forth in this section are derived, verbatim in some instances, from the
Amended Complaint (Doc. 44).

Defendant Constantin Jitaru was, at all relevant times, Asconi's President, Chief Executive Officer and Chairman of the Board. Jitaru, a Moldovan citizen and resident, also owns 46.44% of Asconi's common stock. Defendant Anatolie Sirbu was, at all relevant times, Asconi's Chief Financial Officer, Treasurer and Secretary. He, too, was one of Asconi's directors, and also owned 46.44% of the company's common stock. Like Constantin Jitaru, Sirbu is a citizen and resident of Moldova. Apparently, Jitaru and Sirbu continue to hold these corporate positions. *See* Doc. 58 at 1.

Defendant Serguei Melnick has served as Asconi's Chief Operations Officer and as a director of the company since the Summer of 2003. Additionally, Melnick has been a Vice President of Asconi since February 2003. Melnick is a citizen and resident of the State of Florida.

Defendants Nicolae Sterbets, Radu Bujoreanu, Tatiana Radu and Frank Clear are directors of Asconi, and have held those positions since the Summer of 2003.[2] Sterbets and Radu are citizens and residents of Moldova. Bujoreanu and Clear are citizens and residents of, respectively, Virginia and Florida.

In December 2003, Asconi disclosed in an SEC filing that, pursuant to a decision of its board of directors reached in April 2003, the company had issued Jitaru and Sirbu each 5 million shares of its common stock.[3] These shares were later valued at $40 million. The SEC filing disclosed that each of the company's directors had recommended that shareholders vote to ratify the stock issuance, and that there would be a shareholder vote in December 2003 to ratify the transaction. Mehlenbacher

---

[2] In the legal memorandum supporting their motion to dismiss, Asconi and Melnick state that Clear is "a former member" of the company's board. Doc. 58 at 1.

[3] At the time of the stock issuance, Jitaru and Sirbu were the only directors of Asconi.

-2-

claims that the stock issuance was, in fact, ratified by a majority of Asconi's shareholders, and that this transaction effectively diluted the shares of minority stockholders.

In March 2004, Asconi issued a press release announcing that the company would restate the results of its operations for the first three quarters of 2003. The press release disclosed that the company's prior interim financial statements for those periods should not be relied upon. The release further stated that the restatement would change the accounting for the stock issuances to Jitaru and Sirbu. The release also stated that while the stock issuances had previously been treated as equity transactions, the company had determined that the market value of the issued stock should have been charged against the company's income statement. This disclosure caused an immediate 25% decline in the price of Asconi's common stock, and the American Stock Exchange suspended trading in the company's shares.

In June 2004, Asconi filed its restated financial statements for the first three quarters of 2003. In a press release concerning those filings, Asconi stated that the corrected accounting for the Jitaru/Sirbu stock issuance resulted in the recording of $40 million of non-cash non-recurring stock issuance expense. Among other things, the restatement resulted in the posting of a net loss of $39,800,382.00, as opposed to the $640,019.00 in net income previously reported, for the second quarter of 2003.

In Asconi's Form KSB for 2003 (filed with the SEC in May 2004), the company admitted that the negative publicity surrounding its financial statement errors and corrections may have contributed to significant declines in its stock prices, and that the adverse publicity might continue to have that effect. In its 2003 Form KSB, Asconi also revealed that its disclosure controls and procedures were ineffective to ensure that material information was recorded, evaluated and reported as required by

-3-

federal law. The company identified the following weaknesses, among others, in its disclosure controls and procedures: the lack of a chief accounting officer possessing the necessary level of experience with U.S. generally accepted accounting principles (GAAP) and SEC reporting, and an inadequately staffed and insufficiently active audit committee. Concerning the audit committee, Mehlenbacher alleges that Asconi did not even create such a committee until sometime after June or July 2003, and that this committee did not meet at all during 2003.

When Asconi's stock resumed trading on AMEX in July 2004, the price of the company's shares immediately fell 25% on the first day of trading.

Mehlenbacher's First Amended Complaint consists of three counts. Count I alleges a claim of breach of fiduciary duty against all seven of Asconi's directors. In this count, Mehlenbacher contends that each of the directors "had a duty to ensure that Asconi was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements," and that the directors "violated the fiduciary duties of loyalty, good faith, and due care by knowingly causing or allowing the Company to engage in the unlawful and imprudent conduct" alleged more particularly in the pleading. Doc. 44, ¶ 69 & 70, at 33.

Count II asserts claims of contribution and indemnity. In this count, Mehlenbacher contends that "Asconi is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Individual Defendants' liability to Asconi." *Id.*, ¶ 73, at 34. Mehlenbacher further asserts:

> Asconi's alleged liability on account of the wrongful acts and practices
> and related misconduct described above arises, in whole or in part,
> from the knowing, reckless, disloyal and/or bad faith acts or omissions

-4-

> of the Individual Defendants as alleged above, and Asconi is entitled
> to contribution and indemnification from each of the Individual
> Defendants in connection with all such claims that have been, are or
> may in the future be asserted against Asconi by virtue of the Individual
> Defendants' misconduct.

*Id.*, ¶ 74, at 34.

Finally, in Count III, Mehlenbacher sues Jitaru and Sirbu, but not the other Asconi directors. Purportedly founded on § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243, this count seeks "reimbursement of all bonuses and other incentive-based or equity-based compensation paid to Jitaru and Sirbu, and any profits realized from the sale of Asconi securities by them." *Id.*, ¶ 76, at 34.

### III. ANALYSIS

#### A. Demand Futility

First, Melnick, Bujoreanu and Asconi argue that Mehlenbacher has not complied with the "demand" requirements of Fed. R. Civ. P. 23.1 and Nevada law. Specifically, the movants assert that Mehlenbacher has failed to properly plead that it would be futile for him to demand that Asconi's board of directors pursue the claims advanced in this lawsuit.

Rule 23.1 of the Federal Rules of Civil Procedure requires that a complaint in a shareholder's derivative action "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." However, Rule 23.1 does not actually create a demand requirement; rather, it "speaks only to the adequacy of the shareholder representative's pleadings." *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 96 (1991). To ascertain the substantive demand requirements governing this action, the Court must consult Nevada law, since Asconi is incorporated under the laws of that state.

*See Kamen,* 500 U.S. at 97-109; *Burks v. Lasker,* 441 U.S. 471, 478 (1979); *Peller v. Southern Co.,* 911 F.2d 1532, 1536 (11th Cir. 1990).

