UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
OLYMPIA LEVINSON STIEGELE,     )
derivatively on behalf         )
Nominal Defendant Viisage      )
Technology, Inc.               )
     Plaintiff,                )
                               )
     v.                        )     C.A. No. 05-10677-MLW
                               )
BERNARD C. BAILEY, PAUL T.     )
PRINCIPATO, PETER NESSEN,      )
THOMAS J. REILLY, DENIS K.     )
BERUBE, BUDDY G. BECK,         )
CHARLES E. LEVINE, WILLIAM     )
K. AULET, MARCEL YON AND       )
HARRIET MOUCHLEY-WEISS         )
     Defendants.               )
                               )
     and                       )
                               )
VIISAGE TECHNOLOGY, INC.,      )
     Nominal Defendant.        )
```

MEMORANDUM AND ORDER

WOLF, D.J.                                    August 23, 2007

I.  INTRODUCTION

        This  is  a  shareholder  derivative  action  brought  by
shareholders  of  Viisage  Technology,  Inc.  ("Viisage"  or  the
"Company")  on  behalf  of  the  Company,  against  certain  of  its
officers  and  directors,  for  allegedly  breaching  their  fiduciary
duties by disseminating, or permitting the dissemination of, false
and/or  misleading  statements  regarding  the  Company's  condition  and
prospects,  and  for  selling  stock  based  on  that  misinformation.
Pursuant  to  Federal  Rules  of  Civil  Procedure  23.1  and  12(b)(6),
nominal  defendant  Viisage  and  the  individual  defendants  moved  to
dismiss  plaintiff's  amended  complaint  on  the  grounds  that  plaintiff

neither made a pre-suit demand upon Viisage's Board of Directors, nor demonstrated why a demand would have been futile. A hearing was held on August 13, 2007. For the reasons explained in this Memorandum, defendants' motion to dismiss is being allowed.

II. THE MOTION TO DISMISS STANDARD

In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must accept all well-pleaded facts alleged in the Complaint as true and draw all reasonable inferences in favor of the plaintiff." Day v. Fallon Cmty. Health Plan, Inc., 917 F. Supp. 72, 75 (D. Mass. 1996). See also Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). The court must "neither weigh[] the evidence nor rule[] on the merits because the issue is not whether the plaintiffs will ultimately prevail, but whether they are entitled to offer evidence in support of their claims." Day, 917 F. Supp. at 75.

This "highly deferential" standard of review "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992). Claims in a complaint need not only be possible but also plausible. See Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007). Plaintiff may not simply allege a "conceivable" claim, but instead must allege facts sufficiently "plausible on [their] face" to entitle it to relief. Id. at 1974. Thus, a court should "eschew

2

any reliance on bald assertions, unsupportable conclusions, and 'opprobrious epithets.'" <u>Chongris v. Board of Appeals of Town of Andover</u>, 811 F.2d 36, 37 (1st Cir. 1987) (<u>quoting</u> <u>Snowden v. Hughes</u>, 321 U.S. 1, 10 (1944)).

Ordinarily, a court will not consider documents outside of the pleadings in a motion to dismiss. <u>See</u> <u>Watterson</u>, 987 F.2d at 3. There is, however, a "narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for document sufficiently referred to in the complaint." <u>Id.</u> 3-4. When "a complaint's factual allegations are expressly linked to-and admittedly dependent upon-a document the authenticity of which is not challenged, that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." <u>Beddall v. State Street Bank and Trust, Co.</u>, 137 F.3d 12, 16-17 (1st Cir. 1998).

The application of these principles to shareholder derivative actions is discussed in Section IV, <u>infra</u>.

III. THE FACTS AND PROCEDURAL BACKGROUND

The following facts are based on plaintiff's amended complaint and public documents referenced in it. Viisage is a technology company in the business of designing, developing, marketing, and implementing integrated software and hardware solutions that produce secure identification credentials and other biometric

technologies used to deter criminal and terrorist activities, including face recognition technology used in airport screenings. Amended Complaint, ¶¶17, 40. Its products and services are also geared toward creating difficult to reproduce documents, including driver's licenses, and toward producing technology for authenticating documents and preventing identity theft. Id., ¶17.

In a May 13, 2002 press release, Viisage disclosed that it had achieved "strong results" in the first phases of a pilot program involving its face recognition technology at Logan International Airport in Boston. Id., ¶41. A few days later, it announced in a press release that the Manchester, New Hampshire airport would be adopting the same technology. Id., ¶42. In September, 2002, defendant Dennis Berube, the Chairman of Viisage's board, wrote a letter to a trade journal touting the technology's 90% performance rate during the Logan test. Id., ¶44. According to a confidential, unnamed source referenced throughout the amended complaint (the "Source"), the technology did not in fact work as well as Viisage claimed it did, and the Logan Airport test had been staged to produce the reported 90% success result. Id., ¶¶53, 59-70.

During the first half of 2002, Viisage communicated regularly with Chris Johnson of Piper Jaffray, a broker-dealer and co-manager of Viisage's 2004 secondary stock offering. Id., ¶¶49, 55-58. According to the Source, Viisage senior executives disclosed non-

public information to Johnson which enabled him, on behalf of Piper Jaffray and its clients, to trade profitably in Viisage stock. Id.

In 2003, Viisage borrowed approximately $5,000,000 on a $7,000,000 credit facility provided by Lau Acquisition Corp. ("Lau"). Id., ¶¶90, 138. The company repaid the loan from Lau with part of the proceeds of an August 5, 2004 secondary public offering. Id. Lau owned 17% of Viisage's common stock as of May, 2004, and 11.4% of that stock as of December, 2004, respectively. Id., ¶¶23, 147(m).

Berube is Executive Vice President and Chief Operating Officer ("COO") of Lau. Id., ¶23  Principato is Lau's Chief Financial Officer ("CFO"). Id., ¶20. Berube's wife, Joanna Lau ("Joanna"), is either the Chief Executive Officer or President of Lau, depending where in the complaint one looks. Id., ¶¶147(j), (m). Berube and Joanna are alleged to own a majority of Lau's voting stock. Id., ¶147(m).