There is a demand requirement under Nevada law. *See Johnson v. Steel, Inc.,* 678 P.2d 676, 678-79 (Nev. 1984). However, "a well recognized exception to the demand requirement is where demand would be futile." *Id.* at 678. "Where the board participated in the wrongful act or is controlled by the principal wrongdoer, it is generally held that no demand is needed." *Id.* This exception is based on the notion that "[s]ince the board is itself involved in the dispute, it is less likely that the action will be vigorously prosecuted." *Id.*

*Johnson* illustrates the application of the Nevada rule. In that case, minority stockholder Joyce Johnson sued all of the current directors and remaining shareholders of a closely held corporation named Steel, Inc. She alleged that Stanley Johnson, who owned 42.95% percent of the corporation, sat on its board of directors, and was its CEO, had misappropriated a substantial sum of money beyond his authorized salary and that "the remaining officers and directors knew of and acquiesced in such overpayment." *Id.* Stanley's wife, Constance, was also a director but did not own shares in the company. The remaining director was Sophie Weiner, who held 10% of the company's stock. Weiner and Stanley Johnson were officers of another corporation which allegedly had been allowed *gratis* use of Steel, Inc.'s equipment and property.

Noting that Constance Johnson, as Stanley's wife, "would stand to benefit by any misappropriations by her husband," the Nevada Supreme Court determined that it was "doubtful that she would vigorously pursue any action on behalf of the corporation to seek reimbursement for the unauthorized payments." *Id.* at 679. The *Johnson* court further noted: "It is apparent that Ms. Weiner's business relationships with Mr. Johnson and the competing corporation would prevent her

-6-

from fairly pursuing an action on behalf of the minority shareholders." *Id.* Accordingly, the Court

concluded: "Since a quorum of disinterested directors or shareholders cannot be assembled to appraise

the merits of Joyce Johnson's claims, notice upon the board of directors would be a futile and

ritualistic act." *Id.*

Based on the allegations set forth in the Amended Complaint filed in the present case, Jitaru

and Sirbu clearly cannot be considered disinterested because they are accused of, *inter alia*,

wrongfully causing Asconi to issue them $40 million worth of stock. The remaining directors also

cannot be considered disinterested because they are accused of misconduct, as well. Among other

things, they are alleged to have breached their fiduciary duties to Asconi by recommending

shareholder ratification of the $40 million stock issuance to Jitaru and Sirbu, by approving false and

misleading SEC filings, and by completely abdicating their corporate oversight responsibilities.

Additionally, Mehlenbacher alleges that Jitaru and Sirbu control the board by virtue of their

92.88% ownership in the company. He also points out that Asconi admitted in its Form 10-KSB for

the year ending 2003 that Jitaru and Sirbu possessed the ability to control the outcome of any matter

submitted to the stockholders for a vote. Further, Mehlenbacher alleges that Melnick has appointed

Jitaru as his proxy for the purpose of casting votes on matters before the board, and that Melnick and

Radu are employees of Asconi and are thus beholden to Jitaru and Sirbu for continued employment.

These allegations cast further doubt on the independence of Melnick and Radu. Jitaru, Sirbu, Melnick

and Radu constitute a majority of Asconi's board.

Based on the foregoing, the Court determines that Mehlenbacher has alleged with sufficient

particularity that it would be futile to demand that Asconi's directors pursue the claims advanced in

this suit. More specifically, Mehlenbacher has pled that Asconi's directors participated in the

-7-

wrongful acts upon which this suit is based, that they are controlled by the principal alleged

wrongdoers (Jitaru and Sirbu), and that a quorum of disinterested directors cannot be assembled to

evaluate the merits of Mehlenbacher's claims. These allegations satisfy the requirements of Nevada

law and Fed. R. Civ. P. 23.1.

### B. Fed. R. Civ. P. 9(b)

The movants also urge the Court to dismiss the Amended Complaint on the asserted basis that

Mehlenbacher has not satisfied Fed. R. Civ. P. 9(b)'s requirement that fraud be pled with particularity.

This argument lacks merit. Mehlenbacher has not brought a fraud claim; rather, he has sued the

directors for breach of fiduciary duty.[4] Rule 9(b)'s particularity requirement does not apply to a

breach of fiduciary duty claim because fraud and *scienter* are not necessary elements of such a claim.

*See Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1088-89 (N.D. Ill. 2004); *Motorola, Inc. v.

Airdesk, Inc.,* 2005 WL 894807 *3 (E.D. Pa. Apr. 15, 2005). This rule is consistent with the Supreme

Court's recent reaffirmation that Fed. R. Civ. P. 8(a)'s "simplified pleading standard applies to all

civil actions, with limited exceptions," and that the "exception" embodied in Rule 9(b) should not be

extended beyond the contexts of fraud and mistake. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513

(2002). Hence, the Amended Complaint states a valid claim for breach of fiduciary duty under Rule

8(a). Moreover, even if Rule 9(b) did apply, the Amended Complaint is sufficiently particular

regarding the alleged falsities involved in this case, i.e., the SEC filings and press releases concerning

the first three quarters of 2003. In any event, if the misrepresentation allegations were not particular

---

[4]As previously noted, Mehlenbacher has also sued Jitaru and Sirbu for allegedly violating §
304 of Sarbanes-Oxley, and the Amended Complaint seeks indemnity and contribution from all of
Asconi's directors. However, the movants do not contend that Rule 9(b)'s heightened pleading
requirement applies to these claims.

-8-

enough to satisfy Rule 9(b), the proper course is to disregard those averments and consider the

remainder of the pleading under liberal Rule 8(a) standards to ascertain whether it properly states a

claim for relief *See Tigue Investment Co., Ltd. v. Chase Bank of Tex., N.A.*, 2004 WL 3170789 *3

(N.D. Tex. Nov. 15, 2004). Stripped of the misrepresentation allegations, the Amended Complaint

still states a claim for breach of fiduciary duty under Rule 8(a). For example, the $40 million stock

issuance to Jitaru and Sirbu, and the directors' subsequent approval of that transaction, are alleged to

have been wrongful independent of any misrepresentation. *See* Doc. 44, ¶ 20, at 6.[5] Accordingly, the

movants have not shown that the breach of fiduciary duty count should be dismissed.

## C. Contribution and Indemnity

The movants contend that because securities fraud class actions brought by others against

Asconi have been "voluntarily dismissed without payment by the Company of any settlement," the

count seeking contribution and indemnity must be dismissed. Doc. 58 at 17-18; Doc. 76 at 18-19.