In the third quarter of 2004, on October 26, 2004, Viisage reported a net profit and increased its Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") projections for 2004 from a previously announced $11,500,00 to $12,500,000. Id., ¶109. Viisage later announced that during the third quarter it had secured a $25,000,000 line of credit from Citizens Bank. Id., ¶¶4, 110, 115.

On December 27, 2004, Viisage issued a press release

concerning litigation in Georgia regarding its contract to provide driver's licenses in that state. Id., ¶122. It announced that it had learned that day that a Georgia court had issued a summary judgment ruling that permitted Viisage to participate in a re-bid of the contract, awarded Viisage $500,000 to compensate for funds spent by Viisage under the original contract, and had enjoined the State of Georgia from paying Viisage a $2,000,000 contract termination free previously agreed upon by the parties. Id., ¶¶ 122-23.

On February 7, 2005, Viisage announced its preliminary results for the fourth quarter of 2004. Id., ¶125. Viisage reported that it would suffer a loss for that quarter. Id. While Viisage reported that it would meet its revenue projections, it revised downward its previous 2004 EBITDA projections of $12,500,000 to $8,000,000 to $9,000,000. Id. Viisage cited as reasons for the downward revision certain non-recurring charges. The largest of these were: (1) a $2,000,000 impairment charge related to the Georgia court's summary judgment decision; and (2) another non-cash item, the recording of $900,000 deferred tax asset associated with a tax election related to its acquisition of Trans Digital Technologies Corporation during the first quarter of 2004. Id. Other charges included items such as greater than expected costs

associated with Sarbanes-Oxley compliance[1] and unanticipated legal fees.  Id.

During the second half of 2004, several Viisage directors sold portions of their stock.  More specifically, (1) Buddy Beck, a director, received $779,779 for the sale of 141,778 Viisage shares in Viisage's August, 2004 secondary offering, id., ¶138; (2) Berube, through his company, Lau, received $779,779 for the sale of 141,778 Viisage shares in Viisage's August, 2004 secondary offering, and $2,800,000 by selling 380,602 shares of Viisage stock on the open market from May 26, 2004 to December 15, 2004, id., ¶¶23, 138, 140, 147(b);[2] (3) Marcel Yon, a director, through his company Odeon, sold 770,473 shares of Viisage stock from November 2, 2004 to December 14, 2004, for over $6,000,000 (or $8,000,000, depending where in the amended complaint one looks), id., ¶139-42, 147(f), and received an additional $743,363.50 by selling 135,157 shares of Viisage stock during the August, 2004 secondary offering; (4) during the period from May 17, 2004 to January 17, 2005,

_____

[1] See Sarbanes-Oxley, 18 U.S.C. § 1350.  Sarbanes-Oxley requires, in part, that a company's Chief Executive Officer ("CEO") and CFO certify that quarterly financial reports submitted to the Securities and Exchange Commission ("SEC") comply with sections 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in a quarterly report fairly presents, in all material respects, the financial condition and results of the operations of the company.  Id. at §1350(a), (b).

[2] When the complaint was filed in April, 2005, Lau owned 11.4% of Viisage.  See Amended Complaint, ¶147(m).

Charles Levine and Thomas Reilly, directors and members of Viisage's Audit Committee, received $100,000, and $87,000, respectively, on sales of 13,500, and 10,000 shares of Viisage stock. <u>Id.</u>, ¶¶ 138-42, 147(d)-(e).

On March 2, 2005, Viisage reported that, in connection with its preparation of its 2004 financials, it had determined that it had two internal control deficiencies, constituting material weaknesses under Sarbanes-Oxley. <u>Id.</u>, ¶129. It attributed the deficiencies to insufficient personnel resources and technical accounting expertise within the accounting department to resolve non-routine or complex accounting matters and to weaknesses in its information technology systems. <u>Id.</u>

Less than a month later, on April 6, 2005, this shareholder derivative action was filed, naming as individual defendants Berube, Beck, Yon, Levine, and Reilly, as well as CEO Bernard Bailey, Paul Principato, a director, Peter Nessen, a director and Chairman of the Audit Committee, and CFO William Aulet. Prior demand was not made on Viisage's board. <u>See</u> Complaint, ¶58.

The complaint alleged six counts against all defendants: (1) demand futility; (2) breach of fiduciary duty; (3) abuse of control; (4) gross mismanagement; (5) waste of corporate assets; and (6) unjust enrichment. These claims were predicated on alleged misrepresentations defendants made regarding the Georgia litigation and the Company's internal controls, and insider trading based on

8

those misrepresentations.  In April, 2005, the nine members of the board were Bailey, Principato, Nessen, Reilly, Berube, Beck, Levine, Yon, and Harriet Mouchley-Weiss.  <u>See</u> Complaint, ¶58.

On July 26, 2006, plaintiff filed an amended complaint, without prior demand being made on Viisage's board.  <u>See</u> Amended Complaint, ¶143-47.  It alleged eight counts: (1) breach of fiduciary duties in connection with insider trading and misappropriation of information, against Berube, Beck, Levine, Reilly, and Yon; (2) breach of fiduciary duty against all defendants; (3) abuse of control, against all defendants; (4) gross mismanagement, against all defendants; (5) waste of corporate assets, against all defendants; (6) unjust enrichment, against all defendants; (7) contribution and indemnification, against all defendants; and (8) aiding and abetting breach of fiduciary duties, against all defendants.  The amended complaint relied in part on the earlier allegations of misrepresentations and insider trading based on the Georgia litigation and the internal controls issues. It also alleged additional facts involving the company's facial recognition technology, specifically that the defendants made misrepresentations regarding the efficacy of the facial recognition technology and made insider trades based on that information.  <u>See</u> Amended Complaint, ¶¶43-67.  At the time the amended complaint was filed, the board had expanded to thirteen individuals, and included Berube, Beck, Levine, Reilly, Bailey, Principato, Nessen, and

Mouchley-Weiss, who were members of the April, 2005 board, and new members Robert LaPenta (Chairman), Louis Freeh, Robert Gelbard, James Loy, and George Tenet. <u>See</u> Viisage Form S-4, July 27, 2006, at II-10, II-11, attached as Ex. A, Baraniak Aff.