In response, Mehlenbacher contends that the Amended Complaint properly states a claim for

---

[5]The Court rejects Asconi and Melnick's contention that by including allegations concerning the propriety of the stock issuance, Mehlenbacher violated the December 20, 2004 Order permitting Mehlenbacher to file and serve an amended complaint. The December 20th Order provided Mehlenbacher with "an opportunity . . . to include additional detail concerning his existing claims," and did state that Mehlenbacher was "not granted permission to plead additional or different claims." Doc. 41, ¶ 1, at 1. However, Mehlenbacher's response to the motion to dismiss the initial complaint made clear that the amended complaint he intended to file would contain allegations concerning the propriety of the stock issuance. *See* Doc. 26 at 2 & n.2. Moreover, the December 20th Order stated: "In his Response (Doc. 26), Plaintiff includes additional factual detail, asks that he be allowed leave to amend to correct pleading deficiencies if the motion to dismiss is granted, and states that he intends to file an amended complaint containing additional fact allegations in any event." Doc. 41 at 1. The allegations concerning the propriety of the stock issuance were "additional factual detail" contemplated by the December 20th Order. Further, the Amended Complaint pleads the same three causes of action as the initial Complaint. Under these circumstances, the Court determines that Mehlenbacher has not violated the December 20th Order.

indemnity because he "seeks reimbursement of expenses and defense costs incurred by Asconi as a result of Defendants' wrongful conduct and the resulting class action lawsuits and SEC investigation." Doc. 72 at 18.

Paragraph 74 of the Amended Complaint, which is included in Count II, alleges, in pertinent part, that Asconi "is entitled to contribution and indemnification from each of the Individual Defendants *in connection with* all such claims that have been . . . asserted against Asconi by virtue of the Individual Defendants' misconduct." Doc. 44, ¶ 74, at 34 (emphasis added). Count II also incorporates by reference all other paragraphs of the Amended Complaint. *Id.*, ¶ 72, at 34. Paragraph 4 of the Amended Complaint alleges, in pertinent part: "[T]he SEC investigation, the securities fraud class actions, and the internal investigations of the Company caused the Company to incur costs related to defending these actions or complying with investigations. Clearly, the Company has been damaged due to the Individual Defendants' wrongful actions." Doc. 44, ¶ 4, at 3.

These allegations are sufficient to state a claim with respect to recoupment of the defense costs and other expenses Asconi incurred as a result of the directors' alleged wrongdoing. Count II may not be a model of pleading, but it does pass muster under the liberal Fed. R. Civ. P. 8(a) standard. Of course, if the movants believe they are entitled to judgment as a matter of law on Count II, they are free to seek summary judgment and develop the issue more fully.

### D. § 304 of Sarbanes-Oxley[6]

---

[6]Section 304 of the Sarbanes-Oxley Act is codified at 15 U.S.C. § 7243. The Court uses § 304 and § 7243 interchangeably in this Order.

Asconi and Melnick seek dismissal of the Sarbanes-Oxley claim asserted in Count III of the Amended Complaint. *See* Doc. 58 at 18-19.[7] As previously noted, Count III asserts a § 304 claim against only Jitaru and Sirbu. Mehlenbacher does not challenge Asconi (or Melnick's) standing to attack this count. Accordingly, the Court will assume that Asconi, at least, has standing to seek dismissal of the § 304 claim.

Asconi argues that Mehlenbacher "has failed to plead facts indicating that the restatement by the Company of its financials resulted from any misconduct." Doc. 58 at 18. The company also asserts that Mehlenbacher "has still failed to identify what compensation, if any, received by Jitaru or Sirbu during the relevant period, is allegedly subject to Sarbanes-Oxley § 7243 reimbursement, or whether there have been any sales of Asconi securities by them." *Id.* Accordingly, Asconi maintains that Count III fails to satisfy even minimal notice pleading requirements. Finally, the company asserts that in *Gideon Minerals U.S.A., Inc. v. JP Morgan Chase Bank*, 2003 WL 21804850 (S.D.N.Y. Aug. 6, 2003), the district court "indicated that Sarbanes-Oxley § 7243 [] does not create a private right of action." Doc. 58 at 18.

In response, Mehlenbacher points out that the plain terms of § 304 require a CEO and CFO to "reimburse the issuer" for certain compensation received by that person if "an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws[.]" § 7243(a). Mehlenbacher asserts that § 304 would be "of no purpose" and "a nullity" if the issuer could not bring a civil suit seeking reimbursement. Doc. 72 at 19. He identifies the "compensation" for which he (on

---

[7]Bujoreanu does not seek dismissal of the Sarbanes-Oxley claim. *See* Doc. 76 at 3-4 n.2

-11-

behalf of Asconi) is seeking reimbursement as the $40 million in stock issued to Jitaru and Sirbu in 2003, and cites the paragraphs in the Amended Complaint regarding the stock issuance. *Id.* Mehlenbacher also cites the portions of the Amended Complaint alleging that Asconi restated its financial statements covering that period and identifying the claimed misconduct. *Id.* In a footnote, Mehlenbacher argues that *Gideon Minerals* is distinguishable on the asserted grounds that it "was not a shareholder derivative action" and "did [not] deal with allegations for reimbursement under § 7243." *Id.* at n.9. Finally, Mehlenbacher contends: "[a]n analysis under the four part private right of action test set forth in *Cort v. Ash,* 422 U.S. 66 (1975) compels the existence of a private right of action under § 7243." Doc. 72 at 19.

The Court rejects Asconi's technical pleading arguments. In his Amended Complaint, Mehlenbacher has identified the compensation for which reimbursement is sought, has alleged that Asconi was required to restate its financial filings, and has specified the conduct that he contends constituted misconduct. This is sufficient to satisfy Fed. R. Civ. P. 8(a). However, the question remains whether a private right of action exists under § 304 of Sarbanes-Oxley.

In its entirety, § 7243 provides:

> (a) Additional compensation prior to noncompliance with Commission financial reporting requirements
>
> If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for–
>
> (1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission

-12-

(whichever first occurs) of the financial document embodying such financial reporting requirement; and
(2) any profits realized from the sale of securities of the issuer during that 12-month period.

(b) Commission exemption authority
The Commission may exempt any person from the application of subsection (a) of this section, as it deems necessary and appropriate.