IV.    DISCUSSION

    A.    <u>Rule 23.1</u>

    Shareholder derivative actions in federal court are governed by Federal Rule of Civil Procedure 23.1 which states, in pertinent part, that "[a] complaint shall [] allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the board . . . or [the reasons for] not making the effort." <u>See</u> <u>also</u> <u>Kamen v. Kemper Fin. Servs., Inc.</u>, 500 U.S. 90, 96(1991). Under this Rule, the shareholder must plead with particularity that either demand was made or that demand would have been futile. <u>Gonzalez Turul v. Rogatol Distribs., Inc.</u>, 951 F.2d 1, 2 (1st Cir. 1991).

    In the First Circuit, the requirements of Rule 23.1 are "vigorously enforced" and a court should dismiss derivative actions when plaintiffs do not comply. <u>Id.</u>; <u>see</u> <u>also</u> <u>Grossman v. Johnson</u>, 674 F.2d 115, 125 (1st Cir. 1982); <u>Heit v. Baird</u>, 567 F.2d 1157, 1160 (1st Cir. 1977); <u>Landy v. D'Alessandro</u>, 316 F. Supp.2d 49, 59-60 (D. Mass. 2004). Allegations necessary for a finding of demand futility must be particularly set forth in the complaint. A shareholder may not plead in general terms hoping that, by

discovery or otherwise, he can later establish that making a demand on the board would have been futile. See Gonzalez Turul, 951 F.2d at 3; Grossman, 674 F.2d at 123, 125.   Although the general standards applicable to motions to dismiss apply to the extent that the court must take as true all well-pleaded allegations and make all reasonable inferences in favor of the plaintiff, the court must not accept mere conclusions or generalized allegations of control, acquiescence, wrongful participation, or the like.   Instead, the plaintiff must allege with particularity facts that would support such a conclusion. See Gonzalez Turul, 951 F.2d at 3; Landy, 316 F. Supp.2d at 60-75; Grossman, 674 F.2d at 124; Heit, 567 F.2d at 1161.

   B.   Pleading Demand Futility

   "Before bringing a derivative suit on behalf of a corporation, a plaintiff must 'demonstrate that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions.'" Caviness v. Evans, 229 F.R.D. 354, 358 (D. Mass. 2005) (quoting Kamen, 500 U.S. at 95-96).   As explained by the First Circuit:

> The purpose of the demand requirement is, of course, to require resort to the body legally charged with conduct of the company's affairs before licensing suit in the company's name by persons not so charged. Given the expense of litigation, and the normal presumptions running in favor of those acting for the company, this seems only reasonable.

Heit, 567 F.2d at 1162 n.6.   To be excused from making a demand on the board, a stockholder must show that his case is exceptional.

11

<u>Gonzalez Turul</u>, 951 F.2d at 2.

To determine whether the allegations in plaintiff's amended complaint would make demand futile, the court must look to the laws of Delaware, the state of Viisage's incorporation. <u>See</u> <u>Landy</u>, 316 F. Supp. 2d at 57; <u>Sachs v. Sprague</u>, 401 F.Supp. 159, 163 (D. Mass. 2005). The Delaware Supreme Court has articulated the relevant test as follows:

> [A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

<u>Rales v. Blasband</u>, 634 A.2d 927, 934 (Del. 1993).

Demand futility is assessed at the time the complaint is filed. <u>See</u> <u>Grossman</u>, 674 F.2d at 123. Where a party amends its complaint, adding new claims and factual allegations, and there is a change in the composition of the board after the filing of the original complaint, plaintiff must make demand on the new board as to those new claims. <u>See</u> <u>Braddock v. Zimmerman</u>, 906 A.2d 776, 785-6 (Del. 2006).

In the instant case, the amended complaint includes allegations related to Berube's statements regarding the Company's facial recognition technology not previously made in the original complaint and adds new claims based on them. <u>See</u> Amended Complaint, ¶¶5, 40-70, 147(o), 149-58. At the time of the amended

complaint, there were 13 board members.  They were Berube, Beck, Levine, Reilly, Bailey, Principato, Nessen, and Mouchley-Weiss, LaPenta, Freeh, Gelbard, Loy, and Tenet. Therefore, plaintiff would have had to make the required showing that at least seven of these directors were either "interested" or not "independent," as defined below, to demonstrate that a demand to the board concerning the new claims would have been futile.  However, the amended complaint does not address the five new board members, and makes no allegations as to Mochley-Weiss, who was also on the board in April, 2005.  As to Nessen, she merely asserts he was a member of the Audit Committee, which is alone insufficient to disqualify Nessen as a disinterested and independent director.  See In re First Bancorp 465 F. Supp. 2d at 120; In re IAC/Interactive Securities Litigation, 478 F.Supp.2d 574, 605-06 (S.D.N.Y. 2007).  Therefore, plaintiff fails to make cognizable allegations as to at least seven of the 13 July, 2006 directors concerning the claims that first appear in the amended complaint.

However, the court need not focus on the distinction between the members of the Viisage board in 2005 and 2006.  Even if plaintiff only had to show demand futility as to the 2005 board for all her claims in the amended complaint, she has failed to plead properly that a majority of the nine members of the board in April, 2005, were interested and/or not independent.  Therefore, she has not adequately alleged that a demand on the board in April, 2005,

would been futile.

More specifically, when the original complaint was filed in April, 2005, the nine directors on Viisage's Board were Bailey, Principato, Nessen, Reilly, Berube, Beck, Levine, Yon, and Mouchley-Weiss.  <u>See</u> Complaint, ¶58.  Accordingly, plaintiff was required to plead with particularity facts which cast a reasonable doubt concerning the disinterestedness or independence of at least five of these directors.  <u>See</u> <u>Rales</u>, 634  A.2d at 927, 934, 937; <u>Sachs</u>, 401 F.Supp.2d at 163; <u>Caviness</u>, 229 F.R.D. at 358-59.