Although § 7243 provides that the specified corporate officers "shall reimburse the issuer" if other statutory requirements are met, the statute does not actually state that the issuer (or anyone else) may bring a civil suit to compel reimbursement.

The Court has been unable to locate any published decisions addressing the question of whether § 304 implicitly creates a private right of action. *Gideon Minerals*, the case cited by Asconi and Melnick, contains a footnote in which the district court stated: "Sarbanes-Oxley created only two private causes of action: one that involves recovery of profits from insider trading, 15 U.S.C. § 7244, and one that provides protection for whistle blowers, 18 U.S.C. § 1514A." 2003 WL 21804850 at *1 n.2. However, as Mehlenbacher notes, *Gideon Minerals* did not involve § 304. Two other published opinions touch on the question of whether a private right of action exists under the statute, but they do not actually decide the issue. In the first case, *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 478 (M.D.N.C. 2004), the district court avoided the question of "whether a Section 304 claim may be sustained in a private-party, class-action lawsuit" by granting the plaintiffs leave to file an amended complaint. The second case, *In re Interpublic Sec. Litig.*, 2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004), was a derivative action in which the district court addressed the fairness of a proposed settlement in accordance with Fed. R. Civ. P. 23.1. The judge characterized the plaintiff's claim as "perilously weak," due in part to doubt "whether plaintiff even has standing to bring a claim against

-13-

defendants . . . under the Sarbanes-Oxley Act, since, unlike other Sarbanes-Oxley provisions, Section 304 does not expressly provide a private right of action." 2004 WL 2397190 *9. In terms of published federal decisions, *Cree* and *Interpublic* appear to be all that exist concerning this issue.[8] Confronted with this relative judicial void, the Court finds it necessary to consult decisions of the Supreme Court and the Eleventh Circuit regarding the circumstances under which a statute may be said to create an implied right of action.

"The issue of whether a statute creates by implication a private right of action is a question of statutory construction." *Love v. Delta Air Lines*, 310 F.3d 1347, 1351 (11th Cir. 2002) (citation and internal quotations omitted). "Until its decision in *Cort v. Ash*, 422 U.S. 66 (1975), the Supreme Court implied a private right of action from a statute if it concluded that doing so would advance what it perceived to be the congressional *purpose* in enacting the statute." *Love,* 310 F.3d at 1351 (parallel citations omitted, emphasis in original).

> In *Cort*, however, the Court lent a more discernible shape to this inquiry, as it articulated four factors that must be considered before a private right of action may be implied:
>
>> First, is the plaintiff one of the class for whose especial benefit the statute was enacted,--that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically

---

[8]Section 304 was also mentioned or discussed in *Reina v. Tropical Sportswear Intern*, 2005 WL 846170 (M.D. Fla. Apr. 4, 2005); *Kaltman v. Sidhu,* 2004 WL 357861 (N.D. Tex. Feb. 26, 2004); and *In re AFC Enters., Inc. Derivative Litig.,* 224 F.R.D. 515 (N.D. Ga. 2004). However, none of these opinions address the "private right of action" question.

> the concern of the States, so that it would be
> inappropriate to infer a cause of action based solely on
> federal law?

*Love,* 310 F.3d at 1351 (quoting *Cort,* 422 U.S. at 78) (internal quotations omitted).

Since the *Cort* decision, however, the Supreme Court "has gradually receded from its reliance

on three of these four factors, focusing exclusively on legislative intent to create a private right of

action as *the* touchstone of its analysis." *Love,* 310 F.3d at 1351-52 (emphasis in original). *Alexander*

*v. Sandoval,* 532 U.S. 275 (2001), "is the culmination of this trend;" it "distills and clarifies the

approach[.]" *Love,* 310 F.3d at 1351-52. As stated in *Sandoval:*

> Like substantive federal law itself, private rights of action to enforce
> federal law must be created by Congress. The judicial task is to
> interpret the statute Congress has passed to determine whether it
> displays an intent to create not just a private right but also a private
> remedy. *Statutory intent on this latter point is determinative.* Without
> it, a cause of action does not exist and courts may not create one, no
> matter how desirable that might be as a policy matter, or how
> compatible with the statute. Raising up causes of action where a statute
> has not created them may be a proper function for common-law courts,
> but not for federal tribunals.

532 U.S. at 286-87 (citations and internal quotations omitted, emphasis added); *Love,* 310 F.3d at

1352 (quoting *Sandoval*). "The other three *Cort* factors remain relevant *only* insofar as they provide

evidence of whether Congress intended to create a private cause of action." *Love,* 310 F.3d at 1352

(emphasis in original).

*Sandoval* "clearly delimits the sources that are relevant to [a court's] search for legislative

intent." *Love,* 310 F.3d at 1352. "First and foremost," the text of a statute must be examined for

"rights-creating language." *Id.* (citation and internal quotations omitted). "Rights-creating language

is language explicitly conferring a right directly on a class of persons that includes the plaintiff in a

-15-

case, or language identifying the class for whose especial benefit the statute was enacted." *Id.* (citations, internal quotations and brackets omitted). "By contrast, statutory language customarily found in criminal statutes . . . and other laws enacted for the protection of the general public, or a statute written simply as a ban on discriminatory conduct by recipients of federal funds, provides far less reason to infer a private remedy in favor of individual persons." *Id.* at 1352-53 (citation and internal quotations omitted).

Second, a court must "examine the statutory structure within which the provision in question is embedded." *Id.* at 1353.

> If that statutory structure provides a discernible enforcement mechanism, *Sandoval* teaches that we ought not imply a private right of action because "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. Indeed, *Sandoval* observes that this suggestion is "[s]ometimes . . . so strong that it precludes a finding of congressional intent to create a private right of action, even though other aspects of the statute (such as language making the would-be plaintiff 'a member of the class for whose benefit the statute was enacted') suggest the contrary." 532 U.S. at 290 (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985)).

*Love,* 310 F.3d at 1353 (parallel citations omitted).