### 1.    Reasonable Doubt

Under Delaware law, there is no bright-line test for defining reasonable doubt.  <u>See</u> <u>Grobow v. Perot</u>, 539 A.2d 180, 186 (Del. 1988), <u>overruled on other grounds</u> by <u>Brehm v. Eisner</u>, 746 A.2d 244 (Del. 2000).  As the Delaware Supreme Court explained:

> it would be neither practicable nor wise to attempt to formulate a criterion of general application for determining reasonable doubt. The facts necessary to support a finding of reasonable doubt either of director disinterest or independence . . . will vary with each case. Reasonable doubt must be decided by the trial court on a case-by-case basis employing an objective analysis.

<u>Id.</u>  However, plaintiff must address each director individually and cannot rely on allegations made generally against the whole board or a group of directors.  <u>See</u> <u>Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart</u>, 845 A.2d 1040, 1046, 1048-50 (Del. 2004).

### 2.    Interest

Directors are entitled to a presumption that they are disinterested. Id. at 1048-49. The presumption disappears if "'a corporate decision will have a materially detrimental impact on [the] director, but not on the corporation and the stockholders,'" or if a director "'will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.'" Sachs, 401 F.Supp. 2d at 164 (quoting Rales, 634 A.2d at 936 (citations omitted)). To plead adequately that a director is "interested," a complaint must allege specific facts demonstrating that the director faces a substantial likelihood of personal liability. See id. at 164; Rales, 634 A.2d at 936; Aronson v. Lewis, 473 A.2d 805, 815 (Del. 1984). The "mere threat" of personal liability is insufficient to challenge the disinterestedness of a director. Rales, 634 A.2d at 936.

3. Independence

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." Aronson, 473 A.2d at 816. To plead a director's lack of independence, a plaintiff must allege facts that create a reasonable doubt as to whether that director was "so 'beholden' to an interested director . . . that his or her 'discretion would be sterilized.'" Beam, A.2d at 1050 (quoting Rales, 634 A.2d at 936). Essentially, a plaintiff must allege that the director is dominated by an interested director to

such a degree that he or she would be "more willing to risk his or her reputation than risk the relationship with the interested director." Beam, A.2d at 1052. Such a relationship may arise either because of financial ties, familial affinity, a particularly close or intimate personal or business affinity, or because of evidence that in the past the relationship caused the director to act non-independently vis-a-vis an interested director. Id. at 1049. The analysis is fact-specific and must be made in the context of each particular case. Id.

    C.  Analysis

    Directors of Delaware corporations have three primary fiduciary duties: due care, loyalty, and good faith. Emerald Partners v Berlin, 787 A.2d 85, 90 (Del. 2001). Delaware law permits corporations to eliminate liability for monetary injury arising from a breach of the duty of care.  Del. Code Ann. tit. 8, §102(b)(7)(2006).  Viisage has adopted a charter provision exculpating directors from their duty of care. See Restated Cert. of Incorporation, Article VIII, Ex. G to Baraniak Aff.  Therefore, plaintiff must plead demand futility based upon the non-exculpated duties of loyalty and of good faith.  See In re Sonus Networks, Inc., 422 F. Supp. 2d 281, 286-87 (D. Mass. 2006); Caviness, 229 F.R.D. at 359 n.45

    Plaintiff alleges that: (1) each defendant engaged in securities fraud by disseminating erroneous information to the

16

public regarding the Georgia litigation, the company's internal controls, and the company's facial recognition technology, and, therefore, faced a substantial likelihood of liability in a then pending securities litigation, see Amended Complaint, ¶¶14, 41, 43-47, 51 59-67, 73, 83-86, 88-90, 95, 97, 99-101, 109-10, ¶¶15, 147(I); (2) defendants Berube, Beck, Levine, Reilly and Yon breached their duty of loyalty and derived improper personal benefits through insider training, and that Berube breached the same duty by "tipping" Piper Jaffray with material nonpublic information, id., ¶¶49-50, 138-142, 147(b-f); and (3) that the defendants breached their duties of good faith and loyalty by abdicating their oversight responsibilities, in that Nessen, Reilly and Levine were members of the Audit Committee, and that all the directors were made aware of Berube's conduct as to misstatements regarding the facial recognition technology and his tips to Piper Jaffray but took no action. Id., ¶147(g). The third claim is sometimes called a "Caremark claim". See In re Caremark Int'l, 698 A.2d 959, 971 (Del. Ch. 1996). As explained below, plaintiff does not adequately plead demand futility under any of these theories.

B.   At Most, Plaintiff Has Alleged A Lack Of Disinterest Only As To Bailey

1.   Bailey Allegedly Made Misrepresentations to the Public Regarding Sarbanes-Oxley

Plaintiff alleges that all nine directors face a substantial likelihood of liability and are, therefore, interested in the

outcome of this litigation.  However, plaintiff only addresses two of the directors specifically in her amended complaint.  First, she alleges that Bailey, the CEO and a director, and Aulet, the CFO, but not a director, signed Sarbanes-Oxley certifications with the Company's quarterly reports that misrepresented the efficacy of the company's internal controls.  See Amended Complaint, ¶147(f).  No other defendants are alleged to have made false Sarbanes-Oxley certifications.