The third step is to "turn to the legislative history and context within which a statute was passed." *Love,* 310 F.3d at 1353. However, this step can be undertaken "if - and *only* if - statutory text and structure have not conclusively resolved whether a private right of action should be implied[.]" *Id.* (emphasis in original). However, a court must view legislative history "with a skeptical eye . . . because the bar for showing legislative intent is high." *Id.* (citation and internal quotations omitted). In that regard, "Congressional intent to create a private right of action will not be presumed. There must be clear evidence of Congress's intent to create a cause of action." *Id.*

(citations and internal quotations omitted). "Moreover, the legislative history of a statute that is itself

unclear about whether a private right of action is implied is unlikely to provide much useful

guidance." *Id.*

"Finally, if examination of a statute's text, structure, and history does not yield the conclusion

that Congress intended it to confer a private right and a private remedy, *Sandoval* instructs that such

a right may not be created or conferred by regulations promulgated to interpret and enforce it[.]" *Id.*

In other words, "regulations that merely interpret a statute may provide evidence of what private

rights Congress intended to create," but "regulations that go beyond what the statute itself requires

are not enforceable through a private right of action." *Id.* at 1354 (internal quotations omitted).

With this analysis in mind, the Court turns to the statute at hand.

Although § 304 is not a model of clarity, it does appear to contain "rights-creating" language.

That is, while the statute does focus on the person regulated, i.e., the corporate officers who must

make reimbursement, it also identifies the class for whose especial benefit the statute arguably was

enacted, i.e., the issuer to whom reimbursement must be made.  Accordingly, the Court will proceed

beyond the first analytical step.

Next, the Court examines the statutory framework within which § 304 is embedded to see if

it contains a discernible enforcement mechanism.  In fact, the Sarbanes-Oxley Act does contain such

a mechanism: it contemplates judicial enforcement by the Securities and Exchange Commission.  In

that regard, 15 U.S.C. § 7202(b)(1) provides:

> A violation by any person of this Act, any rule or regulation of the
> Commission issued under this Act, or any rule of the Board shall be
> treated for all purposes in the same manner as a violation of the
> Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq.*) or the rules
> and regulations issued thereunder, consistent with the provisions of this

-17-

> Act, and any such person shall be subject to the same penalties, and to
> the same extent, as for a violation of that Act or such rules or
> regulations.

Under the Exchange Act, the SEC is empowered to sue in district court to obtain an injunction, civil

penalties and other relief (including equitable remedies) for violations of that Act. *See* 15 U.S.C. §

78u(d)(1), (3) & (5). Section 78u(d)(4) contemplates the remedy of disgorgement; it provides that

funds disgorged as the result of a federal suit (or an administrative action) brought by the SEC "shall

not be distributed as payment for attorneys' fees or expenses incurred by private parties seeking

distribution of the disgorged funds." Presumably, this is in recognition of the fact that disgorgement

is a remedy the SEC often seeks in judicial enforcement actions, for the purpose of compensating

victims. *See, e.g., S.E.C. v. Diversified Corporate Consulting Group,* 378 F.3d 1219, 1224 (11th Cir.

2004) (stating, "When the SEC sues to enforce the securities laws, it is vindicating public rights and

furthering public interests, and therefore is acting in the United States' sovereign capacity. This is

so even though the SEC seeks disgorgement as a remedy of the violation and even though the

disgorged proceeds may be used to compensate the defendant's victims"). Hence, under this statutory

enforcement scheme Congress has created, if a corporate officer violates § 304 of the Sarbanes-Oxley

Act by failing or refusing to reimburse the issuer for covered compensation, the SEC can sue the

officer, obtain the compensation via the remedy of disgorgement, and reimburse the issuer.

Mehlenbacher is therefore incorrect in stating that § 304 serves no useful purpose absent an implied

private right of action. In accordance with *Sandoval* and *Love,* the availability of this enforcement

mechanism suggests strongly that Congress did not intend to implicitly create a private right of action

under § 304.[9] This suggestion is reinforced by Congress's decision to include express language

creating a private right of action in § 306 of the Act, which concerns insider trading during pension

fund blackout periods. 15 U.S.C. § 7244. That section expressly states that any profit unlawfully

realized by an issuer's director or executive officer "shall inure to and be recoverable by the issuer[.]"

§ 7244(a)(2)(A). It further provides:

> An action to recover profits in accordance with this subsection may be
> instituted at law or in equity in any court of competent jurisdiction by
> the issuer, or by the owner of any security of the issuer in the name and
> in behalf of the issuer if the issuer fails or refuses to bring such action
> within 60 days after the date of request, or fails diligently to prosecute
> the action thereafter, except that no such suit shall be brought more
> than 2 years after the date on which such profit was realized.

§ 7244(a)(2)(B). The fact that Congress saw fit to include this language in § 306, yet omitted any

similar language from § 304 (which also deals with financial rewards improperly reaped by corporate

insiders), confirms that no private right of action exists under § 304.[10]

Further, Sarbanes-Oxley's legislative history sheds no light on the private right of action issue.

As far as this Court can determine, no relevant legislative history exists concerning § 304.

Apparently, the Sarbanes-Oxley Act was passed in a hurry. *See Newby v. Enron Corp. (In re Enron*

*Corp. Sec., Derivative & ERISA Litig.),* 2004 U.S. Dist. LEXIS 8158 *60 (S.D. Tex. Feb. 24, 2004)

---

[9]Section 7243(b) broadly grants the SEC authority "to exempt any person" from the application of § 304's reimbursement requirement "as it deems necessary and appropriate." This delegation lends further support to the Court's conclusion that § 304 enforcement is to be undertaken by the SEC, not private parties.

[10]Additionally, § 804 of Sarbanes-Oxley, which extended the limitation period for private securities fraud suits, expressly states that it shall not create a new private right of action. This does not persuade the Court that the absence of similar language in § 304 "clearly evidences" that Congress intended to create a private right of action under § 304, particularly when comparing the subject matter of the two sections.

(noting that "several commentators have remarked that the Sarbanes-Oxley Act was passed in such haste that inconsistencies and ambiguities are the result"); *Roberts v. Dean Witter Reynolds, Inc.*, 2003 WL 1936116 *1 n.2 (M.D. Fla. Mar. 31, 2003) (quoting commentator's opinion that the legislation moved so quickly through Congress that the conference report did not contain commentary typically associated with a bill). In any event, what little legislative history exists concerning the Act is of no use for present purposes.

Finally, the Court has been unable to locate any SEC regulations (at least in the Code of Federal Regulations) implementing or interpreting § 304.

From the foregoing analysis, the Court discerns no "clear evidence" that Congress intended to create a private cause of action via § 304.[11] Absent such evidence, Mehlenbacher is not authorized to sue under that law. Accordingly, Count III of the Amended Complaint will be dismissed, with prejudice.