Securities fraud liability may be premised on false statements made in SEC filings.  See In re Indep. Energy Holdings PLC Sec. Litig, 154 F. Supp. 2d 741, 767 (S.D.N.Y. 2001).  This rationale has been extended to Sarbanes-Oxley disclosures.  More specifically, although Sarbanes-Oxley expressly provides only for criminal penalties for false Sarbanes-Oxley certifications, see 18 U.S.C. § 1350(c), courts have recognized that false certifications can serve as the basis for individual, civil liability in a securities suit.  See In re PMA Capital Corp. Sec. Litig., 2005 U.S. Dist LEXIS 15696, at *32-33 (E.D. Pa. 2005); In re OCA, Inc., 2006 U.S. Dist. LEXIS 90854, *17-18, *55-57 (E.D. La. 2006); Limantour v. Cray Inc., 432 F. Supp. 2d 1129, 1158-59 (W.D. Wa. 2006); see also Garfield v. NDC Health Corp, 466 F.3d 1255, 1266-67 (11th Cir. 2006) (discussing scienter).  However, potential liability for a Sarbanes-Oxley violation extends, at most, to the individual or individuals who signed the required certification.

<u>In re PMA Capital Corp. Sec. Litig.</u>, 2005 U.S. Dist LEXIS 15696, at *32-33 (E.D. Pa. 2005); <u>In re OCA, Inc.</u>, 2006 U.S. Dist. LEXIS 90854, *17-18, *55-57 (E.D. La. 2006); <u>Limantour v. Cray Inc.</u>, 432 F. Supp. 2d 1129, 1158-59 (W.D. Wa. 2006).

It is alleged with particularity that Bailey faces a substantial likelihood of liability based on his Sarbanes-Oxley certification. <u>See</u> Amended Complaint, ¶¶12, 85, 101, 125, 129-30, 147(a). Accordingly, the court assumes for purposes of demand futility analysis that Bailey was as of April, 2005, an interested director. <u>Rales</u>, 634 A.2d at 936; <u>Sachs</u>, 401 F.Supp. 2d at 164.

Plaintiff also alleges that Berube made false public statements regarding the efficacy of Viisage's facial recognition technology in 2002. Amended Complaint, ¶¶44-47, 59-67. Plaintiff does not, however, allege that Berube acted knowingly or recklessly in making those statements, as required to establish a violation of the pertinent securities law, 15 U.S.C. §78j(b). <u>See</u> <u>In re Peritus Software Servs., Inc.</u>, 52 F. Supp. 2d 211, 223 (D. Mass. 1999) ("complaint must 'state with particularly facts giving rise to a strong inference that the defendant acted with the required state of mind.'. In this Circuit, the required state of mind is knowing or reckless.") (citations omitted). In the absence of the required allegations as to scienter, or allegations permitting a reasonable inference of scienter, plaintiff has failed to plead any likelihood, let alone a substantial likelihood, of liability as to

Berube.  See Rales, 634 A.2d at 936; Sachs, 401 F.Supp. 2d at 164.

Moreover, no particularized allegations are made as to any of the other seven directors, except for reference to an email from the Source informing Nessen of purported problems with the facial recognition technology while simultaneously demanding $625,000 from Viisage.  Amended Complaint, ¶147(o); Baraniak Aff., Ex. C.  These general allegations as to the entire board are insufficient to show a likelihood of individual liability.  See Beam, 845 A.2d at 1046; Sachs, 401 F.Supp. 2d at 165-66.

Accordingly, plaintiff has only properly alleged interest based on potential liability stemming from false or misleading statements as to Bailey.

2.    Plaintiff Does Not Allege Sufficient Facts To Show That Any Defendant Is Likely To Be Liable On A Caremark Theory And Is, Therefore, Interested

Plaintiff may also demonstrate that a director is interested by alleging facts that are sufficient to establish a substantial likelihood of personal liability for the Company's violations of the law because of a failure to provide the required oversight of its activities.  See Stone v. Ritter, 911 A.2d 362, 2006 WL 3169168 at *8 (Del. 2006).  However, under Delaware law, "only a sustained or systematic failure of the board to exercise oversight . . . will establish the lack of good faith that is a necessary condition to liability."  In re Caremark Int'l, 698 A.2d at 971.  To state a claim for breach of the duty of oversight, a plaintiff must plead

facts sufficient to show that the directors either knew or should have known that violations of the law were occurring, that they took no steps in a good faith effort to prevent or remedy that situation, and that such failure resulted in the Company's losses. Id.

Caremark premises liability on a showing that the directors were conscious of the fact that they were not doing their jobs. Guttman v. Huang, 823 A.2d 492, 505-06 (Del. Ch. 2003); Landy, 316 F.Supp. 2d at 74. Therefore, a claim for failure to exercise proper oversight is one of, if not the most, difficult theories upon which to prevail.  In re Caremark Int'l, 698 A.2d at 967; see also Guttman, 823 A.2d at 505-06.

Plaintiff bases her oversight claim only on general allegations.  She essentially asserts that "[a]s a result of their access to and review of internal corporate documents; conversations and connections with corporate officers, employees and directors; and attendance at management and Board meetings," each defendant "knew the adverse non-public information which made the representations made by [Viisage] false and misleading."  Amended Complaint, ¶147(a).  The amended complaint is devoid of any allegation regarding internal documents, conversations or meetings that allegedly revealed adverse non-public information to any particular defendant, or what that information was.  Nor does the complaint describe what internal controls were in place, how they

were deficient, what the Audit Committee did or did not do to review them, or what effect, if any, the deficiencies had on Viisage's financial reports.  Plaintiff also does not identify how any of the defendants purportedly became aware of Berube's alleged tipping of Piper Jaffray.  Therefore, plaintiff's allegations are insufficient to establish a Caremark claim.  See Sachs, 401 F.Supp. 2d at 165, 169; Caviness, 229 F.R.D. at 359-60; Guttman, 823 A.2d at 506-07; In re First Bancorp, 465 F. Supp. 2d at 119.