### E. Personal Jurisdiction as to Bujoreanu

As previously noted, Bujoreanu is alleged to be a citizen and resident of Virginia. He seeks dismissal on the asserted basis that the Amended Complaint does not contain sufficient allegations to establish a *prima facie* case of personal jurisdiction over him. Bujoreanu argues that the pleading fails to assert that he has committed a tortious act in Florida; he contends that "the mere fact that an alleged injury to a Florida resident may have resulted is insufficient to establish jurisdiction in the Florida courts." Doc. 76 at 14. Additionally, Bujoreanu points out that the Amended Complaint does

---

[11]As previously noted, the remaining *Cort* factors "are relevant *only* insofar as they provide evidence of whether Congress intended to create a private cause of action." *Love,* 310 F.3d at 1352 (emphasis in original). In the Court's view, the other *Cort* criteria do not clarify Congress's intent.

not allege that he has ever been physically present in Florida and does not assert that he ever came to this state in connection with his duties as a director of Asconi. In Bujoreanu's view, "the most that has been alleged is that Bujoreanu serves as a director of Asconi, a Nevada corporation which maintains corporate offices in Florida[,] and that Bujoreanu allegedly approved of corporate actions taken by Asconi." *Id.*

In response, Mehlenbacher contends he has satisfied Florida's long-arm statute by alleging that Bujoreanu committed the tort of breach of fiduciary duty and that such breach injured Asconi in Florida. He argues that physical entry into the state is unnecessary under these circumstances. Mehlenbacher further asserts that this Court may constitutionally exercise jurisdiction over Bujoreanu by virtue of Bujoreanu's status as a director of Asconi and a member of its audit committee, and his activities undertaken while holding those positions.

"A federal court sitting in diversity may properly exercise jurisdiction over a defendant only if two requirements are met: (1) the state long-arm statute, and (2) the Due Process Clause of the Fourteenth Amendment." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999).[12] "A plaintiff seeking to obtain jurisdiction over a nonresident defendant initially need only allege sufficient facts to make out a *prima facie* case of jurisdiction." *Id.* at 1214. In this context, a "*prima facie* case" means "enough evidence to withstand a motion for directed verdict." *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 255 (11th Cir. 1996) (quoting *Madara v. Hall*, 916 F.2d 1510,

---

[12]The Amended Complaint invokes both diversity and federal question jurisdiction. *See* Doc. 44, ¶ 15, at 4-5. Presumably, federal question jurisdiction is predicated on the Sarbanes-Oxley Act. However, the Court has determined that Mehlenbacher does not have a right to sue under § 304 of Sarbanes-Oxley. In their legal memoranda, the parties have focused on Florida's long arm statute and personal jurisdiction decisions applicable to diversity cases; neither side argues that any other law applies. Accordingly, this Court applies the jurisdiction analysis governing diversity cases.

1514 (11th Cir. 1990)). "The plaintiff bears the burden of proving 'by affidavit the basis upon which

jurisdiction may be obtained' only if the defendant challenging jurisdiction files 'affidavits in support

of his position.'" *Posner,* 178 F.3d at 1214 (quoting *Venetian Salami Co. v. Parthenais,* 554 So.2d

499, 502 (Fla.1989)). "The district court must accept the facts alleged in the complaint as true, to the

extent they are uncontroverted by the defendant's affidavits." *Madara,* 916 F.2d at 1514.  In the

present case, Bujoreanu has not filed any affidavits concerning the jurisdiction issue; accordingly, the

Court will accept the allegations in the Amended Complaint as true.[13]

### 1. Long-Arm Statute

Although Mehlenbacher does not cite the Florida personal jurisdiction statute in his Amended

Complaint, his response to Bujoreanu's motion to dismiss identifies Fla. Stat. § 48.193(1)(b) as a basis

for long-arm jurisdiction.  That provision subjects a person who commits "a tortious act within this

state" to the jurisdiction of Florida's courts for any cause of action arising from the tortious act.  §

48.193(1)(b).  Breach of fiduciary duty is an intentional tort. *See Davis v. Monahan,* 832 So.2d 708,

711 (Fla. 2002) (referring to "the intentional tort of breach of fiduciary duty"); *Allerton v. State Dept.*

---

[13]Eleventh Circuit decisions indicate that an evidentiary hearing concerning personal jurisdiction is discretionary.  *See Robinson,* 74 F.3d at 255 (observing that the district court "exercis[ed] its discretion" in declining to hold an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction or for a change of venue, and articulating personal jurisdiction standard "[w]hen no evidentiary hearing has been held"); *Madara,* 916 F.2d at 1514 (stating, "When a district court does not conduct a discretionary evidentiary hearing on a motion to dismiss for lack of jurisdiction, the plaintiff must establish a *prima facie* case of personal jurisdiction over a nonresident defendant").  On the other hand, the Supreme Court of Florida has held that a limited evidentiary hearing is required where competing affidavits concerning jurisdiction cannot be harmonized. *Venetian Salami,* 554 So.2d at 502-03.  This court is bound by the Eleventh Circuit precedent concerning the necessity of a hearing.  Exercising that discretion, the Court determines that such a hearing is unnecessary in this case.  In any event, even under the *Venetian Salami* rule, no evidentiary hearing would be required because the parties have not filed any affidavits on the issue of jurisdiction.

*of Ins.*, 635 So.2d 36, 39-40 (Fla. 1st DCA) (characterizing breach of fiduciary duty as an intentional tort), *review denied*, 639 So.2d 975 (Fla. 1994); *see also, Posner*, 178 F.3d at 1219 (characterizing breach of fiduciary duty as "a tort," and noting *Allerton*'s classification of breach of fiduciary duty "as an intentional tort"). Mehlenbacher's Amended Complaint clearly alleges that all of Asconi's directors, including Bujoreanu, breached their fiduciary duties to Asconi, and that the corporation was injured as a result of those breaches. *See, e.g.*, Doc. 44, ¶ 20, at 6. Further, the Amended Complaint alleges that Asconi's principal place of business is in Florida. Doc. 44, ¶ 16, at 5. This is sufficient to make out a *prima facie* case of personal jurisdiction under § 48.193(1)(b). Although there is a split of authority among Florida courts concerning the issue, the Eleventh Circuit follows the Florida decisions holding that § 48.193(1)(b) applies even when a foreign tortious act merely causes injury in Florida. *See Posner*, 178 F.3d at 1216-17; *Robinson*, 74 F.3d at 257.[14] The Court thus determines that, for purposes of § 48.193(1)(b), it is immaterial whether Bujoreanu was ever physically present

---

[14]Given the fact that the Eleventh Circuit "consistently has applied the broader construction of subsection (1)(b)" and has stated that "[a]bsent a contrary decision by [the Florida Supreme Court], we are bound in this case to follow this court's firmly established precedent," *Posner*, 178 F.3d at 1216, 1217, it is disturbing that counsel for Asconi and Bujoreanu declined to bring these binding federal appellate decisions to this Court's attention, and instead cited a Florida intermediate appellate court for a legal proposition the Eleventh Circuit has expressly declined to follow.

in Florida, provided the injury caused by his alleged breach of fiduciary duty occurred here.[15] In sum, the Amended Complaint contains sufficient allegations to satisfy Florida's long-arm statute.