Plaintiff also claims that Nessen, Reilly, and Levine are interested pursuant to Caremark by virtue of their position on the Company's Audit Committee.  This claim is premised on the theory that members of the Audit Committee must have been aware of the board's failure to supervise, as it is tasked with designing and reviewing the oversight system. However, it has been repeatedly and rightly held that, "'generalized allegations reflecting poor supervision over financial statements' by members of the Audit Committee and other directors [do] not excuse pre-suit demand." Caviness, 229 F.R.D at 359-60 n.46 (citation omitted); see also In re First Bancorp 465 F. Supp. 2d at 120 ("[P]laintiffs failed to plead with particularity 'the actions and practices of the audit committee,' including 'whether the committee discussed and approved any of the allegedly improper accounting practices.'") (citations omitted); In re Coca-Cola Enterprises, Inc. Deriv. Litl. 478 F.Supp. 2d 1369, 1378 (N.D.Ga. 2007)("Courts applying Delaware case

law have consistently held, however, that a director is not interested merely by virtue of sitting on an Audit Committee while the corporation faces accounting and audit irregularities"); <u>In re Xcel Energy, Inc.</u>, 222 F.R.D. 603, 607 (D. Minn. 2004) (holding that generalized statements that Audit Committee members "knew or should have known" of false statements did "not constitute facts pleaded with particularity"); <u>Rattner v. Bidzos</u>, 2003 WL 22284323, at *10 n.53 (Del. Ch. Oct. 7, 2003). In the instant case, plaintiff's "conclusory complaint is empty of the kind of fact pleading that is critical to a <u>Caremark</u> claim, such as contentions that . . . the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation." <u>Guttman</u>, 823 A.2d at 506-07.

Therefore, plaintiff has not alleged with the required particularity facts that would make any of the directors potentially liable on her <u>Caremark</u> claim and, as a result, interested for the purpose of demand futility analysis. <u>Sachs</u>, 401 F.Supp. 2d at 165, 169; <u>Caviness</u>, 229 F.R.D. at 359-60; <u>Guttman</u>, 823 A.2d at 506-07; <u>In re First Bancorp</u>, 465 F. Supp. 2d at 119; <u>In re IAC</u>, 478 F.Supp.2d at 605-06; <u>In re Coca-Cola</u>, 478 F.Supp. 2d at 1378.

> 3. Plaintiff Fails To Allege A Likelihood Of Liability
>    Premised On Insider Trading As To Any Of The
>    Defendants

A plaintiff may also allege that a director is interested based on a properly pled claim of insider trading.  In re First Bancorp, 465 F. Supp. 2d at 121;  Rattner, 2003 WL 22284323 at *10-11.  Plaintiff makes insider trading allegations as to five directors--Berube, Beck, Yon, Reilly, and Levine.  Plaintiff does not, however, properly allege an insider trading claim against any of them.

Directors are considered interested for purposes of determining demand futility on an insider trading theory when they "appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." Aronson, 473 A.2d at 812. "Cursory allegations that a director made sales of company stock in the market at a time when he possessed material, nonpublic information are not sufficient to find a director interested for demand-futility purposes." In re Forest Labs., Inc. Derivative Litig., 450 F. Supp. 2d 379, 389 (S.D.N.Y. 2006) (applying Delaware law). Nevertheless, a court may find that directors are interested where "plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, nonpublic information about the company's financial

condition." Guttman, 823 A.2d at 502; see also In re Sonus
Networks, Inc., 422 F. Supp. 2d 281, 287 (D. Mass. 2006);
Zimmerman, 2005 Del. Ch. LEXIS 135, 2005 WL 2266566, at *7;
Rattner, 2003 WL 22284323 at *11.

In other words, plaintiff must plead with particularity
allegations of scienter on the part of each director. See Guttman,
823 A.2d at 505 ("Delaware case law makes the same policy judgment
as federal law does, which is that insider trading claims depend
importantly on proof that the selling defendants acted with
scienter."); Ji v. Van Heyningen, 2006 WL 2521440, *11 (D.R.I.
2006) ("Under Delaware law, insider sales allegations require
particularized allegations of fraudulent intent by the selling
insider.").  Absent direct evidence, "fraudulent intent may be
inferred from the timing and quantities of the trades."  In re
Sonus Networks, 422 F. Supp. 2d at 287.

Insider trading is suspicious, however, only when it is
"dramatically out of line with prior trading practices at times
calculated to maximize the personal benefit from undisclosed inside
information." In re Silicon Graphics, Inc., Securities Litigation,
183 F.3d 970, 986 (9th Cir. 1999); see also In re IAC, 478
F.Supp.2d at 603-04.  This is because:

> As a matter of course, corporate insiders sell company stock
> and such sales, in themselves, are not quite as suspect as a
> self-dealing transaction in which the buyer and seller can be
> viewed as sitting at both sides of the negotiating table.
> Although insider sales are (rightly) policed by powerful
> forces -- including the criminal laws -- to prevent insiders

> from unfairly defrauding outsiders by trading on non-public
> information, it is unwise to formulate a common law rule that
> makes a director "interested" whenever a derivative plaintiff
> cursorily alleges that he made sales of company stock in the
> market at a time when he possessed material, non-public
> information.

Guttman, 823 A.2d at 592.  Moreover, as the Delaware Court of

Chancery has observed:

> the Court must be careful not to put too high a burden on
> pleaders, but, on the other hand, the Court must be careful
> not to leave the directors of Delaware corporations at risk of
> burdensome legal challenges whenever they sell stock in the
> corporation. There are incentive-based rationales as to why
> directors should be encouraged to invest in stock of the
> corporation. Not permitting directors adequate opportunities,
> however, to liquidate their holdings (or placing potential
> insider trading liability upon them without sufficient
> allegations of fault) destroys the very incentive that holding
> company stock provides directors.

Zimmerman, WL 2266566, at *7 (Del. Ch. Sept. 8, 2005), rev'd on

other grounds, Braddock v. Zimmerman, 906 A.2d 776 (2006).

In the instant case the amended complaint fails to allege with

particularity what insider knowledge the defendant directors

possessed or what would make the timing of their stock trades

suspicious.  The amended complaint does not allege what non-public

information Berube, or his company Lau, possessed about either the

Georgia litigation or Viisage's internal accounting controls at the

time of the sales or how he may have learned such information.