### 2. Constitutional Requirements

A more difficult question is presented concerning whether the Amended Complaint contains allegations sufficient to satisfy constitutional due process requirements. There is Florida decisional authority holding that "the commission of a tort within Florida by a non-resident is a sufficient 'minimum contact' with Florida to justify personal jurisdiction in light of the federal constitution." *International Harvester Co. v. Mann*, 460 So.2d 580, 581-82 (Fla. 1st DCA 1984) (citing *Godfrey v. Neumann*, 373 So.2d 920 (Fla. 1979)), *disapproved of on other grounds, Doe v. Thompson*, 620 So.2d 1004 (Fla. 1993)).[16] However, shorn of context, such an absolute rule seems at odds with the concept

---

[15]In *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002), the Florida Supreme Court expressly held that a defendant's physical presence in Florida is not required to commit a tortious act within the state for the purpose of § 48.193(1)(b). However, the Supreme Court declined to "decide the broader issue of whether injury alone satisfies the requirement of section 48.193(1)(b), as that issue is not the basis for this Court's jurisdiction." 822 So.2d at 1253 n.2. Continuing, the *Wendt* court stated:

> However, we note that the federal courts that have addressed this issue, although acknowledging the confusion among Florida's district courts, have adopted a broad construction of section 48.193(1)(b), holding that the commission of torts out of state that cause an injury to an in-state resident satisfies Florida's long-arm statute.

822 So.2d at 1253 n.2 (citing, *inter alia, Posner* and *Robinson*).

[16]In *Doe*, the plaintiff attempted to assert jurisdiction over a corporate officer accused of gross negligence. 620 So.2d at 1005. The Supreme Court of Florida decided that the officer was not subject to Florida's long-arm statute for acts he committed on behalf of the company. *Id.* at 1006. In a footnote, the Supreme Court took pains to limit the scope of its decision, stating: "A corporate officer committing fraud or other intentional misconduct can be subject to personal jurisdiction, however." *Id.* at 1006 n.1.

Based on Eleventh Circuit decisions interpreting *Doe*, it appears that *Doe*'s disapproval of

-24-

of a two-step jurisdictional analysis and federal decisions in which courts have looked beyond mere satisfaction of the long-arm statute to ascertain whether the defendant has sufficient minimum contacts to satisfy constitutional requirements. *See, e.g., Posner,* 178 F.3d at 1216-22 (after concluding that plaintiff's tort allegation satisfied § 48.193(1)(b), proceeding to evaluate whether defendant had minimum contacts and met other due process requirements); *see also, Green v. USF & G Corp.,* 772 F. Supp. 1258, 1262 (S.D. Fla. 1991) (noting that Florida law suggesting that commission of tort in Florida satisfies "minimum contacts" was not binding on a federal court,[17] and further commenting, "[I]t would seem to vitiate the two-part approach to jurisdiction to hold that in every case where a tort has occurred in the state, the exercise of jurisdiction comports with due process"). In other words, to apply such a rule rigidly, without regard to the particular circumstances of a case, risks conflating the two-part analysis into a single step.

---

*International Harvester* is limited to the application of the "corporate shield" doctrine, and that *Doe* is confined to negligence claims. *See Posner,* 178 F.3d at 1217 n.9; *Robinson,* 74 F.3d at 257. This interpretation is supported by *Allerton,* in which Florida's First District Court of Appeals stated:

> [W]e construe *Doe* as disapproving *International Harvester* only to the extent that *International Harvester* might be seen to sanction the "injury only" rule with respect to merely negligent conduct by a nonresident corporate officer. We do not believe that the supreme court intended in *Doe* to deprive a Florida plaintiff, injured by the intentional misconduct of a nonresident corporate employee expressly aimed at him, of the right to obtain personal jurisdiction over that employee in a Florida court.

635 So.2d at 40.

[17]By contrast, "the reach of the Florida long-arm statute is a question of Florida law." *Madara,* 916 F.2d at 1514.

However, based on the allegations contained in the Amended Complaint, this Court need not apply the *International Harvester* rule in a purely mechanistic fashion. Although Mehlenbacher's pleading does not assert that Bujoreanu was ever present in Florida,[18] it does allege (1) that Asconi's principal place of business is in Florida, (2) that Bujoreanu was (and is) a director of Asconi and a member of the company's audit committee, (3) that Bujoreanu knowingly committed the intentional tort of breach of fiduciary duty, and (4) that the breach injured Asconi in Florida. In substance, then, the pleading asserts that while serving as a board member of a corporation headquartered in Florida, Bujoreanu knowingly and intentionally committed wrongful acts directed at the corporation, thereby injuring the company in Florida. These allegations are sufficient to satisfy due process requirements as interpreted in *Calder v. Jones,* 465 U.S. 783 (1984), and its Eleventh Circuit progeny.

In *Calder,* a libel action, the Supreme Court determined that jurisdiction could be exercised in California over defendants "based on the 'effects' of their Florida conduct in California." 465 U.S. at 789. In reaching this conclusion, the Court noted:

> . . . petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works

---

[18]In his response to the motion to dismiss, Mehlenbacher implies, but does not actually state, that Bujoreanu attended Asconi board meetings in Florida. *See* Doc. 79 at 6. However, the Amended Complaint does not actually allege that Bujoreanu attended board meetings in Florida, or that he has otherwise been physically present in this state. Accordingly, the Court must assume for present purposes that he has not.

> and in which the *National Enquirer* has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article.

*Id.* at 789-90. The Supreme Court added: "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." *Id.* at 790.