Moreover, while plaintiff does make allegations as to Berube and

the facial recognition technology, those allegations pertain to

events occurring in 2002.  Amended Complaint, ¶¶5, 40-70.  Berube's

alleged insider trading occurred two years later.  Id., ¶140

26

Therefore, the timing does not support an inference of insider knowledge. <u>See</u> <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194, 1216-17 (1st Cir. 1996); <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1424 (3d Cir. 1997); <u>In re Silicon Graphics, Inc., Securities Litigation</u>, 183 F.3d 970, 986 (9th Cir. 1999).

Nor does the complaint allege what percentage of its Viisage holdings Lau and Berube sold or retained. Instead, plaintiff simply alleges that because Berube was Viisage's Chairman at the time, he must have known of the alleged misrepresentations regarding the Georgia litigation and the internal control issues. This alone is insufficient. <u>See Caviness</u>, 229 F.R.D. at 360, n.46; <u>In re Coca-Cola</u>, 478 F.Supp.2d at 1379-80; <u>Rattner v. Bidzos</u>, 2003 WL 22284323, at *10 n.53 (noting that conclusory allegations of directors' knowledge of wrongdoing based on their status as directors does not satisfy the demand futility pleading standard). Moreover, while the amended complaint alleges that Lau sold 522,390 of its shares, Amended Complaint, ¶¶23, 138, 140, 147(b), defendants' point out that Viisage's SEC filings show that Lau retained 5,533,592 of its shares. <u>See</u> Baraniak Aff. Ex. D.[3] The 522,390 shares sold were 8.6% of the Lau/Berube's Viisage stock. Absent other particularized allegations, a sale of this percentage

---

[3] Defendant's filings referred to here are public SEC documents referenced in plaintiff's complaint, and may therefore be considered on a motion to dismiss. <u>See</u> <u>Watterson</u>, 987 F.2d at 3-4; <u>Beddal</u>, 137 F.3d at 16-17.

of Lau's holdings is insufficient to show scienter.  <u>See</u>  <u>In re</u>
<u>Vantice Corp. Sec. Litig.</u>, 283 F.3d 1079, 1094 (9th Cir. 2002)
(sale of only 13% of shares "belies any intent to rid himself of a
substantial portion of his holdings); <u>In re IAC</u>, 478 F.Supp.2d at
603-04.

Levine made his stock sales pursuant to a pre-existing SEC
Rule 10b5-1 trading plan.  <u>See</u> Baraniak Aff., Ex. F.  The purpose
of such a plan is to insure against being accused of having engaged
in a stock sale "on the basis of . . . adverse material non-public
information." <u>Weitschner v. Monterey Past Co.</u>, 294 F.Supp.2d 1102,
1117 (N.D. Cal. 2003).  In fact, the presence of a trading plan
rebuts an inference of scienter and supports the reasonable
inference that stock sales were pre-scheduled and not suspicious.
<u>Id.</u>; <u>Fishbaum v. Liz Claiborne, Inc.</u>, 1999 WL 568023, at *4 (2d
Cir. July 27, 1999); <u>In re Immucor Inc. Sec. Litig.</u>, 2006 WL
3000133, at *18 n.8 (D. Ga. Aug. 4, 2006) ("A valid 10b5-1 plan
serves as an affirmative defense to allegations of insider
trading.").  Moreover, there is no allegation linking Levine's sale
to any false statement.  In addition, the 13,500 shares Levine sold
were only 9% of the total shares owned and optioned to Levine,
weakening any inference of scienter.  <u>See In re Vantice</u>, 283 F.3d
at 1094.  Therefore, plaintiff fails to plead with particularity
that Levine is interested because of his potential liability for
insider trading.

Plaintiff also does not allege particularized facts regarding what material information Beck, Yon, or Reilly knew about the Georgia litigation, the internal controls, or the face recognition technology at the time of their sales, or how they learned any such information.   Nor does plaintiff allege that their sales ($6,000,000 by Yon's company, $743,363.50 by Yon himself, $87,000 by Reilly, and $779,779 by Beck) were at suspicious times or in suspicious amounts.  See In re Coca-Cola, 478 F.Supp.2d at 1379-80; In re IAC, 478 F.Supp.2d at 603-04; Ferre v. McGrath et al, 2007 U.S. Dist. LEXIS 29490, at *4 (S.D.N.Y. Feb. 16, 2007).

Beck owned 5,217,873 shares during the relevant period.  See Baraniak Aff., Ex B.  He sold 141,778, or 2.7%, of his shares in the August, 2004 secondary offering.  Absent any other allegations, the sale of less than three percent of his stock, during an SEC sanctioned offering, does not raise an inference of scienter.  See In re Vantive., 283 F.3d at 1094.  Therefore, plaintiff fails to plead interestedness based on this issue as to Beck.

Reilly sold only 10,000 shares, while retaining 17,577 shares and options to 90,496 shares, meaning that he sold only 8.4% of his holdings.  Once again, the percentage of his interest sold does not raise an inference of scienter in the absence of other allegations. See In re Vantive., 283 F.3d at 1094.  The amended complaint does not address why Reilly's sale was unusual or what inside information he improperly relied on.  See In re Coca-Cola, 478

F.Supp.2d at 1379-80; In re IAC, 478 F.Supp.2d at 603-04.

Yon is alleged to have sold $743,363.50 of his own stock and about $6,000,000 of the holdings of Odeon, a company he allegedly controlled. However, the amended complaint includes no allegations concerning the percentage of his holdings Yon sold, personally or through Odeon, or why the fact that Yon sold his stock in November and December of 2004 was suspicious. Therefore, plaintiff has failed to plead interestedness with particularity concerning Yon. See In re Coca-Cola, 478 F.Supp.2d at 1379-80; In re IAC, 478 F.Supp.2d at 603-04.

In short, the amended complaint does not raise a reasonable doubt concerning the disinterestedness of any director alleged to have engaged in insider trading.

Accordingly, plaintiff only alleges adequately that one of nine directors in April, 2005, Bailey, was not disinterested.