The Eleventh Circuit has applied *Calder* beyond the defamation context. *See Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.,* 207 F.3d 1351, 1358 (11th Cir. 2000) (insurance benefits denial case involving, *inter alia,* allegations of fraud and bad faith); *S.E.C. v. Carrillo,* 115 F.3d 1540, 1546-47 (11th Cir. 1997) (SEC enforcement action involving alleged fraudulent sale of unregistered securities).

In *Molina,* the Eleventh Circuit rejected the defendants' contention that because they had no direct contact with the plaintiff in Alabama, they were not amenable to jurisdiction in that state. On that point, the *Molina* court stated: "Direct contact by a nonresident defendant with the forum is not required." 207 F.3d at 1357. The appellate court further noted that the defendants were "not charged with mere negligence; they are charged with fraud and fraudulent deceit." *Id.* at 1358. Relying on *Calder,* the Eleventh Circuit concluded that the defendants had sufficient contacts for Alabama to exercise jurisdiction over them, and stated that the defendants "should certainly have anticipated being haled into an Alabama court should a claim arise out of their conduct." *Id.*

Similarly, in *Carrillo,* the Eleventh Circuit determined that a Costa Rican corporation "could reasonably have expected to be haled into court in this country because it deliberately set about to sell

its unregistered securities to United States residents." 115 F.3d at 1546. To support this conclusion, the appellate court noted:

> The Supreme Court has previously held that defendants whose "intentional . . . actions were expressly aimed at California" could reasonably anticipate being haled into court there. *See Calder v. Jones*, 465 U.S. 783, 789-90 (1984); *accord Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 259 (11th Cir.1996) (defendants could reasonably anticipate being haled into court in Florida where they were "fully aware that their actions or omissions would have a substantial effect in Florida").

115 F.3d at 1546-47 (parallel citations omitted). The *Carrillo* panel characterized the foreign corporation's jurisdiction arguments as unsupported by case law and "contrary to common sense and everyday experience." *Id.* at 1547 (internal quotations and brackets omitted).

Additionally, in *Allerton*, Florida's First District Court of Appeals relied on *Calder* in rejecting a non-resident defendant's argument that he was insulated from operation of Florida's long-arm statute by virtue of the corporate shield doctrine. *See* 635 So.2d at 39. After quoting from *Calder*, the First DCA stated: "Here, Allerton is not alleged to have committed acts of 'untargeted negligence,' but rather to have committed the intentional torts of fraud, conspiracy to defraud, breach of fiduciary duty, and aiding and abetting a breach of fiduciary duty, all aimed at GLS, a Florida insurance company." *Id.*

Based on *Calder, Molina, Carrillo* (and *Allerton*), Bujoreanu is subject to personal jurisdiction in Florida. He is accused of intentional wrongdoing directed at a corporation headquartered in Florida, which injured that company in Florida. Further, Bujoreanu is no ordinary (alleged) third-party tortfeasor. He is a corporate director and audit committee member of a Florida-based company. Based on "common sense and everyday experience," these are significant positions customarily

-28-

associated with a company's governance. Further, these positions are voluntarily assumed and held; it was Bujoreanu's choice to accept leadership positions in a corporation headquartered in this state. Hence, Bujoreanu's contacts with Florida are not random, fortuitous or attenuated; he can hardly claim surprise at being haled into a Florida court to answer to the kind of allegations levied against him in the Amended Complaint.

Under these collective circumstances, the Court determines that the allegations in the Amended Complaint satisfy constitutional due process requirements concerning the relatedness of the defendant's contacts to the claims asserted, purposeful availment, reasonable expectation of being haled into court in Florida, and fair play and substantial justice. Hence, this Court may constitutionally exercise jurisdiction over Bujoreanu.[19]

However, this Court's comments concerning personal jurisdiction should not be misconstrued as an opinion concerning the merits of this suit. At this stage, the Court is legally required to accept Mehlenbacher's allegations of wrongdoing in the Amended Complaint as true. It remains to be seen whether Mehlenbacher can marshal sufficient evidence to survive a summary judgment motion, or having surmounting that potential obstacle, whether he will be able to prove actionable misconduct at trial. On that subject, the Court expresses no opinion.

### F. Service of Process on Other Defendants

---

[19]*Hollingsworth v. Iwerks Entertainment, Inc.*, 947 F. Supp. 473 (M.D. Fla. 1996), is distinguishable on the basis that its due process analysis contains no discussion of *Calder*.

In the legal memorandum supporting their motion to dismiss, Asconi and Melnick point out that Mehlenbacher has failed to serve five other Defendants (Jitaru, Sirbu, Sterbets, Radu and Clear) with initial process. In a footnote in his response to Bujoreanu's motion to dismiss, Mehlenbacher concedes that these Defendants remained unserved as of March 11, 2005. *See* Doc. 79 at 2 n.1. Mehlenbacher adds that he "intends to file a motion seeking the Court's authorization to effect service on at least some of the unserved Defendants, residents of Moldova, by alternative methods as permitted under Rule 4(f)(3), Fed. R. Civ. P." *Id.* However, Mehlenbacher has already been denied permission to serve these Defendants by alternative means. *See* Doc. 39.

As far as the Court can determine, service on these other Defendants remains unaccomplished. This action has been pending for nearly eleven months. Accordingly, Mehlenbacher will be required to show cause why this action should not be dismissed, without prejudice, as to the unserved defendants for failure to prosecute and timely effect service.

## IV. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. The Motion to Dismiss Amended Complaint (Doc. 55), filed by Defendants Asconi Corporation and Serguei Melnick on February 3, 2005, is GRANTED IN PART AND DENIED IN PART.

The Motion is GRANTED insofar as it seeks dismissal of Count III of the Amended Complaint, which purports to plead a claim under § 304 of the Sarbanes-Oxley Act.

In all other respects, the Motion is DENIED.

2. The Motion to Dismiss Amended Complaint (Doc. 75), filed by Defendant Radu Bujoreanu on February 28, 2005, is DENIED.

3. Within eleven (11) days, Plaintiff Keith Mehlenbacher shall show cause in writing why this

action should not be dismissed, without prejudice, as to Defendants Constantin Jitaru, Anatolie Sirbu,

Nicolae Sterbets, Tatiana Radu and Frank Clear, for failure to prosecute and timely effect service of

initial process. The Defendants who have been served in this action may file and serve responses to

Mehlenbacher's filing within eleven (11) days thereafter.

    **DONE** and **ORDERED** in Chambers, in Orlando, Florida on June 6, 2005.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Party
Magistrate Judge Karla R. Spaulding