            2.    Independence

Although plaintiff has properly pled interest only as to Bailey, she may still adequately allege demand futility by properly alleging that at least four of the eight other members of the April, 2005 board could not exercise their business judgment independent of Bailey. See Rales, 634 A.2d at 934. She has not done so.

Plaintiff alleges the following facts as to the independence of the other directors: (1) Principato is Chief Financial Officer

of Lau, a company that Berube and his wife allegedly control, and
is, therefore, beholden to Berube, Amended Complaint, ¶¶20, 23,
147(j),(k); (2) the Board is controlled by Berube and Beck because,
in April, 2005, they owned, respectively, 11.4% (through Lau) and
11.9%, or 23.3% of outstanding shares, and Beck, for unstated
reasons, is beholden to Berube, id., 147(m); (3) Bailey, who is CEO
of Viisage, is beholden to Berube, because Berube controls the
Company, id., ¶17; and (4) a general allegation that Berube
controls all directors, based in part on the board's failure to
take action against Berube following the Source's email to Nessen,
id., ¶147.  These allegations fail to allege adequately that any
director lacked independence.

    Plaintiff's claims regarding independence focus on Berube.
However, as discussed previously, Berube is not properly alleged to
be interested.  This alone warrants dismissal, as plaintiff has not
alleged that the sole interested director, Bailey, dominates any
other board member.  See Rales, 634 A.2d at 936) ("To establish
lack of independence, [plaintiffs] must show that the directors are
beholden' to the [interested directors] or so under their influence
that their discretion would be sterilized.") (alterations in
original); Sachs, 401 F.Supp.2d at 164.  However, even assuming
that Berube is an interested director, plaintiff's allegations
based on his dominance of the board are insufficient.

    Plaintiff provides no authority for her claims that an

31

individual with 11.4% of its outstanding stock controls a company, let alone its board. Nor does she offer any authority for the proposition that as CEO Beck is beholden to the Chairman of the board, Berube, by virtue of Berube's ownership of 11.4% of the company's shares. To the contrary, Delaware courts have repeatedly held that even majority voting power held by one member of the board, without more, is not enough to rebut the presumption that the other directors are independent. See Aronson, 473 A.2d at 815-16; Stewart, 845 A.2d at 1051 (94% voting power insufficient to rebut presumption of outside director's independence); Zimmerman, 2005 WL 2266566, at *8 (48% stock ownership not enough to show domination of board); see also Zimmerman, 2002 WL 31926608 ("The bald allegation that [defendant] 'is the largest equity owner' of [defendant] does not provide the factual predicate necessary for an inference that he was the controlling equity holder of that company.").

Moreover, the fact the Beck owns 11.9% of the company does not "ipso facto cast into doubt that director's ability to act independently of an allegedly dominating director and/or shareholder of that company." See Zimmerman, 2002 WL 31926608, at *10. If anything, "'the only reasonable inference that . . . can [be] drawn . . . is that [the shareholder-director in question] is an economically rational individual whose priority is to protect the value of his . . . shares.'" Id. (quoting In re the Walt

32

Disney Co. Deriv. Litig., 731 A.2d 342, 356-57 (Del. Ch. 1998), rev'd on other grounds sub nom, Brehm, 746 A.2d 244 (Del. 2000)); see also Kanter v. Barella, 489 F.3d 170, *17 (3d Cir. 2007) (noting that fact that defendant owned a significant stake in a company suggested that his interests were aligned with other stockholders); McGowan v. Ferro, 859 A.2d 1012, 1029 (Del. Ch. Ct. 2004).

Plaintiff also provides no authority for the proposition that Principato, the CFO of Lau, is beholden to Berube by virtue of Principato's position at Lau. In any event, such allegations, without more, are insufficient to raise a reasonable doubt concerning Principato's independence. See In re IAC, 478 F. Supp. 2d at 602-603 (fact that director was executive at another company and received compensation not enough to show lack of independence); Zimmerman, 2002 WL 31926608, at *10 (same). Allegations as to a business relationship outside of Viisage must be accompanied by "substantially more in the nature of serious allegations that would demonstrate a reasonable doubt" as to Principato's independence. Beam, 845 A.2d at 1052; see also In re Fannie Mae Sec., 2007 WL 1577872, *10 (D.D.C. 2007) (allegations of extensive business relationship insufficient to excuse demand where no facts are alleged suggesting directors would not have retained their other positions unless they acted in accordance with the interested director's wishes) (citing Stein v. Orloff, 1985 WL 11561, at *4

33

(Del. Ch. 1985)). Plaintiff offers nothing more than the allegation that Principato works for Berube at Lau. She, therefore, fails to plead adequately a lack of independence as to Principato.

Plaintiff also offers no authority to support her general, conclusory argument that because none of the directors took action against Berube when the Source informed Nessen of Berube's alleged wrongdoing, the remainder of the Board was controlled by Berube and lacked independence. As explained previously, plaintiff has not pled facts sufficient to show that Berube, who owned only 11.4% of the company's stock, controlled Viisage. In any event, even assuming he controlled the Company by virtue of his stock ownership, that alone would not be sufficient to show that the other directors lacked independence. See Beam, 845 A.2d at 1051; In re IAC, 478 F.Supp 2d at 600. Plaintiff must plead "particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." Aronson, 473 A.2d at 816. Except for alleging in general terms that other directors did not confront Berube regarding the Source, plaintiff alleges nothing suggesting that they failed to do so to comport with the "wishes or interests" of Berube. Among other things, except for Principato, plaintiff does not allege anything concerning the business or personal relationships of Berube and other members of

the board.  See Beam, 845 A.2d at 1052.

Even assuming, without finding, that plaintiff properly alleges that Berube, in addition to Bailey, is interested, she fails to allege that at least three more members of the board in April, 2005, lacked independence.  Therefore, she has failed to plead demand futility with the required particularity.

IV.  ORDER

In view of the foregoing, defendants' motion to dismiss plaintiff's amended complaint is ALLOWED. (Docket No. 26).


/s/ MARK L. WOLF
UNITED STATES DISTRICT JUDGE